**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **U.S. ALUMINUM EXTRUDERS COALITION,**<br><br>**and**<br><br>**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**KINGTOM ALUMINO S.R.L.,**<br><br>**Defendant-Intervenor.** | **Before: Hon. Lisa W. Wang, Judge**<br><br>**Court No. 23-00270** |

**ORDER**

Upon consideration of the Rule 56.2 motion of Plaintiffs the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (collectively, "Plaintiffs") for judgment on the agency record, and all other pertinent papers and proceedings herein, it is hereby

**ORDERED**, that Plaintiffs' motion for judgment on the agency record is granted; and it is further

**ORDERED**, that this action is remanded to the U.S. International Trade Commission for proceedings consistent with this Court's opinion.

**SO ORDERED**.

________________________________
Hon. Lisa W. Wang, Judge

Dated: ________________________, 2024
New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **U.S. ALUMINUM EXTRUDERS COALITION,**<br><br>**and**<br><br>**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**KINGTOM ALUMINO S.R.L.,**<br><br>**Defendant-Intervenor.** | **Before: Hon. Lisa W. Wang, Judge**<br><br>**Court No. 23-00270** |

**PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (collectively, "Plaintiffs"), hereby move for judgment upon the agency record with respect to certain portions of the U.S. International Trade Commission's (the "Commission") preliminary determination in the antidumping and countervailing duty investigations of aluminum extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam. The Commission's determination was published in the Federal Register on November 27, 2023. *Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico,*

*South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, 88 Fed. Reg. 82,913 (Int'l Trade Comm'n Nov. 27, 2023); *see also Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657, USITC Pub. 5477 (Nov. 2023) (Prelim.).

For the reasons explained in the accompanying brief, Plaintiffs respectfully submit that the Commission's determinations that imports of aluminum extrusions from the Dominican Republic were negligible, that no likelihood existed for contrary evidence concerning the level of such imports to arise in the final phase that would make them non-negligible, and that such imports did not have the potential to exceed the negligibility threshold in the imminent future, and thus to terminate the Commission's investigation with regard to such imports, were not supported by substantial evidence or in accordance with law. Plaintiffs thus respectfully request that the Court remand the Commission's determination for disposition consistent with the Court's final opinion.

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Robert E. DeFrancesco, III, Esq.
Alan H. Price, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union*

Dated: April 30, 2024

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **U.S. ALUMINUM EXTRUDERS COALITION,**<br><br>**and**<br><br>**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**KINGTOM ALUMINO S.R.L.,**<br><br>**Defendant-Intervenor.** | **Before: Hon. Lisa W. Wang, Judge**<br><br>**Court No. 23-00270**<br><br>**<u>NON-CONFIDENTIAL VERSION</u>**<br><br>**Business Proprietary Information Removed from Pages 2, 4, 7-11, 13, 16-18, 20-23** |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

**Robert E. DeFrancesco, III, Esq.**
**Alan H. Price, Esq.**
**Laura El-Sabaawi, Esq.**

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

***Counsel to the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union***

**Dated: April 30, 2024**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1

II. RULE 56.2 STATEMENT ........ 5

A. Administrative Decision under Review ........ 5

B. Issue Presented ........ 6

III. BACKGROUND ........ 6

A. The Commission Initiated Its Investigations ........ 6

B. The Commission Collected, and then Adjusted, Import Data Showing That Dominican Imports Were Not Negligible ........ 7

C. The Commission Rejected Evidence of Imminent Non-Negligibility ........ 11

D. The Commission Terminated Its Investigation into Dominican Imports ........ 12

IV. STANDARD OF REVIEW ........ 13

V. ARGUMENT ........ 15

A. The Commission's Determination To Terminate the Investigation into Subject Imports From the Dominican Republic Was Not Supported by Substantial Record Evidence ........ 15

1. Unadjusted import data demonstrated that Dominican subject imports were not negligible. ........ 15

2. The Commission's adjustments over-counted total imports. ........ 16

3. Preliminary questionnaire responses accounted for only half of total imports. ........ 17

4. Commerce specifically forecasted potential changes to the scope. ........ 18

5. Dominican imports were growing at a rapid rate. ........ 20

B. The Commission's Determination To Terminate the Investigation into Subject Imports From the Dominican Republic Was Not in Accordance With Law ........ 21

VI. CONCLUSION ........ 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Lamb Co. v. United States*,
785 F.2d 994 (Fed. Cir. 1986)........................................................................... *passim*

*Am. Mfrs. of Multilayered Wood Flooring v. United States*,
639 F. Supp. 3d 1216 (Ct. Int'l Trade 2023) .......................................................14

*Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*,
357 F.3d 1294 (Fed. Cir. 2004)...........................................................2, 16, 19

*Comm. for Fair Coke Trade v. United States*,
27 CIT 774 (2003) ..........................................................................................22, 23

*CS Wind Vietnam Co. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016)...........................................................................14

*Fischer S.A. Comercio, Industria & Agricultura v. United States*,
471 F. App'x 892 (Fed. Cir. 2012) .....................................................................17

*Georgetown Univ. Hosp. v. Bowen*,
862 F.2d 323 (D.C. Cir. 1988)............................................................................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)...............................................................................................22

*Nucor Fastener Div. v. United States*,
35 CIT 1074, 791 F. Supp. 2d 1269 (2011)....................................................18, 23

*Ranchers-Cattlemen Action Legal Found. v. United States*,
23 CIT 861, 74 F. Supp. 2d 1353 (1999)...........................................................16

*Suramerica de Aleaciones Laminadas, CA. v. United States*,
44 F.3d 978 (Fed. Cir. 1994)...........................................................................13, 14

*Torrington Co. v. United States*,
82 F.3d 1039 (Fed. Cir. 1996).............................................................................14

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951).............................................................................................14

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ................................................................................13

19 U.S.C. § 1673b(a) ....................22

19 U.S.C. § 1673b(a)(1)....................1

19 U.S.C. § 1677(24)(A)(i)....................1

19 U.S.C. § 1677(24)(A)(iv)....................11, 20

**Other Authorities**

*Certain Crystalline Silicon Photovoltaic Products from China and Taiwan*, Inv. Nos. 701-TA-511 and 731-TA-1246-1247, USITC Pub. 4454 (Feb. 2014) (Prelim.) ....................4, 19

# I. INTRODUCTION

At the outset of an antidumping or countervailing duty investigation, the U.S. International Trade Commission (the "Commission") must preliminarily determine whether there is a "reasonable indication" that a domestic industry is "materially injured or is threatened with material injury . . . by reason of imports of the subject merchandise," requiring in part a determination "that imports of the subject merchandise are {not} negligible." 19 U.S.C. § 1673b(a)(1). In applying this standard, the Commission weighs the evidence and determines whether "(1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation." *Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657, USITC Pub. 5477 (Nov. 2023) (Prelim.), P.R. 174 at 5 (quoting *Am. Lamb Co. v. United States*, 785 F.2d 994, 1001–04 (Fed. Cir. 1986)). The Commission misapplied this standard in making its preliminary determination in the underlying case, and its resulting determination was unsupported by substantial evidence and not in accordance with law.

"{I}mports from a country of merchandise corresponding to a domestic like product identified by the Commission are 'negligible' if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which data are available . . . ," preceding either the filing of the petition or the initiation of the investigation. 19 U.S.C. § 1677(24)(A)(i). The Commission's negligibility determination is thus a straightforward fraction: the numerator is the volume of imports from a subject country, and the denominator is the total volume of imports of the merchandise from all countries.

In the underlying proceeding, official import statistics—which are the presumptive data source for negligibility determinations, *see, e.g.*, *Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1298 (Fed. Cir. 2004)—demonstrated that, in the 12 months preceding the underlying petitions, aluminum extrusions from the Dominican Republic accounted for [ ] percent of total imports (*i.e.*, satisfied the negligibility threshold). *See* Confidential Views of the Commission, *Aluminum Extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657 (Prelim.) (Nov. 29, 2023), C.R. 360, at 59 n.188 ("Views").

Record data further suggested that this figure was understated. For example, the record confirmed that certain importers had overreported non-Dominican imports by reporting the weight of downstream products <u>*containing*</u> subject merchandise, rather than the weight of the subject merchandise itself. *See* Post-Conference Brief of Petitioners, *Aluminum Extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657 (Prelim.) (Oct. 31, 2023), C.R. 274, P.R. 132 at 4, Exhibit 5 ("Post-Conference Br."); Response to Follow-Up to U.S. Importer's Questionnaire Response of [ ] (Nov. 6, 2023), C.R. 330, at II-3b ("[ ] Response to U.S. Importer's Follow Up"). Such overreporting had the effect of inflating the Commission's denominator and artificially reducing the share of subject imports from the Dominican Republic.

Moreover, the scope of the investigations was not yet finalized. Indeed, at the outset of the investigations, Commerce explicitly stated its intent "to continue evaluating the scope of these investigations, with the possibility of making additional modifications to clarify further what

products are covered and not covered by the scope of these investigations." Preliminary and Final Staff Report to the Commission, *Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657 (Prelim.) (Nov. 13, 2023), C.R. 336, P.R. 170 at I-8 n.18 ("Staff Report"). Thus, record data demonstrated not only that subject imports from the Dominican Republic were not negligible, but that their import share could well be *higher* by the final phase of the investigation.

The Commission disregarded that record evidence. It determined that official import statistics, though usually reliable, were both over- and under-inclusive on this record. *See* Views at 56–57. Accordingly, the Commission made extensive adjustments to those statistics, creating a scenario where the Dominican import share fell below 3 percent.[1] For the reasons discussed below, the Commission's adjustments were problematic. But for purposes of this appeal, the key issue is not the Commission's specific methodology. The issue is that, to reach a finding of negligibility and thus to terminate the investigation into Dominican imports, the Commission started with record data showing that such imports were *not* negligible, altered that data so that they were, disregarded further record evidence showing that Dominican imports were in fact *under*-represented, ignored the fact that the scope defining subject imports was likely to change before the final phase, and yet concluded that "*no likelihood exists* for contrary evidence concerning the level of subject imports from the Dominican Republic to arise in any final phase of these investigations that would make them non-negligible{.}" Views at 60–61.

1 Normally, such imports would be subject to aggregation with imports from other individually negligible countries, but due to a provision of the Dominican Republic-Central American-United States Free Trade Agreement ("CAFTA") and implementing legislation, the Commission is unable to aggregate imports from the Dominican Republic with those from other non-CAFTA countries. Views at 59–60.

Likewise, in determining that Dominican imports did not pose a threat of material injury, *i.e.*, were not imminently likely to become non-negligible, the Commission disregarded record evidence showing that Dominican imports had increased [ ] percent between 2020 and 2022, and [ ] percent between 2022 and interim 2023. Staff Report at IV-12 (Table IV-2). In other words, the Commission determined that, although Dominican imports were growing at a faster rate than subject imports from any other country, *see id.*, there was *no likelihood* that such imports would imminently exceed the negligibility threshold.

These determinations were contrary to law. Almost forty years ago, the U.S. Court of Appeals for the Federal Circuit codified and affirmed the Commission's "reasonable indication" standard in *American Lamb Co. v. United States*. 785 F.2d at 999. It observed that, "{s}ince the enactment of the 1974 Act, {the Commission} has consistently viewed the statutory 'reasonable indication' standard as one requiring that it issue a negative determination . . . *only when* (1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) *no likelihood exists* that contrary evidence will arise in a final investigation." *Id.* at 1001 (emphasis added) (acknowledging that a lesser standard would not adequately protect "against unwarranted terminations"). Put differently, the law "weight{s} the scales in favor of affirmative and against negative determinations." *Id.* The Commission adheres to that standard and recognizes that the potential for evidence of non-negligibility in a final investigation tips the scales against termination at the preliminary phase. *See, e.g.*, *Certain Crystalline Silicon Photovoltaic Products from China and Taiwan*, Inv. Nos. 701-TA-511 and 731-TA-1246-1247, USITC Pub. 4454 (Feb. 2014) (Prelim.) at 18-19 ("USITC Pub. 4454") ("{T}ermination at the preliminary phase of these investigations based on a finding of negligible imports would not be appropriate when the parameters of the scope definition . . . are not clear."; "For all of these reasons,

we do not find that subject imports from China or Taiwan are negligible on the basis of the *American Lamb* standard.").

Here, in determining that "*no* likelihood exists" that Dominican imports would be found non-negligible in a final investigation, the Commission disregarded substantial record evidence to the contrary and ran directly afoul of governing law. Accordingly, Plaintiffs respectfully submit that the Commission's determination that imports of aluminum extrusions from the Dominican Republic were negligible, and thus to terminate the Commission's investigation with regard to such imports, should be remanded.

## II. RULE 56.2 STATEMENT

### A. Administrative Decision under Review

The administrative determination challenged herein is the Commission's final preliminary determination in the antidumping and countervailing duty investigations of aluminum extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam. *See Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, 88 Fed. Reg. 82,913 (Int'l Trade Comm'n Nov. 27, 2023), P.R. 168 ("Prelim. Deter."). Specifically, Plaintiffs contest the Commission's determination that imports of aluminum extrusions from the Dominican Republic allegedly sold in the United States at less than fair value were negligible and its decision to therefore terminate its investigation with regard to such imports. *Id.*

### B. Issue Presented

**1. Whether the Commission's decision to terminate its investigation into subject imports from the Dominican Republic was supported by substantial evidence or otherwise in accordance with law where record evidence demonstrated that such imports were not negligible and, at minimum, could surpass the negligibility threshold in a final investigation.**

No. The Commission's determination that subject imports from the Dominican Republic were negligible for purposes of both material injury and threat of material injury, and that "no likelihood exists" that they would be otherwise in a final phase of the investigation, was unsupported by substantial evidence and not in accordance with law. In reaching its determination, the Commission disregarded substantial record evidence demonstrating non-negligibility or, at minimum, imminently likely non-negligibility, and thus improperly terminated its investigation contrary to *American Lamb* and relevant agency precedents.

## III. BACKGROUND

### A. The Commission Initiated Its Investigations

On October 4, 2023, Plaintiffs filed petitions with the Commission and U.S. Department of Commerce ("Commerce") requesting antidumping and countervailing duty relief from imports of aluminum extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam. The petitions alleged that unfairly traded imports of certain aluminum extrusions caused and threatened to cause material injury to the domestic industry.

On October 13, 2023, the Commission initiated the preliminary phase of its investigations into the effects of subject imports from the specified countries. The Commission defined a single domestic like product coextensive with Commerce's scope, which covered both aluminum extrusions imported alone and also the aluminum extrusion components of parts or subassemblies

of larger products or systems. Views at 11, 22; *see also id.* at 17 ("Aluminum extrusions are often imported with other components attached in addition to fasteners; these aluminum extrusions are in-scope merchandise, whether assembled or not assembled, if they are part of a subassembly of a larger product or system."). For reporting purposes, "{m}erchandise that is comprised solely of aluminum extrusions or aluminum extrusions and fasteners . . . is covered by the scope in its entirety." *Id.* at 13. By contrast, when subject extrusions "are imported with non-extruded aluminum components beyond fasteners . . . that are a part or subassembly of a larger product or system," "{o}nly the aluminum extrusion portion of the merchandise . . . is subject to duties." *Id.*

From the outset, the Commission recognized that the scope of the underlying investigations was subject to change. Commerce stated in its notices of initiation, and the Commission repeated in its Staff Report: "We have some concerns related to the administrability of certain provisions in the proposed scope. . . . Accordingly, Commerce intends to continue evaluating the scope of these investigations, with the possibility of making additional modifications to clarify further what products are covered and not covered by the scope of these investigations." *Aluminum Extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, the Republic of Korea, Malaysia, Mexico, Taiwan, Thailand, the Republic of Turkey, United Arab Emirates, and the Socialist Republic of Vietnam*, 88 Fed. Reg. 74,421, 74,423 (Int'l Trade Administration Oct. 31, 2023) (initiation of less-than-fair-value inv.), P.R. 164 ("Initiation Notice"); Staff Report at I-8 n.18.

### B. <u>The Commission Collected, and then Adjusted, Import Data Showing That Dominican Imports Were Not Negligible</u>

The Commission compiled U.S. import data for the period of investigation from official import statistics and questionnaire responses from certain importers. Views at 8. Because questionnaire responses accounted for just [ ] percent of total subject imports, including [ ]

percent of subject imports from the Dominican Republic, the Commission determined to calculate import shares for negligibility purposes based on official import statistics under the primary Harmonized Tariff Schedule ("HTS") numbers as it normally does. *Id.* at 8, 56.

There is no dispute that those official import statistics showed subject imports from the Dominican Republic were above 3 percent during the negligibility period. *See id.* at 59 n.188; *see also* Negligibility Calculations Worksheet, *Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*; Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657 (Prelim.) (Nov. 16, 2023), C.R. 355, ("Negligibility Calculations Worksheet") and Staff Report at Appendix F, p. F-3 (Table F-1) (showing Dominican extrusions accounted for 23,165 short tons of 743,698 total – 3.1 percent). Indeed, not one party argued at the Preliminary Conference that any subject imports were negligible. Nevertheless, the Commission determined that official import statistics did not account for certain "imports under the non-primary HTS numbers, out-of-scope merchandise reported in the primary HTS numbers that importers indicated was not in-scope, or merchandise from importers who certified in their questionnaire response that they had not imported in-scope merchandise." Views at 59 n.188. Accordingly, the Commission decided to adjust the official import statistics to achieve what it perceived as greater accuracy. *See id.*

As relevant to the underlying negligibility determination, the Commission made three adjustments. *First*, the Commission used data submitted in response to importer questionnaires to incorporate [ ] short tons of in-scope imports reported under non-primary HTS numbers, bringing the total imports denominator from [ ] to [ ]. *See* Staff Report at IV-24 n.8; Negligibility Calculations Worksheet. Most of these "other" HTS imports were reported by

[ ], including [ ]. Staff Report at IV-24 n.8. Because none of the added imports were Dominican, there was no corresponding increase in the relevant numerator. *Second*, the Commission used further questionnaire response data to remove [ ] short tons of supposedly out-of-scope imports. *See* Negligibility Calculations Worksheet. *Third*, the Commission used "proprietary Census-edited, Customs records" to remove [ ] short tons of imports reported by firms that stated in questionnaire responses that they do not import aluminum extrusions, including [ ] short tons of Dominican extrusions. *See id.*; Staff Report at IV-24 n.8. Accordingly, "the adjustments made in this preliminary phase decreased the volume of subject imports from the Dominican Republic and increased the volume of total imports" by nearly [ ]. *See* Views at 60 n.194.

The Commission's adjustments were problematic, for reasons Plaintiffs had previously explained. To begin with, the Commission based most of its adjustments on questionnaire data, while acknowledging that preliminary questionnaire responses represented only [ ] percent of subject imports. *Id.* at 8. Indeed, "{g}iven the low coverage afforded by importer questionnaire responses," the Commission specifically ***declined*** to rely on questionnaire data for purposes of calculating import shares. *Id.* at 56 (emphasis added). Petitioners also noted that the Commission's largest adjustment—which was to add imports reported under non-primary HTS numbers—artificially inflated the volume of total imports because it included non-subject merchandise. *See* Post-Conference Br. at 4, Exhibit. 5. Several firms had reported difficulties isolating the weight and value of subject aluminum extrusions from downstream products. *See* Staff Report at IV-1 n.3. [ ], for example, reported [ ] of its imports under non-primary HTS numbers, explaining [ ] thus

acknowledging that its reporting was overstated. [ ] to U.S. Importer's Follow Up at II-3b. Notably, [ ]'s imports accounted for [ ] of the [ ] short tons that the Commission added to its calculations. Staff Report at IV-24 n.8; U.S. Importer's Questionnaire Response of [ ] (Oct. 20, 2023) at II-3b, C.R. 117 ("[ ] U.S. Importer's Response"). Finally, the Commission's reliance on "proprietary" Customs data to remove certain Dominican imports speaks for itself, as such data is not released to interested parties and thus cannot be confirmed.

Beyond these limitations on the accuracy and representativeness of the Commission's preliminary data, the record further underscored the potential for change in the final phase of investigation. In its initiation notice, Commerce specifically forecasted potential changes to the scope. *See* Initiation Notice, 88 Fed. Reg. at 74,423 ("Commerce intends to continue evaluating the scope of these investigations, with the possibility of making additional modifications . . . "). Indeed, scope considerations and debate dominated the Preliminary Conference before the Commission. *See, e.g.*, Conference Tr., *Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657 (Prelim.) (Oct. 25, 2023), P.R. 112 at 60:8–80:14, 81:6–84:18, 190:22–25, 203:11–23, 206:5–8 (scope questions by Commission analyst); 89:15–16 ("I also have a few scope questions"); 156:2–5 ("I think we all recognize that the census data could paint a misleading picture because we don't know how much of the Chinese volume is out of scope or how much of the Mexican volume from companies like Frontera is also out of scope."); 164:18–165:5 ("{W}e think that the proposition that Reflection's window wall units are subassemblies is just wrong . . . . But one doesn't litigate scope issues before the ITC, so that's another battle for a different day.").

In short, record data showed—and no party disagreed—that subject imports from the Dominican Republic exceeded the negligibility threshold. But the Commission reduced the Dominican import share below 3 percent by adjusting that data in ways that (1) inflated the volume of total imports, (2) were likely inaccurate, and (3) could easily change during a final investigation when additional, and more accurate, data would be received and after scope revisions had been made.

### C. <u>The Commission Rejected Evidence of Imminent Non-Negligibility</u>

Even if a subject country's import share is below 3 percent at the close of a preliminary investigation, the Commission's inquiry is not at an end. In determining whether subject imports pose a threat of material injury, the Commission also considers whether non-negligibility is imminently likely. *See* Views at 61; *see also* 19 U.S.C. § 1677(24)(A)(iv) ("Notwithstanding clauses (i) and (ii), the Commission shall not treat imports as negligible if it determines that there is a potential that imports from a country described in clause (i) will imminently account for more than 3 percent of the volume of all such merchandise imported into the United States{.}").

Here, setting aside the Commission's adjustments resulting in a present import share below 3 percent, record data indisputably showed a [ ] increase in subject imports from the Dominican Republic between 2020 and 2022, and a [ ] increase in such imports between 2022 and interim 2023 alone. Staff Report at IV-12, (Table IV-2). Thus, in the three years preceding the investigation, Dominican imports grew at a faster rate than subject imports from any other country. *See id.* Given that rapid growth, based on official import statistics, the Dominican Republic's monthly import share exceeded 3 percent in 8 of the 12 months of the negligibility period. Post-Conference Br. at Exhibit 1, p.59. Even using the Commission's

questionably adjusted figures, the Dominican Republic's monthly import share exceeded 3 percent in July 2023 (*i.e.*, just three months before the initiation of the investigation). Views at 61.

### D. The Commission Terminated Its Investigation into Dominican Imports

The Commission published its preliminary determination on November 27, 2023. Prelim. Deter., 88 Fed. Reg. at 82,913. It found a reasonable indication that the domestic industry was materially injured, or threatened with material injury, by reason of imports from every country under investigation but the Dominican Republic. Views at 5. With regard to Dominican imports, the Commission determined to end its investigation.

*First*, the Commission found no reasonable indication of present injury because it found that Dominican imports were negligible and "*no likelihood exists* for contrary evidence concerning the level of subject imports from the Dominican Republic to arise in any final phase of these investigations that would make them non-negligible for purposes of present material injury." *Id.* at 60–61 (emphasis added). In support, the Commission observed that "{f}urther adjustments to data for subject imports from the Dominican Republic or total imports are possible," but it concluded without explanation that "any such changes are unlikely to increase subject imports from the Dominican Republic . . . to the 3 percent required for them to be found not negligible." *Id.* at 60. In footnotes, the Commission conceded that it was only the agency's own adjustments that had resulted in a Dominican import share below three percent. *Id.* at 59–60 nn.188, 194.

*Second*, the Commission found no reasonable indication of a threat of material injury, *i.e.*, no indication that Dominican imports had the potential to imminently exceed the 3 percent threshold. *Id.* at 61–64. That determination rested in part on the same adjusted data described above. *See id.* at 61 ("*Based on adjusted official import statistics*, subject imports from the Dominican Republic never accounted for over 3 percent of total imports during any of the 21

rolling 12-month periods preceding the filing of the petition.") (emphasis added). And the agency likewise extrapolated from preliminary questionnaire responses representing only a fraction of the Dominican industry during the relevant period of time. *See id.* at 61–63, n.200 (extrapolating Dominican production capacity based on a single producer representing [ ] percent of adjusted imports in 2022). While the Commission acknowledged that "subject imports from the Dominican Republic as a share of total imports trended upward in 2023," it concluded that "this trend alone does not indicate that they have the potential to imminently exceed 3 percent of total imports." *Id.* at 61.

As discussed above, and as the Commission rightly observed, a preliminary investigation may be terminated "*only when* . . . *no* likelihood exists that contrary evidence will arise in a final investigation." *Am. Lamb*, 785 F.2d at 1001–04 (emphasis added); *see also* Views at 6, n.2. But the record before the Commission contained overwhelming evidence that contrary data could arise in a final investigation rendering the share of Dominican subject imports non-negligible in a final phase. The Commission's negligibility determination, and corresponding termination of the investigation into Dominican imports, were thus unlawful.

## IV. STANDARD OF REVIEW

The Court considers whether the Commission's final determinations are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Suramerica de Aleaciones Laminadas, CA. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Whether a determination is supported by substantial evidence is evaluated based on the record as a whole, and must take into account any

evidence that fairly detracts from the agency's determination. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951); *Suramerica*, 44 F.3d at 985 ("{T}his court cannot evaluate the substantiality of evidence supporting an ITC determination merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." (internal quotation omitted)).

As to whether a determination is in accordance with the law, the Court assesses both the legal soundness of the Commission's decision, in addition to the adequacy of the Commission's explanations. An agency decision is not in accordance with law if it conflicts with governing statutes, binding court decisions, or the agency's own regulations. *See, e.g.*, *Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996) ("It is a familiar rule of administrative law that an agency must abide by its own regulations." (citation omitted)); *Georgetown Univ. Hosp. v. Bowen*, 862 F.2d 323, 328 n.12 (D.C. Cir. 1988) ("{A} court {must} set aside an intermediary's decision that directly conflicts with a final and binding court precedent since such a decision would not be 'in accordance with law.'"). Likewise, an agency's explanation is inadequate if it is conclusory or otherwise fails to inform the Court of the agency's decision-making path. *See CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) ("If the Court of International Trade and this court are to play their statutorily required roles in reviewing Commerce's determinations, it is important that we have clear guidance from Commerce as to what is actually happening." (internal quotation omitted)); *Am. Mfrs. of Multilayered Wood Flooring v. United States*, 639 F. Supp. 3d 1216, 1232 (Ct. Int'l Trade 2023) ("Commerce has not offered an adequate explanation because conclusory statements are not sufficient{.}").

# V. ARGUMENT

## A. The Commission's Determination To Terminate the Investigation into Subject Imports From the Dominican Republic Was Not Supported by Substantial Record Evidence

The reasonable indication standard permits the Commission to "issue a negative determination . . . only when (1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation." *Am. Lamb*, 785 F.3d at 1001. That standard involves "a process of weighing the evidence but under guidelines requiring clear and convincing evidence of '*no* reasonable indication,' and *no* likelihood of later contrary evidence" to protect against "unwarranted terminations" of Commission investigations. *Id.* (second emphasis added). Accordingly, the Commission's "guidelines weight the scales in favor of affirmative and against negative determinations." *Id.*

To reach the conclusion here that Dominican imports were negligible, were not imminently likely to become non-negligible, and that "no likelihood exists for contrary evidence concerning the level of subject imports from the Dominican Republic to arise in any final phase of these investigations," Views at 60–61, the Commission made extensive adjustments to the dataset that on its face showed non-negligibility (adjustments as to which Plaintiffs did not have the opportunity to comment) and discounted myriad categories of undisputed evidence—any one of which could easily render Dominican imports non-negligible in a final investigation.

### 1. Unadjusted import data demonstrated that Dominican subject imports were not negligible.

Official import statistics—before any adjustment—demonstrated that subject imports from the Dominican Republic accounted for more than 3 percent of total imports during the relevant 12-month period. *Id.* at 59 n.188. In other words, whatever other data the Commission later

determined to take into account, the starting point for the agency's calculations, and presumptive data source for negligibility determinations, indisputably demonstrated a non-negligible import share. *See Co-Steel Raritan*, 357 F.3d at 1298 ("In order to make a determination with respect to negligibility in a given case, the Commission examines official import statistics for the subject merchandise for the most recent twelve-month period for which data is available."); *Ranchers-Cattlemen Action Legal Found. v. United States*, 23 CIT 861, 847, 74 F. Supp. 2d 1353, 1365 (1999) ("{A}s the ITC had complete, comprehensive, and reliable information for its secondary sources (e.g., data compiled by the U.S.D.A. and official import statistics), there is no evidence these sources would change or add more information in the near future.").

As the Commission concedes, it was only through adjustments to that official data that the Dominican import share was rendered negligible at the preliminary phase. *See* Views at 60 n.194 ("We note that the adjustments made in this preliminary phase decreased the volume of subject imports from the Dominican Republic and increased the volume of total imports of aluminum extrusions."). Thus, to say that *no evidence* of non-negligibility could later arise—when the Commission only reached negligibility through extensive adjustment—is patently unreasonable.

**2. The Commission's adjustments over-counted total imports.**

Furthermore, the record demonstrated that the Commission's adjustments indisputably inflated the volume of total imports based on non-subject merchandise. Official import statistics reflected total imports of [ ] short tons of subject extrusions. *See* Negligibility Calculations Worksheet. To that figure, the Commission added [ ] short tons of supposedly in-scope imports—a substantial enlargement—[ ] of which had been reported in [ ] questionnaire response. *See id.*; *see also* Staff Report at IV-24 n.8; [ ] U.S. Importer's Response at II-3b. But [ ] specifically told the Commission that its reported

import volumes were not limited to subject extrusions as the scope required and thus were overstated. [ ] Response to U.S. Importer's Follow Up . Instead, contrary to reporting instructions, [ ] had reported the total weight and value of downstream products containing aluminum extrusions as component parts. *Id.*; *see also* Staff Report at IV-1 n.3. Moreover, the Commission observed that [ ] was not alone, stating that "{s}everal firms reported difficulties isolating the weight and value of just aluminum extrusions from products they imported which included components beyond in-scope aluminum extrusions." Staff Report at IV-1 n.3. Commission staff thus cautioned that questionnaire responses "*may be over-inclusive* of data not specifically for aluminum extrusions." *Id.* (emphasis added). Yet the Commission used that overinclusive data to inflate the denominator of the negligibility calculation, dropping Dominican imports below the threshold, and found that no likelihood existed for that admittedly overstated data to be corrected or otherwise change during the final phase.

Given the magnitude of the adjustment at issue (which increased total imports by nearly [ ]), *any* effort to correct the over-reporting in total imports at the final phase would have increased the Dominican import share proportionally. *Cf. Fischer S.A. Comercio, Industria & Agricultura v. United States*, 471 F. App'x 892, 895 (Fed. Cir. 2012) ("Commerce is obliged to correct any errors in its calculations during the preliminary results stage to avoid an imposition of unjustified duties.").

**3. Preliminary questionnaire responses accounted for only half of total imports.**

Further complicating the Commission's reliance on questionnaire responses is the fact that preliminary responses only accounted for [ ] percent of subject imports. Views at 8. Indeed, it was specifically due to the "low coverage afforded by importer questionnaire responses" that the Commission declined to rely on such data for the purpose of calculating import shares. *Id.* at 56.

And yet, the Commission *did* rely on questionnaire responses to adjust official import statistics, resulting in a negligible Dominican import share at the preliminary phase. Negligibility Calculations Worksheet.

It goes without saying that further questionnaire responses would necessarily result in further adjustments to the Commission's calculations. It is commonplace in Commission investigations for the agency to receive more comprehensive questionnaire responses in a final phase than in a preliminary phase (where the investigation was just been initiated and parties must respond with a very short turnaround time). And with [ ] of responses outstanding in this case, such adjustments have the potential to be drastic. Thus, given the low coverage afforded by preliminary questionnaire responses, and their role as the *sole* data source rendering Dominican subject imports negligible at the preliminary phase, it is impossible to reasonably say that *no* evidence of non-negligibility could later arise. *See, e.g.*, *Nucor Fastener Div. v. United States*, 35 CIT 1074, 1084, 1089, 791 F. Supp. 2d 1269, 1280, 1284 (2011) (reversing negative preliminary injury determination based on questionnaire response data where only 50 percent of recipients responded; "In short, rather than consider the volume of imports of the subject merchandise, ITC effectively considers only the volume of imports reported by a self-selected subset of a subset." (cleaned up)).

**4. Commerce specifically forecasted potential changes to the scope.**

Particularly detracting from the Commission's determination is Commerce's forewarning that the scope of investigations was subject to change. While the scope of any AD/CVD investigation is subject to change after initiation, such changes were particularly foreseeable and likely here, where Commerce directly stated the possibility of post-initiation changes to the scope language. In its notices of initiation, Commerce stated:

> We have some concerns related to the administrability of certain provisions in the proposed scope. For example, we find the definition of subassemblies (included) and imported merchandise that is not a part or subassembly of a larger product or system (excluded) remains an outstanding issue. Accordingly, *Commerce intends to continue evaluating the scope of these investigations, with the possibility of making additional modifications* to clarify further what products are covered and not covered by the scope of these investigations.

Staff Report at I-8 n.18 (emphasis added). Because the Commission defined a single domestic like product coextensive with the scope, Views at 22, any changes to the scope would likewise impact the Commission's calculations.

For this reason, the Commission has previously observed that, under the *American Lamb* standard, "termination at the preliminary phase of these investigations based on a finding of negligible imports would not be appropriate when the parameters of the scope definition . . . are not clear." *See* USITC Pub. 4454 at 18-19 ("Because it is not clear whether or how Commerce will apply petitioner's proposed rules concerning which products are subject imports from China or Taiwan, Commerce's decision may impact import levels with respect to subject imports from both subject countries. For all of these reasons, we do not find that subject imports from China or Taiwan are negligible on the basis of the *American Lamb* standard.").[2]

Commerce's forecast of potential scope modifications at the outset of the case, the substantial debate over scope parameters at the Preliminary Conference before the Commission, *see supra* at 10, and the fact that several respondents preliminarily reported data according to their *preferred* reading of the scope rather than the language as written amount to further powerful

---

[2] Consistent with *Certain Crystalline Silicon Photovoltaic Prod. from China & Taiwan*, Commerce's notice at the outset of the investigations that the scope was subject to change weighs against a preliminary finding of negligibility, and stands in sharp contrast to situations where, *e.g.*, petitioners have filed last-minute scope modification requests at the close of the preliminary phase. *See Co-Steel Raritan*, 357 F.3d at 1314 (finding a unilateral scope modification request submitted "three days before the Commission was to vote"—and with no endorsement by Commerce—did not require reversal of a negative injury determination under *American Lamb*).

record evidence detracting from the Commission's determination that no likelihood of non-negligibility could later arise.

**5. Dominican imports were growing at a rapid rate.**

Finally, the Commission disregarded evidence that in the three years preceding the investigation, Dominican imports not only "trended upward," Views at 61, but in fact outpaced every other subject country in rate of growth:

| Month | Quantity, DR Imports | Quantity, Total Imports | DR Import % |
|---|---|---|---|
| Sep-22 | 1,297 | 65,642 | 2.0% |
| Oct-22 | 1,675 | 66,761 | 2.5% |
| Nov-22 | 1,991 | 62,644 | 3.2% |
| Dec-22 | 1,647 | 56,890 | 2.9% |
| Jan-23 | 1,183 | 59,421 | 2.0% |
| Feb-23 | 1,965 | 55,300 | 3.6% |
| Mar-23 | 1,845 | 59,046 | 3.1% |
| Apr-23 | 1,915 | 61,602 | 3.1% |
| May-23 | 2,238 | 64,315 | 3.5% |
| Jun-23 | 2,006 | 64,420 | 3.1% |
| Jul-23 | 2,669 | 63,192 | 4.2% |
| Aug-23 | 2,130 | 63,242 | 3.4% |

Post-Conference Br. at Exhibit 1, p. 59 (showing monthly Dominican import share based on official import statistics); *see also* Staff Report at IV-12 (Table IV-2) (showing the rate of change in Dominican imports between 2020 and 2022 was [ ] percent).

The Commission countered that, when adjusted, the Dominican import share only exceeded 3 percent in July 2023. Views at 61. But, regardless of present import share, and adjusted or no, a [ ] percent growth trajectory plainly demonstrates the "potential" for imminent non-negligibility. *See* 19 U.S.C. § 1677(24)(A)(iv) (holding the Commission "shall not treat imports as negligible if it determines that there is _a potential_ that imports . . . will imminently account for more than 3 percent"); *see also Am. Lamb*, 785 F.2d at 1001 (holding the "no likelihood" standard applies to both the Commission's present-injury and threat analyses). The Commission further countered—based on questionnaire responses from a single Dominican respondent—that

the Dominican Republic lacked the capacity to continue its growth trajectory. *See* Views at 61–63. But that sole respondent represented just [ ] percent of adjusted imports in 2022 and [ ] percent in interim 2023, during which the Commission conceded [ ]. *Id.* at 62 n.200. And, moreover, Dominican imports need not continue to grow to imminently exceed the negligibility threshold, if the Commission's denominator were corrected per discussion above.

* * *

At bottom, the potential for further evidence to arise in a final investigation rendering subject imports from the Dominican Republic non-negligible or at least imminently likely to exceed the negligibility threshold was undeniable. Because the Commission's determination to the contrary disregarded that overwhelming record evidence—including the indisputable over-inclusivity of the total import data that rendered the Dominican import share negligible through adjustments—that determination should be remanded.

**B. <u>The Commission's Determination to Terminate the Investigation into Subject Imports from the Dominican Republic Was Not in Accordance with Law</u>**

For the same reasons and more, the Commission's decision to terminate the investigation into Dominican imports was also not in accordance with law. *American Lamb* confirms that a negligibility determination that rests on preliminary data that is subject to change not only lacks substantial evidentiary support but also violates the Commission's statutory obligations.

The issue in *American Lamb* was whether the Act's "reasonable indication" standard permits the Commission to weigh evidence at the preliminary phase of an investigation. *See* 785 F.2d at 999. The Federal Circuit answered that question in the affirmative, *<u>if</u>* the Commission adheres to its practice of issuing a negative determination "*<u>only when</u>* (1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and

(2) no likelihood exists that contrary evidence will arise in a final investigation." *Id.* at 1001 (emphasis added). Considering the record as a whole, and crediting a demonstrable possibility of contrary evidence, are thus not only substantial-evidence issues but also requirements of law. *See id.*

For all the reasons above, the Commission's "no likelihood" determination here was thus unlawful under *American Lamb*. Record evidence demonstrated that (1) Dominican imports were not negligible until the Commission adjusted record data, (2) the Commission's adjustments were based on questionnaire response data with low coverage and that was therefore subject to change, (3) that questionnaire data stated on its face that it over-counted total imports—the enlargement of which was the sole reason the Dominican import share fell below 3 percent, (4) Commerce was actively considering scope changes that could further impact the Commission's calculations, and (5) in the three years preceding the investigation, Dominican imports had grown by [ ] percent—each of which independently demonstrated a "likelihood" that contrary evidence could later arise. To say that no likelihood of such evidence was shown on this record is simply not credible or consistent with the governing standard.

Nor was that determination adequately explained. It is axiomatic that, to be in accordance with law, a determination must "articulate a satisfactory explanation for {the agency's} action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The obligation to explain determinations made "in light of the reasonable indication standard set forth in 19 U.S.C. § 1673b(a)" are no exception. *Comm. for Fair Coke Trade v. United States*, 27 CIT 774, 777 (2003) (remanding preliminary negative injury determination in light of *American Lamb* and

Commission's failure to articulate "a rational connection between the facts found and the choices made" with regard to no-likelihood determination).

Here, the Commission recited the *American Lamb* standard and determined, as it must to terminate an investigation, that "no likelihood" existed for future evidence of the non-negligibility of Dominican imports. *See* Views at 6 nn.1–2, 60–61. But the entirety of the Commission's explanation for that determination was these two sentences: "Further adjustments to data for subject imports from the Dominican Republic or total imports are possible. Nonetheless, any such changes are unlikely to increase subject imports from the Dominican Republic as a share of total imports from [ ] percent based on the record of the preliminary phase of the investigations to the 3 percent required for them to be found not negligible." *Id.* at 60. In other words, the Commission conceded that both the numerator and denominator of its negligibility calculation could change. But it failed to offer *any* explanation as to *why* such changes would have no impact.

Because the record evidence described above provided many opportunities to reach non-negligibility in the final phase, the Commission's failure to address that evidence or otherwise explain its no-likelihood determination renders that conclusory decision not in accordance with law. *See Fair Coke*, 27 CIT at 791 ("{A}s there is no rational connection between the facts found and the choices made, the court must remand this matter to the ITC so that it may explain this finding." (cleaned up)); *see also Nucor Fastener*, 35 CIT at 1090, 791 F. Supp. 2d at 1285 (reversing negative preliminary determination; "{A} negative preliminary injury determination must still possess a rational basis in fact. . . . In the necessarily imperfect world of antidumping and countervailing duty determinations, that basis must include at least a candid recognition of and response to inherent limitations.").

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court remand the Commission's preliminary determination.

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Robert E. DeFrancesco, III, Esq.
Alan H. Price, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union*

Dated: April 30, 2024

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 6,877 words.

*/s/ Robert E. DeFrancesco, III*
(Signature of Attorney)

Robert E. DeFrancesco, III
(Name of Attorney)

U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union
(Representative Of)

April 30, 2024
(Date)