**THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  HONORABLE LISA W. WANG, JUDGE**

_____

|  |  |  |
|---|---|---|
| U.S. ALUMINUM EXTRUDERS COALITION, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STEEL, PAPER AND FORESTRY, | ) | |
| RUBBER, MANUFACTURING, ENERGY, | ) | |
| ALLIED INDUSTRIAL AND SERVICE | ) | |
| WORKERS INTERNATIONAL UNION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **NON-CONFIDENTIAL** |
| v. | ) | Proprietary Information Removed |
| | ) | From Pages 5, 8-10, and 12-17 |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | Court No. 23-00270 |
| | ) | |
| and | ) | |
| | ) | |
| KINGTOM ALUMINIO S.R.L., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

_____


**DEFENDANT-INTERVENOR KINGTOM ALUMINIO'S BRIEF IN RESPONSE**
**TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN LLP**
1333 New Hampshire Ave, Suite 800
Washington, D.C. 20036
(202) 216-4116

August 29, 2024                              *Counsel to Kingtom Aluminio S.R.L.*

## TABLE OF CONTENTS

I.   STATEMENT PURSUANT TO RULE 56.2 ........................................................................... 2

II.  ISSUES OF LAW PRESENTED ........................................................................................ 3

III. CONCLUSION ................................................................................................................. 19

CERTIFICATE OF COMPLIANCE ........................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AL Tech Specialty Steel Corp. v. United States*,
    27 C.I.T. 1791 (2003) .................................................................................13

*Am. Alliance for Hardwood Plywood v. United States*,
    392 F.Supp.3d 1298 (Ct. Int'l Trade 2019) ...........................................18

*American Lamb Co. v. United States*,
    785 F.2d 994 (Fed. Cir. 1986)................................................... *passim*

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*,
    419 U.S. 281 (1974).............................................................................18

*Co-Steel Raritan, Inc. v. United States*,
    357 F. 3d. 1294 (Fed. Cir. 2004).............................................6, 14, 15

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984).................................................................15

*Nitrogen Solutions Fair Trade Committee v. United States*,
    29 C.I.T. 86 (2005) ..............................................................................5, 11

*NMB Singapore Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009)..............................................................18

**Statutes**

19 U.S.C. § 1516a(b)(1)(A) ..............................................................................10

19 U.S.C. § 1673b(a)(1).......................................................................................2

19 U.S.C. § 1673b(a) ......................................................................................7, 13

19 U.S.C. § 1677(7)(G)(ii)(III) ..........................................................................8

19 U.S.C. § 1677(7)(H)........................................................................................8

19 U.S.C. § 1677(24) .......................................................................................2, 7

19 U.S.C. § 1677(24)(A)(ii)................................................................................8

19 U.S.C. § 1677(24)(A)(iii)...............................................................................8

19 U.S.C. § 1677(24)(A)(iv)................................................................................8

**Other Authorities**

S. Rep. No. 1298, 93rd Cong., 2d Sess. 171 ......................................................................6

THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE LISA W. WANG, JUDGE

_____

U.S. ALUMINUM EXTRUDERS COALITION,

    and

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,

           Plaintiffs,

    v.

UNITED STATES,

           Defendant,

    and

KINGTOM ALUMINIO S.R.L.,

           Defendant-Intervenor.
_____

**NON-CONFIDENTIAL**
Proprietary Information Removed
From Pages 5, 8-10, and 12-17

Court No. 23-00270

**DEFENDANT-INTERVENOR KINGTOM ALUMINIO'S BRIEF IN RESPONSE
TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

    Defendant-Intervenor Kingtom Aluminio S.R.L. ("Kingtom") files this brief in response to the May 1, 2024, Rule 56.2 Motion for Judgment on the Agency Record filed by Plaintiffs, the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, ECF No. 25 ("Pl. Br.").  Kingtom respectfully requests that the Court reject Plaintiffs' Motion and sustain the U.S. International Trade Commission's Preliminary Determination.

## I.    STATEMENTS PURSUANT TO RULE 56.2

### A.    Administrative Determination Under Review

The administrative determination sought to be reviewed in this appeal is the U.S. International Trade Commission's ("ITC" or "Commission") preliminary determination in the antidumping duty ("AD") and countervailing duty ("CVD") investigations of aluminum extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand,, Turkey, the United Arab Emirates, and Vietnam.[1] *Aluminum Extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam*, 88 Fed. Reg. 82,913 (Int'l Trade Comm'n Nov. 27, 2023), List 1, Doc. 168; Confidential Views of the Commission, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657 (Preliminary), Aluminum Extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam, List 2, Doc. 360.  Plaintiffs contest one aspect of the ITC's preliminary determination — that imports of aluminum extrusions from the Dominican Republic ("DR") allegedly sold in the United States at less than fair value were "negligible" and the resultant termination of the investigation with respect to the DR.

### B.    Issues Of Law Presented And Reasons For Supporting The Administrative Determination

The issues presented are whether the ITC's determination that imports of aluminum extrusions from the DR that are allegedly sold in the United States for less than fair value were negligible pursuant to 19 U.S.C. § 1677(24), and whether the termination of the ITC's investigation with regard to imports from the DR pursuant to 19 U.S.C. § 1673b(a)(1) is

---

[1] The investigation of the DR was limited to an AD investigation.

2

supported by substantial evidence and otherwise in accordance with law.  Kingtom agrees with the ITC's negligibility determination and resulting negative injury determination for the DR and submits that it is supported by substantial evidence and otherwise in accordance with law.  The ITC followed the statutory directive to consider imports from the DR separately for negligibility purposes and exercised its discretion to adjust the official import statistics to ensure that it was basing its negligibility determination on the most accurate data available.  The mere fact that Plaintiffs would have preferred that the ITC rely on the official import statistics without adjustment is not a basis under the standard of review for disturbing the ITC's negligibility determination.

### C.    Request For Court Order And Relief Sought

The ITC's negligibility determination is supported by substantial evidence and is otherwise in accordance with law.  Defendant-Intervenor Kingtom thus respectfully requests that the Court issue an order affirming the ITC's negligibility determination and resultant termination of its AD investigation on imports of aluminum extrusions from the DR, and for such other relief as the Court deems just and proper.

## II.    STATEMENT OF FACTS

Defendant-Intervenor Kingtom agrees with the Statement of Facts as presented by Defendant.  No additional Statement of Facts is thus included herein.

## III.    SUMMARY OF ARGUMENT

This case turns primarily on the ITC's calculation of the quantity of imports from the DR for purposes of determining whether they are legally "negligible" (*i.e.,* under 3 percent) and thus whether the investigation of imports from the DR should be terminated.  In many cases, the ITC's negligibility analysis is simple, as it only involves dividing the quantity of imports from the subject country by the quantity of total imports.  However, the scope of the investigation at

issue is anything but simple, and thus the negligibility calculation is similarly not straightforward. The scope of this investigation covers aluminum extrusions, which can be imported as component parts of complicated assemblies that consist of both subject and non-subject merchandise. Isolating only the aluminum extrusion subject components within such assemblies is difficult and, in some instances, practically impossible. This was confirmed by numerous U.S. importers who acted to the best of their ability to report only the aluminum extrusion portion of their imports but acknowledged that they could not do so with total accuracy. Thus, the import data used by the ITC are, to a certain extent, overinclusive because the reported quantities could also include non-subject components. Within this context, the ITC brought its expertise to bear in making certain adjustments to the import data to make them as accurate as possible. These adjusted import data were used by the ITC to assess negligibility for present injury and threat of injury purposes.

The starting point for the ITC's negligibility calculation was official U.S. import statistics under the primary harmonized tariff schedule ("HTS") numbers that were included in the U.S. Department of Commerce's ("Commerce") scope for the investigation. The ITC then used data from U.S. importer questionnaire responses as well as U.S. Customs and Border Protection ("Customs") records to make certain adjustments to those data to increase accuracy. The first adjustment was to remove from the calculation any aluminum extrusions that were already subject to the existing AD/CVD orders on China and thus were not subject merchandise for purposes of this new investigation. The second adjustment was to add to the data other in-scope merchandise that was not imported under the primary HTS numbers but was instead imported under other HTS numbers that had been identified by U.S. importers in their questionnaire responses. The next adjustment was to remove out-of-scope merchandise imported under

4

primary HTS numbers that had been identified by U.S. importers in their questionnaire responses. Finally, the ITC mined proprietary Census-edited Customs records to remove imports by U.S. importers who had certified in their questionnaire responses that they did not import aluminum extrusions during the relevant period. The result of these efforts to improve the accuracy of the dataset was an increase in the volume of the total imports of subject merchandise (denominator), and a slight decrease in the volume of the total imports of subject merchandise from the DR (numerator). The calculation based on the more accurate data resulted in subject imports from the DR accounting for [      ] percent of total subject imports and hence rendered them under the 3 percent negligibility threshold.

Plaintiffs do not like the result and argue that instead of making these adjustments, the ITC should have just stuck with the official import statistics under the primary HTS numbers. Not surprisingly, Plaintiffs' preferred method, using such unadjusted data, would result in the calculated percentage of subject imports from the DR being [      ] percent of total subject imports and thus just over the 3 percent negligibility threshold. However, Plaintiffs fail to establish any error in the ITC's calculation methodology, which included adjusting the official U.S. import statistics in the manner described above. Rather, Plaintiffs have a self-interested preference for the use of unadjusted data because using those data results in the level of DR imports [                ] the 3 percent negligibility threshold. But mere disagreement with the ITC's methodology, or Plaintiffs' desire for a different outcome, does not suffice. *See Nitrogen Solutions Fair Trade Committee v. United States*, 29 C.I.T. 86, 95 (2005) ("The ITC reasonably chose to rely on the evidence developed by its staff, rather than Plaintiff, and the Court will not disturb this decision.").

Plaintiffs also argue that the standard for getting past an ITC preliminary determination is low and that it was possible that later adjustments could be made to the scope that could have resulted in subject imports exceeding 3 percent. Plaintiffs' argument is misplaced. The ITC's job at the preliminary phase is not to just rubber stamp an injury determination but rather to "'eliminate unnecessary and costly investigations which are an administrative burden and an impediment to trade.'" *American Lamb Co. v. United States*, 785 F.2d 994, 1002-03 (Fed. Cir. 1986) (quoting S. Rep. No. 1298, 93rd Cong., 2d Sess. 171, reprinted in U.S.C.C.A.N., 7186, 7308)). Furthermore, the reasonable indication of injury standard at the preliminary phase is to be applied "in light of the facts as they existed at the time when the Commission was required to vote." *Co-Steel Raritan, Inc. v. United States*, 357 F. 3d. 1294, 1313-14 (Fed. Cir. 2004). Speculation as to potential changes that could later occur with the scope of the investigation does not render the ITC's determination unlawful. *See id.* at 1314 (rejecting challenge to ITC negligibility determination that was based on later change to scope of Commerce's investigation).

Plaintiffs' final argument is that even if subject imports from the DR were below the 3 percent negligibility threshold for purposes of present material injury, the ITC should not have treated subject imports from the DR as negligible for purposes of threat of material injury because, they allege, the data show that such imports will imminently account for more than 3 percent of all imports. As support, Plaintiffs point to the increase in imports from the DR between 2020 and 2022 and between 2022 and interim 2023. However, an upward trend alone does not demonstrate any likelihood that subject imports from the DR will imminently exceed 3 percent. Other relevant factors, which the ITC examined, include whether subject imports from the DR had accounted for 3 percent or more in the past or whether there was excess capacity that

would permit the DR producers to imminently increase exports above 3 percent. The ITC's

analysis of that information, using the adjusted import data, indicated that subject imports from

the DR had not exceeded 3 percent in the period preceding the filing of the AD petition and had

only exceeded 3 percent in one month of the 12-month negligibility period. The ITC also found

that the DR industry was small and operating at high capacity-utilization rates with almost all

production going to the United States such that the industry had no ability to increase exports to

3 percent or above the total subject import volume in the imminent future.

## IV.    ARGUMENT

### A.    The ITC's Negligibility Determination Is Supported by Substantial Evidence And Is Otherwise In Accordance With Law.

In a preliminary injury investigation, the statute requires the ITC to determine, based

upon the information available at the time of the preliminary determinations, whether there is a

reasonable indication that a domestic industry is materially injured or threatened with material

injury by reason of subject imports and that imports of the subject merchandise are not

negligible. 19 U.S.C. § 1673b(a). If the ITC finds that imports of the subject merchandise are

negligible the investigation shall be terminated. *Id.* In making this preliminary determination,

the ITC weighs the evidence before it at the time of the preliminary determination and decides

whether: "(1) the record as a whole contains clear and convincing evidence that there is no

material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will

arise in a final investigation." *American Lamb Co.*, 785 F.2d at 1001.

Under 19 U.S.C. § 1677(24), imports from a subject country of merchandise

corresponding to a domestic like product that account for less than 3 percent of all such

merchandise imported into the United States during the most recent 12 months for which data are

available preceding the filing of the petition shall be deemed negligible. The statute further

provides that subject imports from a single country that comprise less than 3 percent of total such imports of the product may not be considered negligible if there are several countries subject to investigation with negligible imports and the sum of such imports from all those countries collectively accounts for more than 7 percent of the volume of all such merchandise imported into the United States.  19 U.S.C. § 1677(24)(A)(ii).  However, the DR is considered a beneficiary country under the Caribbean Basin Economic Recovery Act ("CBERA") for purposes of 19 U.S.C. § 1677(7)(G)(ii)(III) and 19 U.S.C. § 1677(7)(H), which provide that CBERA countries may *not* be cumulated with imports from non-CBERA countries for purposes of material injury or threat of material injury.  19 U.S.C. § 1677(24)(A)(iii).  Subject imports from the DR thus may not be aggregated with imports from other individually negligible countries.  Additionally, for purposes of threat of material injury, the ITC shall not treat imports as negligible if it determines that there is a potential that imports will imminently account for more than 3 percent of the volume of subject merchandise imported into the United States.  19 U.S.C. § 1677(24)(A)(iv).

In the *Preliminary Determination*, the ITC found that "{a}djusted official import data indicate that subject imports from the Dominican Republic accounted for [     ] percent of total imports during the relevant negligibility period and are therefore negligible for purposes of present injury."  C.R. List 2, Doc. 360 at 58-59.  The ITC acknowledged that the unadjusted import statistics presented in Table F-1 of its Staff Report showed that subject imports from the DR represented [     ] percent of total subject imports during the negligibility period but explained why such unadjusted data were not used for its negligibility calculations.  *See id.* at 59 n.188.  Specifically, the ITC explained that the unadjusted official import data were based only on the primary HTS numbers and did not account for imports under non-primary HTS numbers,

out-of-scope merchandise reported in the primary HTS numbers that importers indicated in their questionnaires were not in-scope, or merchandise from importers that certified in their questionnaire response that they had not imported in-scope merchandise. *See id.* The only adjustment that was made to the data in Table F-1 was an adjustment using data submitted in response to the questionnaires to report subject and non-subject imports from China, *i.e.,* to exclude Chinese imports under the already existing China antidumping and/or countervailing duty orders. *See id.* The ITC thus concluded that "the adjusted data in Table IV-6 are more accurate for determining import volumes for purposes of negligibility." *Id.*

The ITC also considered "whether there is any likelihood that different import numbers will arise in the final phase of these investigations showing that subject imports from the Dominican Republic exceed the 3 percent negligibility threshold in the negligibility period." *Id.* at 60. While acknowledging that further adjustments to the import data were possible, the ITC found that "such changes are unlikely to increase subject imports from the Dominican Republic as a share of total imports from [      ] percent based on the record of the preliminary phase of the investigations to the 3 percent required for them to be found not negligible." *Id.* As support, the ITC also noted that the adjustments it had made decreased the quantity of subject imports from the DR and increased the quantity of total imports, thereby reducing and not increasing the percentage of imports from the DR. *Id.* at 60 n.194.

The ITC next examined the negligibility question for purposes of threat of material injury and whether subject imports have the potential to imminently exceed the 3 percent threshold. *Id.* at 61. While acknowledging that subject imports from the DR as a share of total imports trended upwards during 2023, the ITC found that this fact did not indicate the potential to imminently exceed 3 percent because "in the 12 months of the negligibility period, subject imports from the

Dominican Republic exceeded 3 percent of total imports calculated on a monthly basis only in July 2023, at [     ] percent, before falling to smaller shares in August 2023 ([     ] percent) and September 2023 ([     ] percent)." *Id.*  The ITC found further support for its conclusion in the fact that the aluminum extrusions industry in the DR is relatively small and that the production capacity for the major and only responding foreign producer, Kingtom, remained constant during the POI, and Kingtom's capacity utilization rates remained high but for temporary disruptions caused by Customs and DR Department of Labor investigations in the first half of 2022.  *Id.* at 62.  The ITC found that most of Kingtom's total shipments were to the United States and so its ability to shift production from the home or third country markets to the United States was limited.  *Id.* at 63.  Finally, the ITC observed elsewhere that "during the period, subject imports from the Dominican Republic would have needed to be [     ] percent higher to have accounted for 3 percent of total imports of aluminum extrusions."  *Id.* at 64.

Plaintiffs' challenge to the ITC's negative determination faces a high hurdle.  A negative preliminary determination by the ITC is overturned by this court only if found to have been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A); *American Lamb Co. v. United States*, 785 F.2d at 1000.  As discussed below, Plaintiffs' various challenges to the ITC's negligibility determination for present injury and threat of injury purposes and resulting decision to terminate the investigation as to the DR do not come close to showing reversible error under this highly deferential standard of review.

First, Plaintiffs argue that the *unadjusted* official import statistics demonstrated that subject imports from the DR were above the 3 percent negligibility threshold, and thus "the starting point for the agency's calculations, and presumptive data source for negligibility

determinations, indisputably demonstrated a non-negligible import share." Pl. Br. at 15-16. So what? The ITC found that adjustments needed to be made to the official import statistics to make the dataset more accurate for purposes of its negligibility analysis. *See* C.R. List 2, Doc. 360 at 56-57 n.183. There is no presumption that *unadjusted* data needed to be used, and so unless Plaintiffs can show some error in the ITC's adjustments, this argument fails. No such error has been shown, and so Plaintiffs' argument amounts to nothing more than a disagreement as to the methodology used by the ITC, which is not enough. *See Nitrogen Solutions Fair Trade Committee*, 29 C.I.T. at 95 ("The ITC reasonably chose to rely on the evidence developed by its staff, rather than Plaintiff, and the Court will not disturb this decision.").

Plaintiffs' additional assertion that it was "patently unreasonable" for the ITC to conclude that evidence of non-negligibility would not later arise is also without merit. Pl. Br. at 16. The mere fact that the ITC adjusted the official imports statistics does not support the conclusion that evidence of non-negligibility was likely to later arise. Those adjustments were made to the ITC's dataset to promote accuracy, and there is no evidence that any later collected data would lead to the ITC resorting back to Plaintiffs' preferred use of the unadjusted import statistics, or that later collected data would result in imports from the DR exceeding 3 percent. As discussed, the ITC thoroughly explained the reason why it concluded that there was no likelihood that a different result would be reached in any final phase of the investigation, even if different import numbers were used. *See supra* at 9.

Second, Plaintiffs argue that the ITC's adjustments inflated, or over-counted, the quantity of total imports based on the inclusion of non-subject merchandise and that "the Commission used that overinclusive data to inflate the denominator of the negligibility calculation, dropping Dominican imports below the threshold, and found that no likelihood existed for that admittedly

overstated data to be corrected or otherwise change during the final phase." Pl. Br. at 17. As
support, Plaintiffs focus primarily on the fact that one of the larger adjustments to the total
imports denominator was from [                    ], which had stated that it could not [

                    ]. *See id.* at 16-17. Plaintiffs also point out that other companies responding to the
ITC's questionnaires had reported similar difficulties in isolating only subject aluminum
extrusions. *Id.* at 17 (citing C.R. List 2, Doc. 336 at IV-1 n.3). Plaintiffs argue that, given this
potential for overinclusion in the reported data of merchandise that was not aluminum extrusions,
and due to the size of the adjustment to the total import denominator (an increase of nearly [

    ]), any effort to correct this over-reporting at the final phase would have increased the
Dominican share proportionally. *Id.*

      As discussed, the scope of this case is admittedly complicated, and the reporting of
precise quantities for just subject aluminum extrusions was difficult and, in some cases,
impossible. The ITC transparently acknowledged these issues and cautioned that questionnaire
responses "may be overinclusive of data not specifically for aluminum extrusions." C.R. List 2,
Doc. 336 at IV-1 n.3 (Staff Report). But these imperfections permeated all the data, including
data reported in the official import statistics and in the questionnaires, and would have impacted
both the numerator and the denominator. As noted by [

                    ], C.R. List 2, Doc. 330, and so there
is no indication that this systemic issue would have been remedied in any final phase. Instead,
the ITC understood the imperfections in the data and the possibility of overinclusion resulting
from adjustments but acted to the best of its ability using its expertise to adjust the data to assure
the greatest accuracy. There is absolutely no evidence that the ITC made these adjustments to

                                    12

"inflate the denominator of the negligibility calculation" (Pl. Br. at 17) or any evidence that this systemic overinclusion would be remedied in the final phase.  Rather, the ITC found that the "adjusted data in Table IV-6 are more accurate for determining import quantities for purposes of negligibility."  C.R. List 2, Doc. 360 at 59 n.188.  As the finder of fact, this was the ITC's call to make in the interest of accuracy.  *See AL Tech Specialty Steel Corp. v. United States*, 27 C.I.T. 1791, 1802 (2003) ("{T}he credibility of sources is largely a matter within the province of the Commission, as the trier of fact.").  The fact that the unadjusted data are preferred by Plaintiffs does not render the ITC's decision unsupported by substantial evidence or otherwise not in accordance with law.

Third, Plaintiffs argue that the ITC's adjustment to the official import statistics using questionnaire data was problematic because the preliminary questionnaire data only accounted for [      ] percent of subject imports.  Pl. Br. at 17 (citing C.R. List 2, Doc. 360 at 8).  Plaintiffs try to bolster the force of this point by noting that the ITC had declined to rely solely on questionnaire data due to the low coverage afforded by importer questionnaire responses.  *Id.* (citing C.R. List 2, Doc. 360 at 56).  Plaintiffs thus conclude that "given the low coverage afforded by the preliminary questionnaire responses, and their role as the sole data source rendering Dominican subject imports negligible at the preliminary phase, it is impossible to reasonably say that no evidence of non-negligibility could later arise."  *Id.* at 18 (emphasis omitted).  This argument fails to persuade.

The standard for a preliminary injury determination requires the ITC to determine, "based upon the information available *at the time of the preliminary determination*, where there is a reasonable indication that an industry in the United States is materially injured or is threatened with material injury . . . ."  19 U.S.C.§ 1673b(a) (emphasis added).  The questionnaire data

13

coverage at **[      ]** percent was not so low as to make its usage to adjust the official import statistics unreasonable as the best information available at the time of the preliminary determination.  C.R. List 2, Doc. 360 at 56.  The fact that this questionnaire data coverage was not high enough to rely on questionnaire data exclusively for the import volume dataset does not render the data unusable or so incomplete that they could not be used for purposes of adjusting the official import statistics that were used as the primary source of the ITC's dataset.  The mere possibility that more complete questionnaire data could be available at the final phase does not mean that the ITC could not render its negligibility determination at the preliminary phase based on the information available to it.  *See Co-Steel Raritan*, 357 F.3d at 1313-14 (affirming negligibility determination based on the record that existed at the time the ITC renders its preliminary determination).

Fourth, Plaintiffs argue that a potential change to the scope of the investigation detracts from the ITC's negligibility determination and termination of the investigation as to the DR. Pl. Br. at 18.  As support, Plaintiffs cite to statements from Commerce indicating that it was continuing to evaluate the scope, and discussion of scope issues at the ITC's preliminary staff conference.  *See id.* at 18-19 (citing Staff Report, C.R. List 2, Doc. 336 at I-8 n.18).  This does not demonstrate any error in the ITC's preliminary determination.  A similar argument was considered and rejected in *Co-Steel Raritan*.  In that case, the appellant argued that the ITC could make a preliminary negligibility determination only if there was clear and convincing evidence to support the decision and there was no likelihood of later contrary evidence.  *See Co-Steel Raritan*, 357 F.3d at 1313-14.  Since there had been a request made to Commerce to modify the scope, the appellant argued that this precluded the ITC from making a preliminary negligibility determination because there was a possibility that the scope could change in the final phase.  *See*

*id.* The Federal Circuit rejected this argument and affirmed the ITC's negligibility determination that had been based on the evidence as it existed at the time of its preliminary determination. *See id.* at 1314.

Here, as in *Co-Steel Raritan*, the mere possibility that the scope could change in the final phase does not render the ITC's preliminary negligibility determination unlawful. The ITC acknowledged that further adjustments were possible and was aware of scope issues that had been raised at the preliminary staff conference. C.R. List 2, Doc. 360 at 60. However, the ITC found no likelihood existed that contrary evidence would later arise that would push imports from the DR above the 3 percent negligibility threshold. *See id.* at 60-61. This was reasonable and based on the fact that subject imports from the DR as a share of total imports amounted to only [     ] percent based on the record of the preliminary phase and that the adjustments that had been made to the official import statistics had decreased the quantity of subject imports from the DR and increased the quantity of total subject imports. *See id.* at 60 & n.194; *see also Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (". . . the Court's function is to ascertain "whether there was evidence which could reasonably lead to the {ITC}'s conclusion{.}).

Finally, Plaintiffs argue that "the Commission disregarded evidence that in the three years preceding the investigation, Dominican imports not only 'trended upwards,' Views at 61, but in fact outpaced every other subject country in rate of growth." Pl Br. at 20. The data used by Plaintiffs to support this argument are the unadjusted official imports statistics and not the adjusted data used by the ITC. *See id.* Using the adjusted data that the ITC determined were more accurate shows a much different trend, demonstrating that the DR share of imports only exceeded 3 percent in one month of the relevant 12-month period. C.R. List 2, Doc. 360 at 61.

This is not a trend that supports Plaintiffs' argument.  Plaintiffs also point to the fact that, even using adjusted data, imports from the DR increased by [          ] percent between 2020 and 2022.  Pl. Br. at 20.  As discussed, simply pointing to the absolute percentage increase does not demonstrate any likelihood that DR imports would imminently exceed 3 percent.  More relevant are the actual percentages of total subject imports represented by DR subject imports in those years and any unused capacity that could be directed towards the United States in the imminent future.  The ITC looked at these other factors and concluded that there was no likelihood that DR imports would cross the 3 percent negligibility threshold in the imminent future.  *See supra* at 9-10.

### B.  The Commission's Decision To Terminate The Investigation Into Imports From The DR Was In Accordance With Law.

Plaintiffs also challenge the termination of the AD investigation on imports from the DR based on the ITC's negligibility finding as not being in accordance with law.  Pl. Br. at 21.  More specifically, Plaintiffs argue that under *American Lamb*, "a negligibility determination that rests on preliminary data that is subject to change not only lacks substantial evidentiary support but also violates the Commission's statutory obligations."  *Id.* (citing *American Lamb Co.*, 785 F.2d at 999-1001.  Plaintiffs' interpretation of *American Lamb* and the relevant statutory obligations applicable to the ITC's preliminary determination is off the mark.

*American Lamb* stands for the proposition that the ITC must weigh evidence in determining whether the "reasonable indication" of injury standard is met in a preliminary injury determination.  *See American Lamb Co.*, 785 F.2d at 1003.  The preliminary investigation is not a rubber stamp whereby the ITC continues an investigation if there is a mere possibility of injury or that contrary evidence could possibly arise in the final phase.  Instead, the Court found:

> A series of factors – Congress' requirement that the ITC conduct a thorough investigation, using the best information available to it, Congress' expectation of opportunity for interested parties to present their views, and Congress' provision of the 'reasonable indication' standard for use in investigations initiated in response to a petition and in ITC's self-initiated investigations – all militate against a view that Congress intended ITC to disregard evidence that clearly and convincingly refutes the allegations in a petition.

*Id.* "The statute calls for a reasonable indication of injury, not a reasonable indication of need for further inquiry." *Id.* at 1001.

Considering the record as a whole, and consistent with its legal obligation to conduct a thorough investigation based on the best information available to it, the ITC found clear and convincing evidence of negligibility and no injury and no likelihood that contrary evidence would arise in any final phase of the investigation. This conclusion was reasonable and was based in part on the fact that subject imports from the DR as a share of total subject imports was only [     ] percent based on the record of the preliminary phase. C.R. List 2, Doc. 360 at 58-59. This percentage was not teetering on the border of 3 percent but rather was well below it. Additionally, the ITC noted that the adjustments that had been made to the official import statistics had decreased the quantity of subject imports from the DR and increased the quantity of total imports. *See id.* at 60 & n.194. This further supported the conclusion that later adjustments or revisions to the data were not likely to push the DR's import share to 3 percent or above. Elsewhere in its discussion of negligibility, the ITC further articulated this point by observing that "during the period, subject imports from the Dominican Republic would have needed to be [     ] percent higher to have accounted for 3 percent of total imports of aluminum extrusions." *Id.* at 64.

Plaintiffs also argue that the ITC's determination was not adequately explained because the ITC's discussion of its determination that no likelihood existed for contrary evidence

showing that DR imports might exceed the 3 percent negligibility threshold was limited to "two sentences."  Pl. Br. at 22-23.  The ITC's analysis of this issue was not limited to just two sentences but was instead a complete paragraph that included a relevant footnote.  *See* C.R. List 2, Doc. 360 at 60-61 & n.194.  As discussed above, this discussion adequately explained the basis for the ITC's decision.  Furthermore, while an agency must articulate a "rational connection between the facts found and the choices made" as Plaintiffs argue, Pl Br. at 22, that connection need not be clearly articulated but merely reasonably discernible.  *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).  Here, even though the ITC's discussion may have been concise, its decisional path is easily discernible from that discussion and the context of its entire negligibility determination.  Nothing more was required. *See, e.g.*, *Am. Alliance for Hardwood Plywood v. United States*, 392 F.Supp.3d 1298, 1306, n.10 (Ct. Int'l Trade 2019) (citing *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009)) ("The ITC's explanations do not have to be perfect where the path of the agency decision is reasonably discernable.").

## V.    <u>CONCLUSION AND RELIEF SOUGHT</u>

For the foregoing reasons, Defendant-Intervenor Kingtom respectfully requests that the Court issue an order affirming the ITC's negligibility determination and resultant termination of its AD investigation on imports of aluminum extrusions from the DR, and for such other relief as the Court deems just and proper.

Respectfully submitted,

<u>/s/ Brady W. Mills</u>
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN LLP**
1333 New Hampshire Ave, Suite 800
Washington, D.C. 20036
(202) 212-4116

*Counsel to Kingtom Aluminio S.R.L.*

19

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 5,497 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills