*PUBLIC VERSION*

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  THE HONORABLE LISA W. WANG

Court No. 23-00270

**U.S. ALUMINUM EXTRUDERS COALITION and
UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING,
ENERGY, ALLIED INDUSTRIAL AND
SERVICE WORKERS INTERNATIONAL UNION,**

*Plaintiffs,*

**v.**

**UNITED STATES,**

*Defendant,*

and

**KINGTOM ALUMINO S.R.L.,**

*Defendant-Intervenor.*

---

## DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

ANTHONY C. FAMIGLIETTI
Attorney-Advisor
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 205-2520
Fax: (202) 205-3111
Anthony.Famiglietti@usitc.gov

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

ANDREA C. CASSON
Assistant General Counsel
  for Litigation
Telephone (202) 205-3105

MICHAEL K. HALDENSTEIN
Attorney-Advisor
Telephone (202) 205-3041
Michael.Haldenstein@usitc.gov

**DATED:  AUGUST 29, 2024**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

I.    INTRODUCTION .................................................................................1

II.   STATEMENT PURSUANT TO RULE 56.2 ..........................................1

      A.    Administrative Determinations Under Review ...........................1

      B.    Questions Presented and Summary of Argument ......................2

            1.    Was the Commission's Determination that Subject Imports
                  from the Dominican Republic Were Below the Negligibility
                  Level During the Negligibility Period Arbitrary and
                  Capricious, an Abuse of Discretion, or Contrary to Law? ..........................2

            2.    Was the Commission's Determination that Subject Imports
                  from Dominican Republic Were Not Likely to Imminently
                  Exceed the Negligibility Threshold Arbitrary and
                  Capricious, an Abuse of Discretion or Otherwise Not in
                  Accordance with Law? .................................................5

III.  STATEMENT OF FACTS .....................................................................6

      A.    Commerce's Scope Definition ...................................................7

      B.    The Commission's Calculation of Import Volumes and
            Negligibility ..............................................................................8

      C.    Analysis of Negligibility for Threat of Material Injury .........................11

IV.   STANDARD OF REVIEW ...................................................................13

V.    ARGUMENT .......................................................................................15

      A.    Legal Framework for Negligibility .........................................15

      B.    The Commission's Determination that Subject Imports from the
            Dominican Republic were Below the Negligibility Threshold
            During the Negligibility Period was Based on a Reasonable
            Methodology and Was Rationally Connected to the Facts ....................17

            1.    The Commission Routinely Uses Official Import Statistics
                  and Questionnaire Data to Calculate Import Volumes ..............................18

            2.    Official Import Statistics Did Not Conform to the Scope of
                  the Investigations So the Commission Used Questionnaire
                  Data and Official Import Statistics ...........................................20

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

### TABLE OF CONTENTS (cont'd)

3.    The Commission's Use of Questionnaire Data to Account for Subject Merchandise under Non-Primary HTS Codes Was Rational and in Accordance with Law ...............................................22

4.    Subject Imports from the Dominican Republic Are Still Negligible with [ ███████ ] Imports Excluded ...............................25

5.    The Commission's Use of Proprietary Customs Records to Adjust Subject Countries' Numerators in Calculating Negligibility was Rational and in Accordance with Law .........................26

6.    The Commission Properly Declined to Speculate about Future Scope Changes and its Use of the Scope in Effect at the Time of its Determinations was Rational and in Accordance with Law ..................................................................28

7.    The Commission Considered that Import Data Could Change in the Final Phase of the Investigations But Additional Data Were Unlikely to Render Subject Imports from the Dominican Republic Non-Negligible..........................................31

8.    Plaintiffs' Additional Arguments Concerning the Commission's Calculation of Import Volumes are Without Merit..................................................................................34

C.    The Commission's Determination that Subject Imports from Dominican Republic Were Not Likely to Imminently Exceed the Negligibility Threshold Was Rationally Connected to the Facts .........................39

VI.    **CONCLUSION** ..................................................................................46

## TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Al Tech Specialty Steel Corp. v. United States,*
   27 CIT 1791 (2003) ....................................................................................21, 22, 27

*Am. Lamb Co. v. United States,*
   785 F.2d 994 (Fed. Cir. 1986)..................................................................4, 5, 14, 34

*Arlanxeo USA LLC v. United States,*
   389 F. Supp. 3d 1330 (Ct. Int'l Trade 2019) ..........................................................27

*Atl. Sugar, Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984)...............................................................................37

*Autoliv ASP, Inc. v. United States,*
   422 F. Supp. 3d 1295 (Ct. Int'l Trade 2019) ..........................................................30

*Celanese Chems., Ltd. v. United States,*
   31 CIT 279 (2007) ..............................................................................................13, 14

*Co–Steel Raritan, Inc. v. United States,*
   357 F.3d 1294 (Fed. Cir. 2004)........................................................................ *passim*

*Comm. for Fair Coke Trade v. United States,*
   28 CIT 1140 (2004) .................................................................................................34

*Conn. Steel Corp. v United States,*
   18 CIT 313, 852 F. Supp. 1061 (1994)......................................................37, 39, 40

*Conn. Steel Corp. v. United States,*
   30 CIT 1658, 462 F. Supp. 2d 1322 (2006) .......................................................24, 25

*Consol. Fibers, Inc. v. United States,*
   32 CIT 24, 535 F. Supp. 2d 1345 (2008) ................................................................14

*In re Gartside,*
   203 F.3d 1305 (Fed. Cir. 2000)...............................................................................14

*Int'l Indus., Ltd. v. United States,*
   311 F. Supp. 3d 1325 (Ct. Int'l Trade 2018) ..........................................................27

*JMC Steel Grp. v. United States,*
   70 F. Supp. 3d 1316 (Ct. Int'l Trade 2015) ............................................................15

*Mitsubishi Heavy Indus., Ltd. v. United States,*
   275 F.3d 1056 (Fed. Cir. 2001)...............................................................................15

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                 **Page(s)**

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).................................................................................39

*Navneet Publ'ns (India) Ltd. v. United States*,
    32 CIT 169 (2008)................................................................................26

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)..........................................................15

*Nucor Corp. v. United States*,
    296 F. Supp. 3d 1276 (Ct. Int'l Trade 2018) .................................40, 42

*Nucor Fastener Div. v. United States*,
    35 CIT 1074, 791 F. Supp. 2d 1269 (2011)....................................36, 37

*PAO TMK v. United States*,
    No. 21-00532, Slip Op. 23-150, 2023 WL 6939242 (Ct. Int'l Trade Oct. 12,
    2023) ................................................................................................22, 27

*Ranchers-Cattlemen Action Legal Found. v. United States*,
    23 CIT 861, 74 F. Supp. 2d 1353 (1999).......................................13, 14

*Sandvik Steel Co. v. United States*,
    164 F.3d 596 (Fed. Cir. 1998)...............................................................30

*Shandong TTCA Biochem. Co. v. United States*,
    35 CIT 545, 774 F. Supp. 2d 1317 (2011) ...........................................15

*Steel Auth. of India, Ltd. v. United States*,
    25 CIT 472, 146 F. Supp. 2d 900 (2001) .............................................18

*Torrington Co. v. United States*,
    16 CIT 220, 790 F. Supp. 1161 (1992).......................13, 14, 21, 37

*USEC Inc. v. United States*,
    25 CIT 49, 132 F. Supp. 2d 1 (2001) ....................................................30

*Whirlpool Corp. v. United States*,
    37 CIT 1775 (2013) ...............................................................................15

**Statutes**

19 U.S.C. § 1516a(A)(1)(C) ......................................................................13

19 U.S.C. § 1516a(b)(1)(A) .......................................................................13

## TABLE OF AUTHORITIES (cont'd)

**Statutes (cont'd)**                                                              **Page(s)**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................................14

19 U.S.C. § 1671b(a)(1) .........................................................................................16

19 U.S.C. § 1673b(a) ...............................................................................................7

19 U.S.C. § 1673b(a)(1) ...................................................................................16, 28

19 U.S.C. § 1673b(a)(2)(A)(i) ..........................................................................28, 29

19 U.S.C. § 1677(7)(G)(ii)(III) ...................................................................10, 11, 16

19 U.S.C. §1677(7)(H) .................................................................................... 11, 16

19 U.S.C. § 1677(24)(A) ..........................................................................................1

19 U.S.C. § 1677(24)(A)(i) ..............................................................................2, 15, 28

19 U.S.C. § 1677(24)(A)(iii) ..................................................................................11

19 U.S.C. § 1677(24)(A)(iv) ....................................................................................5

19 U.S.C. § 1677(24)(C) ...............................................................2, 4, 16, 20, 24, 45

19 U.S.C. § 3512(d) ................................................................................................16

19 U.S.C. § 4031(a)(3)(B)(i) ...................................................................................16

Caribbean Basin Economic Recovery Act of 1983 ......................................10, 11, 16

Dominican Republic-Central America-United States Free Trade Agreement of
    2004 ............................................................................................................10, 16, 38

Uruguay Round Agreement Act of 1994 ...............................................................4, 16

**Federal Register Notices**

76 Fed. Reg. 30,650, *Aluminum Extrusions from the People's Republic of China:
    Antidumping Duty Order* (Dep't of Comm. May 26, 2011) ......................................8

76 Fed. Reg. 30,653, *Order*, 76 Fed. Reg. 30,650 (May 26, 2011); *Aluminum
    Extrusions from the People's Republic of China: Countervailing Duty Order*
    (Dep't of Comm. May 26, 2011) ............................................................................8

**TABLE OF AUTHORITIES (cont'd)**

**Federal Register Notices (cont'd)**                                    **Page(s)**

88 Fed. Reg. 74,421, *Aluminum Extrusions From the People's Republic of China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, the Republic of Korea, Malaysia, Mexico, Taiwan, Thailand, the Republic of Turkey, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations* (Dep't of Comm. Oct. 31, 2023) ...................................................................................................29

88 Fed. Reg. 74,433, *Aluminum Extrusions From the People's Republic of China, Indonesia, Mexico, and the Republic of Turkey: Initiation of Countervailing Duty Investigations* (Dep't of Comm. Oct. 31, 2023)............................................29

**Legistative History Materials**

Statement of Administrative Authority to the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1 (1994) ........................................................... *passim*

**USITC Publications**

*Carbon & Certain Alloy Steel Wire Rod from Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad & Tobago, Ukraine, and Venezuela*, Inv. Nos. 701-TA-417-421 and 731-TA-953-961, USITC Pub. 3456 (Oct. 2001) ..........................................................................19

*Certain Aperture Masks from Japan and Korea*, Inv. Nos. 731-TA-823-824 (Prelim.), USITC Pub. 3185 (Apr. 1999) ....................................19

*Certain Collated Steel Staples from China, Korea, and Taiwan*, Inv. Nos. 701-TA-626, 731-TA-1452-1454 (Prelim.), USITC Pub. 4939 (July 2019) ......................................................................................................40

*Certain Crystalline Silicon Photovoltaic Cells from China and Taiwan*, Inv. Nos. 701-TA-511 and 731-TA-1246-1247, USITC Pub. 4454 (Feb. 2014) ...................31

*Certain Stainless Steel Butt-Weld Pipe Fittings from Germany, Italy, Malaysia, and the Philippines*, Inv. Nos. 731-TA-864-867 (Prelim.), USITC Pub. 3281 (Feb. 2000)...........................................................................................19

*Certain Standard Steel Fasteners from China & Taiwan*, Inv. Nos. 701-TA-472, 731-TA-1171-1172, USITC Pub. 4109 (Nov. 2009) .........................37

*Certain Steel Concrete Reinforcing Bars from Belarus, China, Korea, Latvia, and Moldova*, Inv. Nos. 731-873-874 and 877-879 (Final), USITC Pub. 3440 (July 2001) ......................................................................................................40

## TABLE OF AUTHORITIES (cont'd)

**USITC Publications**                                                                 **Page(s)**

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Russia*,
  Inv. Nos. 701-TA-655 and 731-TA-1531 (Final) (Remand), USITC Pub. 5495
  (Feb. 2024)..................................................................................................18, 27, 28

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Czech
  Republic (Czechia)*, Inv. No. 731-TA-1529 (Final), USITC Pub. 5183 (Apr.
  2021) ......................................................................................................................18

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Korea,
  Russia, and Ukraine*, Inv. Nos. 701-TA-654-655 and 731-TA-1530-1532
  (Final), USITC Pub. 5222 (Aug. 2021) ..........................................................19, 27

## I.    INTRODUCTION

Defendant U.S. International Trade Commission ("Commission") opposes the Motion for Judgment on the Agency Record filed by Plaintiffs/Petitioners United States Aluminum Extruders Coalition, and the United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.  The Commission's determination to terminate its preliminary antidumping investigation of subject imports of aluminum extrusions from the Dominican Republic was not arbitrary and capricious, was not an abuse of discretion, and was in accordance with law.  The Commission respectfully requests that the Court sustain the Commission's determination.

## II.    STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Determinations Under Review

Plaintiffs seek review of the Commission's preliminary determination to terminate the antidumping duty investigation of imports of aluminum extrusions from the Dominican Republic because such imports were negligible.  Specifically, Plaintiffs challenge the Commission's findings that the volume of subject imports from the Dominican Republic was below the statutory negligibility threshold set out in 19 U.S.C. § 1677(24)(A), and that such volume was not likely to imminently exceed the statutory threshold.  The Commission's Views are contained in *Aluminum Extrusions from China, Colombia, Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657 (Preliminary), USITC Pub. 5477

**BUSINESS PROPRIETARY INFORMATION**
*SUBJECT TO PROTECTIVE ORDER REDACTED*

(Nov. 2023).[1]  Notice of the determinations was published in the Federal Register on November 27, 2023.  88 Fed. Reg. 82,913 (PR168).

**B.    Questions Presented and Summary of Argument**

**1.    Was the Commission's Determination that Subject Imports from the Dominican Republic Were Below the Negligibility Level During the Negligibility Period Arbitrary and Capricious, an Abuse of Discretion, or Contrary to Law?**

No.  The Commission reasonably found that the imports from the Dominican Republic were [ ▮ ] percent of total imports of the merchandise corresponding to the domestic like product during the 12 months preceding the filing of the petition.  *See* 19 U.S.C. § 1677(24)(A)(i).

In its negligibility analysis, the Commission measures the volume of imports from all subject and nonsubject sources during the most recent 12-month period preceding the filing of the petition for which data are available.  *See id*.  The statute instructs that, in computing import volumes for purposes of its negligibility calculations, the Commission "may make reasonable estimates on the basis of available statistics."  19 U.S.C. § 1677(24)(C).  Application of that provision was particularly apt in these investigations, given that the scope was broad and complex, with many products specifically included and excluded.  As a result, the Commission could not simply use official import statistics to measure imports from different sources.

The scope covers aluminum extrusions imported alone and aluminum extrusions contained in certain assemblies.  The scope also explicitly lists products that are excluded and

---

[1] Citations to the public record are indicated by "PR," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CR," referring to list number 2 on the index of the administrative record.  Accordingly, citations to the Commission's public views and publication are to record document PR174, and citations to the confidential Commission Views (hereinafter, "Views") are to record document CR360.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

thus not subject merchandise. Confidential Staff Report (CR336) (hereinafter "Staff Report") at I-10-11. The scope language also notes differences in the scope here from the scope of existing orders on aluminum extrusions from China. Staff Report at I-12. Specifically, the language identifies products covered by the instant investigations but not by the existing orders. Staff Report at I-12.

While many aluminum extrusions enter alone under the primary Harmonized Tariff Schedule ("HTS") numbers, in-scope aluminum extrusions also enter as parts of other products under other non-primary HTS numbers. Thus, the primary HTS numbers did not conform to the scope of these investigations. For this reason, the Commission used official import statistics compiled for the primary HTS codes, supplemented with questionnaire response data and proprietary Census-edited Customs records, to determine the import volumes from each subject country, as well as the total volume of imports. The Commission determined, based on these data, that subject imports from the Dominican Republic were below the 3 percent negligibility threshold at [ ▮ ] percent. Views at 58-59. Plaintiffs' arguments do not accurately reflect the Commission's calculations of import volumes and wrongly suggest there was no dispute over negligibility. Contrary to Plaintiffs' argument, it was rational for the Commission to rely on adjusted official import statistics, supplemented with questionnaire response data, to calculate both the volume of subject imports from the Dominican Republic for the numerator, and the total volume of imports for the denominator, in determining negligibility. Without using questionnaire data, a substantial portion of undisputedly in-scope imports would have been disregarded. Certainly, the Commission's acceptance of estimates under these circumstances was not arbitrary and capricious or an abuse of discretion, but instead fell within the discretion

**BUSINESS PROPRIETARY INFORMATION**
*SUBJECT TO PROTECTIVE ORDER REDACTED*

afforded the Commission to "make reasonable estimates on the basis of available statistics."  19

U.S.C. § 1677(24)(C).

     Further, if as Plaintiffs urge, the Commission had rejected the estimate provided by the

largest importer [ ▮▮▮▮ ], subject imports from the Dominican Republic would still be

well below the negligibility threshold at [ ▮ ] percent.  Indeed, as explained *infra*, even if the

Commission had declined to use *any* of the import data reported under the other HTS numbers in

importer questionnaires, subject imports from the Dominican Republic still would have been

negligible.

     The Commission's acceptance of the importer's estimate was consistent with Congress'

recognition that it may not be possible to determine negligibility with absolute precision in the

preliminary phase of the investigations.  Not only does the statute grant the Commission

authority to make reasonable estimates; the Statement of Administrative Action to the Uruguay

Round Agreements Act ("URAA") specifically recognizes that the Commission's use of such

"reasonable estimates" may be particularly warranted in the preliminary phase of investigations

where, as happened in this case, the import data are "broader" and did not "conform{} exactly"

to the scope definition.  H.R. Doc. No. 103-316, vol. 1, 856 (1994), reprinted in 1994

U.S.C.C.A.N. 3773, 4188 (hereinafter, "SAA").

     Moreover, Plaintiffs' contention that the Commission should not have terminated the

investigation because the volume of imports reported in questionnaire data were only equivalent

to roughly half of official statistics overlooks that the Commission relied upon questionnaire data

*and* official statistics.  There was no evidence that subject imports from the Dominican Republic

were entering under the non-primary HTS numbers, so the Commission was not likely to receive

importer questionnaires reporting imports not already captured by official statistics.  *See Am.*

*Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986).  As the Commission observed, additional questionnaire data would likely continue to increase the denominator of total imports and decrease the numerator of subject imports from the Dominican Republic in the negligibility calculation.

Also unavailing is Plaintiffs' speculation that changes to the scope would make subject imports from the Dominican Republic non-negligible.  Plaintiffs identify no evidence indicating such an outcome was likely.  Moreover, Plaintiffs never made this argument to the Commission, and are precluded by the exhaustion of administrative remedies doctrine from raising it for the first time on appeal.

> **2.    Was the Commission's Determination that Subject Imports from Dominican Republic Were Not Likely to Imminently Exceed the Negligibility Threshold Arbitrary and Capricious, an Abuse of Discretion or Otherwise Not in Accordance with Law?**

No.  The Commission's determination that subject imports were negligible for purposes of a threat analysis because they were not likely to imminently exceed the 3 percent negligibility threshold was rationally connected to the facts that the Commission found. 19 U.S.C. § 1677(24)(A)(iv).  Its decision was not arbitrary and capricious, an abuse of discretion, or otherwise contrary to law.

It is simply untrue, as Plaintiffs claim (Plaintiffs' Brief ("PlBr") at 22-23), that the Commission did not adequately explain why and how it found that imports from the Dominican Republic were not likely to imminently exceed the negligibility threshold.  As set out in the Commission's Views, in addressing this question, it considered the present import volumes from the Dominican Republic, their rate of increase over the period of the investigation, and other record evidence, including the Dominican industry's relatively small size, its limited production and excess capacity, and its decreasing use of arranged imports, to determine that subject imports

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

from the Dominican Republic did not have the potential to imminently exceed 3 percent of total imports. Views at 61-64. The Commission considered that although subject imports trended upward during 2023, [ ███████████████████████████████████████ ███████████████████████████████████ ███████████████████████████ ]. Views at 62. The monthly data showed that subject imports only exceeded 3 percent once during the negligibility period and were well below the threshold at the end of the period and in interim 2023. Views at 61, 63.

The Commission found that subject imports from the Dominican Republic would have to be [ ████ ] percent higher for them to imminently exceed the negligibility threshold and rationally concluded that this was unlikely. Views at 64. The Commission also considered that given the relatively small size of the Dominican industry, as well as its very limited available capacity and the fact that it already shipped [ ████████ ] its production to the United States, it was unlikely that subject imports from the Dominican Republic would imminently exceed the negligibility threshold. Views at 63.

Plaintiffs ask the Court to favor their preferred findings over the rational ones made by the Commission upon its careful consideration of the record. Not only do they ignore the Commission's explanations for its calculations of import volumes and trends; Plaintiffs calculate negligibility over the incorrect 12-month period and rely on data exclusive of all imports reported in questionnaires.

## III.    STATEMENT OF FACTS

On October 4, 2023, petitioners filed antidumping and countervailing duty petitions with the Commission and Commerce regarding imports of aluminum extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam, with the Commission

and Commerce.  USITC Pub. 5477 at 5-7 (PR174).  The Commission instituted the preliminary

phase of its injury investigations on October 13, 2023.  On November 20, 2023, the Commission

issued its preliminary determinations, in which it found a reasonable indication that the domestic

industry was materially injured or threatened with material injury by imports from each of the

fourteen subject countries other than the Dominican Republic.  USITC Pub. 5477 at 5, 77.  The

Commission further determined that the allegedly dumped imports of aluminum extrusions from

the Dominican Republic were negligible.  Accordingly, the Commission terminated the

investigation of Dominican imports.  *See* 19 U.S.C. § 1673b(a).  This appeal followed.

We summarize below the facts pertinent to this appeal.

### A.    Commerce's Scope Definition

The scope of these investigations included aluminum extrusions entering under 21

"primary" HTS categories that also covered out-of-scope merchandise, as well as 116 "non-

primary" HTS categories that included in-scope merchandise.  *See* USITC Pub. 5477 at 15 n.18.

In describing the "non-primary" HTS codes, "Commerce further explained that imports of

subject merchandise, including subject merchandise entered as parts of other products" under

those HTS numbers.  USITC Pub. 5477 at 15 n.18.  For example, the scope covered "aluminum

extrusions that are imported with non-extruded aluminum components beyond fasteners" but

provided that only "the aluminum extrusion portion of the merchandise . . . is subject to duties."

USITC Pub. 5477 at 11.  Thus, HTS categories did not correspond directly to the scope of

imports subject to these investigations.

Furthermore, the scope also excluded imports from China that entered under the

applicable HTS categories that were already subject to existing antidumping and countervailing

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

duty orders.  USITC Pub. 5477 at 14.[2]  For these reasons, the Commission determined that official import statistics were over-inclusive as to the primary HTS codes, and underinclusive as to some non-primary HTS codes for calculating total import volumes for the denominator in the negligibility analysis.  *See* Views at 56-57, & 59 n.188.

### B.    The Commission's Calculation of Import Volumes and Negligibility

The data in table F-1 of the Commission's staff report were the starting point for its calculation of import volumes for negligibility.  These data are from the primary HTS codes and the only adjustment (using questionnaire data) was to distinguish between subject merchandise from China, and non-subject merchandise from China that was covered by the existing orders. This table did not account for subject merchandise under non-primary HTS codes.  Nor did it exclude imports from importers who certified in their questionnaire responses that they had not imported subject merchandise.  Views at 59 n.188; Staff Report at F-1 (Table F-1).

The Commission adjusted official import statistics with (1) questionnaire data that distinguished between subject and nonsubject imports from China, (2) questionnaire data that included in-scope imports reported under non-primary HTS codes, (3) questionnaire data that removed out-of-scope merchandise reported by Commission questionnaire respondents, and (4) data compiled from proprietary Census-edited Customs records using the primary HTS codes to remove imports by firms that certified that they do not import aluminum extrusions.  *See* USITC Pub. 5477 at 44 n.188.

The adjusted data in Table IV-6 of the Staff Report show that the total volume of imports from all sources was [          ] short tons during the negligibility period.  Staff Report at IV-25

---

[2] *See Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (May 26, 2011); *Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653 (May 26, 2011).

**BUSINESS PROPRIETARY INFORMATION**
*SUBJECT TO PROTECTIVE ORDER REDACTED*

(Table IV-6).  The Commission calculated this figure by adjusting the official import statistics based on different categories of imports reported by importers in their questionnaires.  *See* Negligibility Calculations Worksheet (CR355) (showing additions and subtractions to import data).

Importers reported a total of [ ███ ] short tons of subject imports under non-primary HTS numbers.  These imports under the non-primary HTS numbers were added to the official statistics under the primary HTS numbers.  *See* Staff Report at IV-24 n.8, I-25 (Table IV-6) and F-3 (Table F-1); *see also* Negligibility Calculations Worksheet (CR355).

The [ ███ ] short tons of subject imports reported under non-primary HTS numbers included [ ███ ] short tons reported by [ ███ ].  [ ███ ] Questionnaire at II-3b (CR117).  After Commission staff followed up to ensure that [ ███ ] had followed the instructions in the questionnaire, the company responded that [ ████████████████████████████████████████████████████████████████████████ ].  Follow-up to U.S. Importers Questionnaire, [ ███ ] Email of Nov. 2, 2023, at 1 (CR330).  [ ███ ] further indicated that it has thousands of SKUs and it has [ ████████████████████████████████████████████████████ ]"  Follow-up to U.S. Importers' Questionnaire, [ ███ ] Email of Nov. 2, 2023, at 1 (CR330).[3]

The Commission also used questionnaire data to remove [ ███ ] short tons of out-of-scope merchandise that were products other than aluminum extrusions listed under non-primary

---

[3] Other importers of merchandise also reported that despite their efforts, it was difficult to isolate in-scope aluminum extrusions from nonsubject merchandise under some HTS codes.  *See* Staff Report at IV-2 n.3.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

HTS codes.  Negligibility Calculations Worksheet (CR355).  The Commission used the proprietary Census-edited Customs records to remove [ █ ] short tons of aluminum extrusion for importers who certified in their questionnaire responses that they did not import in-scope merchandise.  Negligibility Calculations Worksheet (CR355).  This included deducting [ █ ] short tons from the numerator for subject imports from the Dominican Republic.  *See* Negligibility Calculations Worksheet (CR355).  Table IV-6 shows subject imports from the Dominican Republic were [ █ ] short tons during the negligibility period.

Overall, the Commission determined that the adjusted import data in Table IV-6 were "more accurate" than those in Table F-1 because the data also included in-scope imports reported in the non-primary HTS numbers, excluded out-of-scope merchandise reported in the primary HTS numbers that importers indicated was not in-scope, and excluded merchandise from importers who certified in their questionnaire response that they had not imported in-scope merchandise.  Views at 59 n.188.  The Commission explained:

> Given the low coverage afforded by importer questionnaire responses, the best information available on the record for purposes of negligibility calculations consists of official U.S. import statistics under the primary HTS numbers, adjusted by Commission staff to exclude out-of-scope merchandise and to include certain in-scope merchandise reported under other HTS numbers.

Views at 56-57.

Using this methodology, the Commission calculated that subject imports from the Dominican Republic were [ █ ] percent of total imports and thus negligible for purposes of material injury.  The Commission also explained that the Dominican Republic receives special treatment under the Dominican Republic-Central America-United States Free Trade Agreement ("CAFTA-DR").  The Dominican Republic remains treated as a Caribbean Basin Economic Recovery Act ("CBERA") beneficiary country for purposes of cumulation under 19 U.S.C.

§§ 1677(7)(G)(ii)(III) and 1677(7)(H) and the exception to the aggregation of individually

negligible imports contained in 19 U.S.C. § 1677(24)(A)(iii).  Such treatment means that, unlike

imports from other subject countries in antidumping investigations that are under 3 percent,

imports from the Dominican Republic may not be aggregated and cumulated even if the total for

all negligible countries is over 7 percent.  Views at 59-60; *see also* Views at 57-58 (aggregating

individually negligible imports from eight non-CBERA countries).

The Commission considered whether it was likely that different import numbers would

arise in the final phase of these investigations showing that subject imports from the Dominican

Republic exceed 3 percent of total imports during the negligibility period.  Views at 60.  The

Commission recognized that additional questionnaire data might yield further adjustments to the

import data, but it noted that the effect of the adjustments in the preliminary phase had been to

decrease the numerator for subject imports from the Dominican Republic and increase the

denominator of total imports.  Views at 60 n.194.  Importers had not reported imports from the

Dominican Republic in the non-primary HTS numbers, so unlike the denominator, the numerator

was not increasing when adding imports reported in the questionnaires.  It therefore concluded

that it was not likely that contrary evidence would arise in the final phase of the investigations

that would make subject imports from the Dominican Republic non-negligible.  Views at 60-61.

### C.    Analysis of Negligibility for Threat of Material Injury

The Commission also considered whether subject imports from the Dominican Republic

were negligible for purposes of a threat analysis, *i.e.,* whether subject imports from the

Dominican Republic were likely to imminently exceed the 3 percent negligibility threshold.

Views at 61.  The Commission concluded that this was not likely.

The Commission acknowledged that subject imports from the Dominican Republic

trended upwards, but it concluded that that trend alone did not indicate that they had the potential

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

to imminently exceed the negligibility threshold.  Views at 61.  The Commission observed that subject imports from the Dominican Republic never accounted for more than 3 percent of total imports during any of the 21 rolling 12-month periods preceding the filing of the petition.  Views at 61 (citing Staff Report at Table IV-7).  It also observed that subject imports from the Dominican Republic as a share of total imports were declining at the end of the negligibility period.  Subject imports from the Dominican Republic exceeded 3 percent of total imports calculated on a monthly basis only once, in July 2023, at [ ██ ] percent, before falling to smaller shares in August 2023 ([ ██ ] percent) and September 2023 ([ ██ ] percent).  Views at 61 (citing Staff Worksheet IV-2 and Fig. IV-1 (CR358)).  Subject imports from the Dominican Republic also accounted for only [ ██ ] percent of total imports in interim 2023, less than their [ ██ ] percent share during the negligibility period.  Views at 63.

The Commission found that the aluminum extrusions industry in the Dominican Republic was relatively small, as it ranked last among the subject exporters by total exports of aluminum extrusions.  Views at 62.  The Commission also found that based on the questionnaire response data from the only responding Dominican producer, Kingtom, the Dominican industry had almost [ ████████ ] and had limited ability to shift sales from its home market or third country markets, as it already exported [ ██████ ] its production to the United States.  Views at 62-63 (citing Kingtom's Foreign Producer Questionnaire at II-3f (CR144) and Staff Report at Tables H-1 and H-2).

The Commission also found that the large percentage increase in Dominican exports was due [ █████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████ ].  Views at 61 n.198; Views at 62 n.204.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

The Commission further found that arranged imports from the Dominican Republic accounted for [ ▓ ] percent of all reported arranged imports for October 2023 to March 2024, and were zero in the first and second quarter of 2024, unlike arranged imports from other subject sources which had increased.[4]  Finally, the Commission calculated that during the negligibility period, subject imports would have needed to be [ ▓ ] percent higher to have accounted for 3 percent of total imports of aluminum extrusions.  Views at 64.  The Commission found that there was no indication on the record that subject imports from the Dominican Republic were likely to imminently increase to that degree.  Views at 64.

## IV.    STANDARD OF REVIEW

This case involves Plaintiffs' challenge to the Commission's determination in the preliminary phase of these investigations to terminate the antidumping investigation on imports from the Dominican Republic.  This case having been brought pursuant to 19 U.S.C. § 1516a(A)(1)(C), is governed by the standard of judicial review set out in 19 U.S.C. § 1516a(b)(1)(A).  Under that standard, "{t}he court shall hold unlawful any determination, finding, or conclusion found . . . to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ."  19 U.S.C. § 1516a(b)(1)(A).  *See Celanese Chems., Ltd. v. United States*, 31 CIT 279, 284 (2007); *Co–Steel Raritan*, *Inc. v. United States*, 357 F.3d 1294, 1309 (Fed. Cir. 2004).  For this purpose, the Court must determine whether there is a "rational basis in fact" for the Commission's determination.  *Ranchers-Cattlemen Action Legal Found. v. United States*, 23 CIT 861, 877, 74 F. Supp. 2d 1353, 1369 (1999), (quoting *Torrington Co. v.*

---

[4] Arranged imports are imports for which a firm has placed an order with a foreign supplier for subject merchandise, but delivery of those imports is not scheduled to occur until after the period of investigation ("POI").  *See* Blank US Importers' Questionnaire, at 13, II-3A (PR173).  The POI covered January 2020 to September 2023.

*United States*, 16 CIT 220, 221, 790 F. Supp. 1161, 1165 (1992) *aff'd*, 991 F.2d 809 (Fed. Cir. 1993)).  The Commission, when making its preliminary determination, must decide whether there is a reasonable indication for finding "(1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation."  *Am. Lamb Co.*, 785 F.2d at 1001.

Therefore, courts will remand the case only if there is a "clear error of judgment" or where there is "no rational nexus between the facts found and the choices made" by the Commission.  *Ranchers-Cattlemen*, 23 CIT at 878, 74 F. Supp. 2d at 1369.  As the Federal Circuit has explained, the Commission decides based on the available information whether the record as a whole indicates a likelihood that contrary evidence would be obtained in a final investigation, not whether additional information might be obtained in the final investigation.  *Co-Steel Raritan,* 357 F.3d at 1311, 1314-17.  The Federal Circuit has rejected the notion that "the barest clues or signs" or the "possibility" of a different outcome justify final investigations.  *Id*. at 1311.  Instead, as the Federal Circuit has held, the "statute calls for a reasonable indication of injury, not a reasonable indication of need for further inquiry."  *Am. Lamb*, 785 F.2d at 1001.  The "arbitrary and capricious standard" requires "that the Commission examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Celanese Chems.*, 31 CIT at 285 (quotation omitted). [5]

---

[5] Plaintiffs erroneously cite instead to the "substantial evidence" standard of review set out under 19 U.S.C. § 1516a(b)(1)(B)(i) for final determinations.  As this Court has explained, the Federal Circuit has determined that "the two standards do require different levels of scrutiny," with arbitrary and capricious being more deferential.  *Consol. Fibers, Inc. v. United States*, 32 CIT 24, 35, 535 F. Supp. 2d 1345 (2008) (quoting *In re Gartside*, 203 F.3d 1305, 1312-13 (Fed. Cir. 2000).  Nevertheless, the "substantial evidence" standard is still a deferential standard of review.

*[Footnote continued on next page]*

"When evaluating challenges to the ITC's choice of methodology," this Court "will affirm the chosen methodology as long as it is reasonable." *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1316 n.4 (Ct. Int'l Trade 2015) (citing *Shandong TTCA Biochem. Co. v. United States*, 35 CIT 545, 556, 774 F. Supp. 2d 1317, 1327 (2011)); *see also Whirlpool Corp. v. United States*, 37 CIT 1775, 1786 (2013) ("As long as the agency's methodology and procedures are a reasonable means of effectuating the statutory purpose . . . the court will not . . . question the agency's methodology.").

## V.    ARGUMENT

This Court should affirm the Commission's determination to terminate the antidumping investigation concerning imports from the Dominican Republic.  The Commission's findings that subject imports from the Dominican Republic did not exceed the 3 percent negligibility threshold, and that there was no likelihood that subject imports from the Dominican Republic would imminently exceed the negligibility threshold, reflected a reasonable estimate based on the available data in the record.  These findings were rationally connected to the facts and were not in any way arbitrary and capricious or otherwise not in accordance with law.

### A.    Legal Framework for Negligibility

The statute provides that imports from a subject country of merchandise corresponding to a domestic like product that account for less than 3 percent of all such merchandise imported into the United States during the most recent 12 months for which data are available preceding the filing of the petition shall be deemed negligible.  19 U.S.C. § 1677(24)(A)(i).  A finding of

---

"A party challenging the Commission's determination under the substantial evidence standard 'has chosen a course with a high barrier to reversal.'" *Nippon Steel Corp. v. United States,* 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quoting *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)).  Under either standard, the Commission's negligibility determination suffices.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

negligibility terminates the Commission's investigation with respect to such imports.  19 U.S.C. §§ 1671b(a)(1), 1673b(a)(1).  Under the CAFTA-DR, the Dominican Republic remains treated as a CBERA beneficiary country for purposes of 19 U.S.C. §§ 1677(7)(G)(ii)(III) and 1677(7)(H).  *See* 19 U.S.C. § 4031(a)(3)(B)(i).  As noted above, this means that a negligibility calculation for imports from the Dominican Republic will always be subject to the 3 percent threshold, and are not to be aggregated with otherwise negligible imports from other countries that total more than 7 percent.[6]  Congress recognized that the Commission "may not have access to either complete questionnaire data or official import statistics conforming exactly to the Commission's like product{} designations," SAA at 856,[7] and explicitly authorized the Commission to make "reasonable estimates on the basis of available statistics" of pertinent import levels for purposes of deciding negligibility.  19 U.S.C. § 1677(24)(C).  In the SAA, Congress contemplated that "if available U.S. government import statistics concern a basket tariff provision that is broader than the like product designated by the Commission, the Commission may reasonably estimate a figure from the data available for the total imports corresponding to the like product."  SAA at 856.

---

[6] Although they wavered on this issue during the underlying proceedings (*see* Views at 60 & n.193), Plaintiffs no longer dispute that the Commission was precluded under CAFTA-DR from aggregating subject imports from the Dominican Republic with imports from other subject countries.  *See* PlBr at 3 & n.1.  While subject imports from Ecuador, India, Italy, South Korea, Taiwan, Thailand, Turkey, and the United Arab Emirates were also individually below the negligibility threshold, collectively, those eight countries accounted for [ ██ ] percent of total imports, and thus exceeded the 7 percent statutory threshold pertinent to aggregated imports.  These countries therefore were not negligible.  Views at 58.

[7] The URAA provides that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and {the URAA} in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d)).

**B.    The Commission's Determination that Subject Imports from the Dominican Republic Were Below the Negligibility Threshold During the Negligibility Period Was Based on a Reasonable Methodology and Was Rationally Connected to the Facts**

Plaintiffs challenge the Commission's methodology for determining the total volume of imports of aluminum extrusions from all countries that provides the denominator for negligibility calculations. They argue that it was improper for the Commission to adjust the official import statistics and assert that the Commission's adjustments to official import statistics overstated the volume of aluminum extrusions. Plaintiffs also challenge the Commission's methodology for determining the total volume of aluminum extrusions from the Dominican Republic that provides the numerator for the negligibility calculation. They argue that the Commission's use of questionnaire data, as well as proprietary, Census-edited Customs records, caused the Commission to understate the volume of subject imports from the Dominican Republic.[8]

However, the Commission's methodology was reasonable; and its resultant finding that subject imports from the Dominican Republic were below 3 percent of total imports was rational and consistent with the discretion the statute scheme confers upon the Commission to use reasonable estimates to determine negligibility.

---

[8] Plaintiffs in their "Background" section (PlBr at 10) complain that they could not verify the accuracy of the Commission's calculations because the Commission does not provide parties with the raw Census-edited data that it receives under a memorandum of understanding with Census (with authorization from CBP, the owner of the proprietary data). Plaintiffs fail to note that the Commission did include in the record a worksheet that contained its relevant calculations using the proprietary data. *See* Negligibility Calculations Worksheet (CR355). Additionally, Plaintiffs' counsel had full access to all questionnaires, including the certified questionnaires in which U.S. importers checked the box indicating that they did not import products falling within the scope. These questionnaires in turn were used to calculate the staff worksheet that was released.

### 1. The Commission Routinely Uses Official Import Statistics and Questionnaire Data to Calculate Import Volumes

As an initial matter, there is no "presumptive data" that the Commission must use to calculate import volumes. *See* PlBr at 2. While the Commission generally starts its analysis with the official import statistics, the statute does not refer to any dataset as the "presumptive" statistics the Commission must use. The Commission has an investigative responsibility to develop evidence on all issues, and it makes findings based on the record evidence that it collects. As exemplified by these investigations, the Commission does not always have accurate, reliable, and useable import data corresponding perfectly to the domestic like product for the 12-month negligibility period.

The SAA specifically recognizes this possibility, and contemplates the Commission's use of either importer questionnaire data or official import statistics, or some combination thereof, particularly in making its negligibility determinations in preliminary phase investigations. SAA at 856 ("The Commission may not have access to either complete questionnaire data or official import statistics conforming exactly to the Commission's like product(s) designations, particularly in preliminary investigations.").

Indeed, the Commission often uses importer questionnaire data, either by itself or as a supplement to official Commerce statistics, in making its negligibility calculations. *See, e.g, Steel Auth. of India, Ltd. v. United States*, 25 CIT 472, 146 F. Supp. 2d 900 (2001); *see also Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe ("SSLPP") from Russia*, Inv. Nos. 701-TA-655 and 731-TA-1531 (Final) (Remand), USITC Pub. 5495 (Feb. 2024), at 8-9 (finding importer questionnaire data as best information available for estimating subject imports from Germany and Mexico during negligibility period); *SSLPP from Czech Republic (Czechia)*, Inv. No. 731-TA-1529 (Final), USITC Pub. 5183 (Apr. 2021), at 24-25 (using

importer questionnaire and official import statistics to determine subject imports from Czechia exceeded statutory negligibility threshold); *SSLPP from Korea, Russia, and Ukraine*, Inv. Nos. 701-TA-654-655 and 731-TA-1530-1532 (Final), USITC Pub. 5222 (Aug. 2021), at 4-5 (adopting analysis from decision in leading investigations that importer questionnaire data was best information available for calculating subject import volumes from Russia, and official import statistics were best information available for calculating subject import volumes from Korea and Ukraine); *Certain Aperture Masks from Japan and Korea*, Inv. Nos. 731-TA-823-824 (Prelim.), USITC Pub. 3185 (Apr. 1999), at 6 (finding subject imports from Korea negligible relying solely on importer questionnaire data because subject imports were imported under a "basket category"); *Certain Stainless Steel Butt-Weld Pipe Fittings from Germany, Italy, Malaysia, & the Philippines*, Inv. Nos. 731-TA-864-867 (Prelim.) USITC Pub. 3281 (Feb. 2000) at 8 (finding questionnaire data more accurate to evaluate negligibility because Commission found official statistics underreported subject imports). In fact, Plaintiffs themselves, in their petition recognized that "{t}he Commission may rely on official import statistics, questionnaire data, or some combination of sources." Petition at 37 (PR1).

Plaintiffs' reliance on *Co-Steel Raritan,* 357 F.3d at 1298, to assert that the official import statistics, without adjustment, are the "presumptive data" that the Commission must use to calculate negligibility is misplaced. *See* PlBr at 2, 16. In *Co-Steel Raritan*, the official import statistics were the only data the Commission used in determining negligibility, *see Carbon & Certain Alloy Steel Wire Rod from Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad & Tobago, Turkey, Ukraine, & Venezuela*, USITC Inv. Nos. 701-TA-417-421 and 731-TA-953-963 (Prelim.), USITC Pub. 3456 (Oct. 2001), at 8, but neither the Federal Circuit's decision nor the statute suggest that official import statistics are the better

or "presumptive" data source.  Instead, as noted, the SAA recognizes the use of other types of data—such as questionnaire responses—as equally possible sources, alone or in combination with official statistics.  SAA at 856.  And the statute likewise contemplates that official statistics may not be reliable in every case, and thus explicitly states that in calculating import volumes for its negligibility analysis, "the Commission may make reasonable estimates on the *basis of available statistics*."  19 U.S.C. § 1677(24)(C) (emphasis added).

> **2.      Official Import Statistics Did Not Conform to the Scope of the Investigations So the Commission Used Questionnaire Data and Official Import Statistics**

Commerce's scope definition in these investigations included aluminum extrusions imported alone or as part of other products.  USITC Pub. 5477 at 9-16.  While many aluminum extrusions enter under the primary HTS numbers, aluminum extrusions enter as parts of other products under other or secondary HTS numbers.  Petition at 15-16 (PR1).  Additionally, the scope language identifies many products that it covers that contain aluminum extrusions.  Staff Report at I-10.  The scope language also identifies many products imported from China that are covered by the scope of these investigations and not the existing orders on aluminum extrusions from China.  Staff Report at I-12 to I-13.

Thus, the primary HTS codes did not conform to the scope, as some were broader and included nonsubject merchandise.  At the same time, because the scope was so broad, there also were non-primary HTS codes that contained in-scope merchandise.  Moreover, aluminum extrusions subject to the existing orders on China are not covered by the investigations.  Because of this complex scope, the Commission could not simply rely on official statistics for import data.  It adjusted the data to remove out-of-scope merchandise and include subject merchandise reported in questionnaires under non-primary HTS numbers.  Views at 56-57 & n.183.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

The Commission acknowledged that unadjusted official import statistics for primary HTS numbers would have shown that subject imports from the Dominican Republic were [ ▇ ] percent of total imports during the negligibility period in Table F-1, but it concluded that official import data were not the most accurate data for determining negligibility in these investigations. Views at 59 n.188.  As the Commission explained, the data in Table F-1 "do not account for imports under non-primary HTS numbers, out-of-scope merchandise reported in the primary HTS numbers that importers indicated was not in-scope, or merchandise from importers who certified in their questionnaire response that they had not imported in-scope merchandise." Views at 59 & n.188 (comparing Staff Report Table IV-6 with Table F-1).  Thus, the Commission did not "disregard{}" that record evidence as Plaintiffs argue, (PlBr at 3), but instead determined that the "the best information available on the record for purposes of negligibility calculations" were the data in Table IV-6 that included additional necessary adjustments to the data.  Views at 56.

In any event, Plaintiffs do not dispute that in-scope aluminum extrusions enter under the non-primary HTS numbers or that some out-of-scope merchandise enters under the primary HTS numbers.  Plaintiffs merely disagree with the Commission's methodology, the weight the Commission afforded the unadjusted official import statistics, and the need to adjust them with questionnaire data.  But as this Court has stated, the "Commission has wide discretion in choosing a reasonable analytical methodology." *Torrington Co.*, 16 CIT at 230, 790 F. Supp. at 1172.

Moreover, this Court has held that it is reasonable for the Commission to use the official import statistics and questionnaire data in calculating import volumes.

> It is beyond cavil that the Commission is entitled to supplement
> information from official statistics with the information that it

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

> gathers during its own investigation, and—after weighing the evidence—to choose to rely upon one set of facts over the other. Indeed, the Commission routinely relies on information it gathers in the course of its investigations, even when that data conflicts with other official statistics on the record; and the Commission has been repeatedly upheld when it has done so.

*Al Tech Specialty Steel Corp. v. United States*, 27 CIT 1791, 1804 (2003) (upholding

Commission's negligibility determination on subject imports from Germany calculated on

adjusted official import statistics); *see also PAO TMK v. United States*, Court No. 21-00532, Slip

Op. 23-150 at 12-13, 2023 WL 6939242, at *4-5 (Ct. Int'l Trade Oct. 12, 2023) (noting ITC's

discretion to select methodology for calculating negligibility, including relying on questionnaire

data for some calculations and unadjusted official statistics for others).

### 3. The Commission's Use of Questionnaire Data to Account for Subject Merchandise under Non-Primary HTS Codes Was Rational and in Accordance with Law

The Commission reasonably used questionnaire data to supplement official statistics for

purposes of calculating the total volume of subject imports (*i.e.*, the denominator of the

negligibility calculations).[9]  These adjustments mainly included use of the comprehensive import

data provided by the largest importer [███████████], including its data for non-primary HTS

imports that could not be derived from the official statistics.

Plaintiffs assert that it was improper for the Commission to make these adjustments at all

because [███████████], as well as other importers acknowledged that they could not perfectly

isolate some out-of-scope ("downstream") merchandise included in their responses.  PlBr at 2, 9,

17.  Plaintiffs, however, recognized that the Commission might need to supplement official

---

[9] The Commission used the same methodology to calculate import volumes for purposes of its entire injury analysis.  *See* Staff Report at IV-11-16 (Table IV-2).

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

import statistics with questionnaire data because subject merchandise enters under non-primary

HTS numbers.  "Depending on the coverage and quality of the responses received, questionnaire

data may therefore serve as a more accurate measure of import volumes."  Petition at 39 (PR1).

They added that "if the Commission receives adequate responses from U.S. importers, the

Commission may choose to base its negligibility analysis for the Dominican Republic on import

quantities collected from questionnaire responses."  Petition at 39 (PR1).

The Staff Report noted that the questionnaire response data regarding non-primary HTS

codes may be overinclusive, and Commission staff took steps during the investigation to try to

get as accurate information as possible regarding non-primary HTS code imports.  *See* Staff

Report at IV-1-2 & n.3.  After receiving [            ] questionnaire, Commission staff

followed up with [          ] regarding the non-primary HTS code data asking whether the

data included out-of-scope merchandise.  [            ] Follow-up to U.S. Importers'

Questionnaire (Part II & III) at II-3b (CR330).  [            ] replied: [                ]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████ ]  [            ] Follow-up to U.S. Importers'

Questionnaire (Part II & III) at II-3b (CR330).  Given that [                            ]

███████████████████████████████████████████ ] *see*

Staff Report at Table IV-1, the Commission reasonably relied upon [                ]

███████████ ] for its import numbers.  If, as Plaintiffs assert was proper (PlBR at 17), the

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

Commission had rejected [          ] estimates entirely, there would have been a gap in the record left by excluding such a large import source.[10]

As noted, the statute confirms that the Commission acted within its discretion in using the import data provided by [          ] as "reasonable estimates" in calculating negligibility. *See* 19 U.S.C. § 1677(24)(C).  Further, the SAA even describes a scenario in which the Commission uses "overbroad" statistics (such as [          ] estimates) in a preliminary phase of its investigations in calculating negligibility because questionnaire data are incomplete or the HTS numbers do not correspond to the scope of the investigation.  SAA at 856.

In these investigations, it was inevitable that the Commission would use imperfect data given that the scope includes (and excludes) a wide range of products and also covers the aluminum extrusion portion of certain downstream products.  Plaintiffs' challenge to the Commission's reliance on best estimates by importers ignores that Congress specifically authorized the Commission to use best estimates to calculate negligibility.

This Court has also previously recognized that, even aside from negligibility determinations, the Commission may rely on estimated data in making its preliminary determinations.  *See Conn. Steel Corp. v. United States*, 30 CIT 1658, 462 F. Supp. 2d 1322 (2006) (affirming negative preliminary determination).  In that case, a petitioner challenged the Commission's use of data from a domestic producer's revised questionnaire response on the ground that the domestic producer reported its data in the form of estimates, rather than confirmed values.  *Id.* at 1669, 462 F. Supp. 2d at 1327.  This is similar to how [          ]

---

[10] The Dominican Republic was not the only country whose import volume shares decreased after the Commission adjusted the official import statistics.  The share of quantity of subject imports for Colombia, India, Indonesia, and Italy also decreased.  *Compare* Staff Report Table IV-6 with Table F-1.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

estimated the volume of its in-scope imports under non-primary HTS codes.  Nevertheless, the Court determined that the Commission did not err by relying on the revised questionnaire response data.  *Id* at 1669, 462 F. Supp. 2d at 1331.  The Court concluded that "the revised questionnaire data is not rendered less reliable than other responses merely because the domestic producer reported estimates rather than confirmed values."  *Id.* at 1669, 462 F. Supp. 2d at 1331.  Furthermore, the Court noted that "{i}n fact, the ITC instructs companies to provide estimates where 'information is not available from {company} records in exactly the form requested."  *Id.* at 1669, 462 F. Supp. 2d at 1331 (quotation omitted).  This is similar to the instruction the Commission issued to importers, including [ ▮▮▮▮▮ ] in these investigations:  "If information is not readily available from your records, provide carefully prepared estimates."  *See* Blank U.S. Importers' Questionnaire, at 5 (PR147).  In this instance the Commission reasonably relied upon [ ▮▮▮▮▮ ] estimates given that it was the largest importer and indicated it acted to the best of its ability in estimating its imports.  Certainly, accepting such an estimate under these circumstances was not arbitrary and capricious or an abuse of discretion.

### 4.    Subject Imports from the Dominican Republic Are Still Negligible with [ ▮▮▮▮▮ ] Imports Excluded

Moreover, even if the Commission had entirely disregarded [ ▮▮▮▮▮ ] non-primary HTS imports, subject imports from the Dominican Republic still would have been negligible.  Excluding [ ▮▮▮▮▮ ] non-primary HTS subject imports of [ ▮▮▮▮ ] short tons would result in a denominator of [ ▮▮▮ ] short tons for the negligibility period, and using the [ ▮▮▮ ] short tons as the numerator for the Dominican Republic, subject imports

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

from the Dominican Republic would be [ ▮ ] percent.[11]  *Calculated from* Negligibility

Calculations Worksheet (CR355) ([ ▮ ]).

Thus, rejecting the challenged data from [ ▮ ] would not have changed the

Commission's determination that subject imports from the Dominican Republic were negligible.

*See Navneet Publ'ns (India) Ltd. v. United States*, 32 CIT 169, 184 (2008) (noting that even if

the Commission had used defendants' proposed adjustments to subject import volumes, subject

imports still would have been non-negligible).  In fact, even if the Commission had disregarded

all [ ▮ ] short tons of imports that importers reported under non-primary HTS codes,

subject imports from the Dominican Republic would have been [ ▮ ] percent of total imports

in the negligibility period, and thus, still below the negligibility threshold.  *Calculated from*

Negligibility Calculations Worksheet (CR355) ([ ▮ ]).  Plaintiffs'

arguments concerning the wholesale rejection of import data reported by importers should be

rejected.

5.    **The Commission's Use of Proprietary Customs Records to Adjust Subject Countries' Numerators in Calculating Negligibility Was Rational and in Accordance with Law**

The Commission did not act arbitrarily by using proprietary Customs records to adjust

subject countries' numerators for the negligibility calculations.  This process involved the

Commission reviewing which importers certified that they had not imported subject imports,

checking whether Customs records showed subject import volumes under applicable HTS codes

for each importer during the negligibility period, and removing that amount from each subject

---

[11] Plaintiffs do not challenge the Commission's inclusion of non-primary HTS imports reported by [ ▮ ], neither of whom indicated that the subject import volumes they reported under non-primary HTS codes contained out-of-scope merchandise. [ ▮ ] are not listed as among the firms that reported difficulty in isolating the weight and volume of subject imports.  *See* Staff Report at IV-1 n.3, IV-24.

**BUSINESS PROPRIETARY INFORMATION**
*SUBJECT TO PROTECTIVE ORDER REDACTED*

country's numerator.  For the Dominican Republic, this resulted in the Commission deducting

[ ███ ] short tons from the numerator for the Commission's negligibility calculations.

Negligibility Calculations Worksheet (CR355).  There was no reason for the Commission to

reject the importers' sworn certifications, and Plaintiffs do not contend that the certifications are

suspect.  Thus, the Commission acted rationally, not arbitrarily, in accepting the importers'

certification that they had not imported subject imports and removing those volumes based on

Customs records.  *See Int'l Indus., Ltd. v. United States*, 311 F. Supp. 3d 1325, 1333 (Ct. Int'l

Trade 2018) ("As the principal fact-finder, the ITC is afforded considerable discretion in

evaluating information obtained from questionnaires . . . .  Consistent with this discretion,

{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the

core of that evaluative process.") (quotations omitted).

Plaintiffs ignore that the Commission frequently uses a similar methodology of using

such Customs records to cross reference questionnaire respondents' certifications with official

import statistics.  *See, e.g.*, *Arlanxeo USA LLC v. United States*, 389 F. Supp. 3d 1330, 1333-34

(Ct. Int'l Trade 2019), *aff'd*, 819 F. App'x 925 (Fed. Cir. 2020) (sustaining ITC negligibility

determination that was based on importer questionnaires (which contained data for misclassified

imports that should have been within the scope) and supplemented with official import

statistics); *Al Tech Specialty Steel*, 27 CIT at 1803 ("The information developed, confirmed, and

corroborated by the Commission through correspondence with importers and foreign suppliers,

as well as proprietary Customs sources, eventually enabled the Commission to reconcile the data,

and resulted in the adjustments to the {Company A } data."); *SSLPP from Korea, Russia, and

Ukraine*, (Final), USITC Pub. 5222, *aff'd in part and remanded in part*, *PAO TMK v. United

States*, Slip Op. 23-150, 2023 WL 6939242 (Oct. 12, 2023); *SSLPP from Russia*, (Final)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

(Remand), USITC Pub. 5495 at 2 ("In accordance with the court's instructions, we reconsider the calculation of in-scope imports from Germany and Mexico, specifically taking into account the U.S. Customs data … in the record.").

Furthermore, as is true for [ ██████████ ] imports, even if the Commission did not use the proprietary data to remove the [ ████ ] short tons from total imports and [ ██████ ] short tons from subject imports from the Dominican Republic, subject imports from the Dominican Republic still would have been below the negligibility threshold.[12]

### 6. The Commission Properly Declined to Speculate about Future Scope Changes and Its Use of the Scope in Effect at the Time of its Determinations Was Rational and in Accordance with Law

The Commission defined a single domestic like product, coextensive with Commerce's scope.  *See* USITC Pub. 5477 at 20.  In accordance with the statute, the Commission must calculate negligibility using "{i}mports from a country of merchandise corresponding to a domestic like product identified by the Commission."  19 U.S.C. § 1677(24)(A)(i).  Thus, because the Commission defined the domestic like product coextensive with the scope, the Commission calculated negligibility from data derived from the applicable scope in the preliminary investigations.  "The antidumping statute states that the Commission is to make its preliminary determination 'based on the information available to it at the time of the determination.'"  *Co-Steel Raritan,* 357 F.3d at 1313 (quoting 19 U.S.C. § 1673b(a)(1)).  "That means that the Commission must render its preliminary determination 'based on the information

---

[12] With the [ ████ ] short tons included, the numerator for the Dominican Republic would be 23,165 short tons, and divided by the denominator of [ ██████ ] short tons would yield a share of [ ███ ] percent of total imports for the Dominican Republic.  *See* Negligibility Calculations Worksheet (CR355).

available to it' within the forty-five-day period following the filing of the petition." *Id.* (quoting 19 U.S.C. § 1673b(a)(2)(A)(i)).

Plaintiffs argue that *Co-Steel Raritan* is distinguishable because the petitioner had requested an "eleventh hour" scope change at Commerce two days before the Commission's vote in the preliminary investigation. They also emphasize that, in this case, Commerce indicated that it may make further modifications to the scope in the final phase because of concerns it has with the scope's administrability.[13] *See* PlBr at 19 n.2. These arguments, however, miss the larger point that the Commission must make its determinations based on the information available during the preliminary investigation period, and cannot speculate about future changes in the scope. In fact, in *Co-Steel Raritan*, the Federal Circuit noted that six months after the Commission's preliminary determinations, Commerce had changed the scope of the investigations in a way that affected the negligibility determinations. *Co-Steel Raritan*, 357 F.3d at 1314. Nevertheless, the Federal Circuit held that it was proper for the Commission to determine that subject imports from Venezuela and Egypt were negligible based on the scope and data that were available during the preliminary phase. *Id.*

In *Co-Steel Raritan*, the plaintiffs had requested a concrete scope change that excluded a specific type of wire rod, and they also explained how the scope change, if accepted by Commerce, would have affected the Commission's negligibility calculation. *Id.* at 1313.

---

[13] *See Aluminum Extrusions From the People's Republic of China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, the Republic of Korea, Malaysia, Mexico, Taiwan, Thailand, the Republic of Turkey, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 88 Fed. Reg. 74,421, 74,423 (Dep't of Commerce Oct. 31, 2023) ("Commerce AD NOI"); *Aluminum Extrusions From the People's Republic of China, Indonesia, Mexico, and the Republic of Turkey: Initiation of Countervailing Duty Investigations* 88 Fed. Reg. 74,433, 74,434 ("Commerce CVD NOI") (Dep't of Commerce Oct. 31, 2023).

Nevertheless, the Commission determined such argument was too speculative, and the Federal Circuit affirmed the Commission's decision.  Here, Plaintiffs' argument is even more speculative.  Plaintiffs have not suggested how Commerce may change the scope, what additional HTS codes or products would be excluded (or included), or how the negligibility calculation could potentially change.  Commerce also has not "specifically forecast{ed}" or "endorsed" changes to the scope as Plaintiffs assert; *see* PlBr. at 18-19 n.2; Commerce merely stated that there is the "*possibility* of making additional modifications to the scope", Staff Report at I-8 n.18 (quoting Commerce AD NOI & Commerce CVD NOI) (emphasis added), which is theoretically true during every preliminary investigation.

Moreover, perhaps because the argument is so speculative, Plaintiffs never argued below that a change in Commerce's scope definition in the final phase of the investigations would render imports from the Dominican Republic non-negligible.  Having failed to exhaust their administrative remedy, Plaintiffs are precluded from raising this argument on appeal.  *See Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998).

This Court has also recognized that "the {Commission} does not look behind {Commerce's} determination but accepts {Commerce's} determination as to which merchandise is in the class of merchandise sold at LTFV {less than fair value}."  *USEC Inc. v. United States*, 25 CIT 49, 56, 132 F. Supp. 2d 1, 8 (2001); *see also Autoliv ASP, Inc. v. United States*, 422 F. Supp. 3d 1295, 1300 (Ct. Int'l Trade 2019) ("The Commission relies on the 'scope' of the subject merchandise provided by the U.S. Department of Commerce . . . to serve as the outside parameter for defining the domestic like product.").  Requiring the Commission to speculate about the possibility of a scope change would "undermine the ability of the Commission to arrive at *final* preliminary determinations in antidumping duty cases."  *Co-Steel Raritan, Inc.*, 357 F.3d

at 1317 (emphasis in original).  Therefore, the Commission properly relied on Commerce's present scope in making its like product determination, and the Commission's use of the related data derived from Commerce's scope was in accordance with law.

Plaintiffs also misconstrue the Commission's decision in *Certain Crystalline Silicon Photovoltaic Cells from China and Taiwan*, Inv. Nos. 701-TA-511 and 731-TA-1246-1247, USITC Pub. 4454 (Feb. 2014) ("*CSPV*") and read the decision too broadly.  *CSPV* does not support that Commerce's mere indication that the scope is subject to change weighs against the Commission making a preliminary finding of negligibility.  *See* PlBr at 19 n.2.

In *CSPV*, the scope changed after the Commission had mailed its questionnaires so there was no data at all to calculate negligibility for imports from China.  "Because the Commission's questionnaires were mailed on January 6, 2014, Commission staff had no opportunity to gather data pertinent to the CSPV products covered by the scope as revised {by Commerce} on January 13. . . . Consequently*, we cannot provide a specific negligibility calculation* as to these imports." *CSPV*, USITC Pub. 4454 at 17 (emphasis added).  The Commission could not calculate the volume of imports from China because the rules determining the imports' country of origin were not reflected in the questionnaire data gathered by the Commission.  *Id.* at 18.  Here, there were no similar issues in determining the country of origin for subject imports from the Dominican Republic or argument that the Commission used an incorrect scope definition in its questionnaires.

> **7.    The Commission Considered that Import Data Could Change in the Final Phase of the Investigations But Additional Data Were Unlikely to Render Subject Imports from the Dominican Republic Non-Negligible**

Plaintiffs argue that because there is the potential for additional questionnaire data in the final phase investigations, it was unreasonable for the Commission to make a preliminary finding

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

that subject imports from the Dominican Republic are negligible.  PlBr at 18.  The Commission

recognized the possibility of additional adjustments to the data but found that it was unlikely that

different import numbers would arise in the final phase of these investigations showing subject

imports from the Dominican Republic to be non-negligible.  Views at 60.  Its decision was not

arbitrary and capricious or an abuse of discretion.  Nor, as Plaintiffs allege, did the Commission

"fail{ } to offer *any* explanation as to *why* such changes would have no impact." PlBr. at 23

(emphasis in original).

> The Commission acknowledged that

> > {F}urther adjustments to data for subject imports from the
> > Dominican Republic or total imports are possible.  Nonetheless, any
> > such changes are unlikely to increase subject imports from the
> > Dominican Republic as a share of total imports from [ ██ ] percent
> > based on the record of the preliminary phase of the investigations to
> > the 3 percent required from them to be found not negligible.

Views at 60.

> The Commission observed that adjustments to the official statistics derived from data in

importer questionnaire responses tended to increase the total volume of imports while decreasing

the volume of imports from the Dominican Republic.  Views at 60 n.194.  There were no

questionnaires reporting imports from the Dominican Republic in the non-primary HTS

numbers.  *See* Negligibility Calculations Worksheet (CR355).

> The Commission had a questionnaire response from Kingtom, [ ███████████████

███████████████████████████████████████████████

██ ], *see* Kingtom Postconference Brief at 13 (CR270), and from three importers of subject

merchandise from the Dominican Republic: [ ███████████████████████ ].

The foreign producer Kingtom reported that importers [ ███████████████████ ]

accounted for [ ███ ] percent of its exports to the United States in 2022.  Kingtom's Foreign

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Producer Questionnaire at I-7 (CR144).  None of the importers' questionnaire responses reported imports under non-primary HTS categories; all reported imports in their questionnaires under the primary HTS numbers.  Importer Questionnaire Response of [ ███████ ] at II-7a (CR109); Importer Questionnaire Response of [ ███████████ ] at II-7a (CR121); Importer Questionnaire Response of [ ████████████ ] at II-7a (CR129).  There is no indication on the record that Kingtom was exporting products that would enter under the non-primary HTS numbers.  Consequently, additional questionnaire responses from importers in the final phase of the investigations would be unlikely to report imports under the non-primary HTS numbers that would add to the volume of subject imports from the Dominican Republic during the negligibility period.

Thus, the Commission reasonably found that further adjustments from additional questionnaires would be unlikely to increase the fraction of imports from the Dominican Republic in the negligibility period from [ ██ ] percent to over 3 percent.  Views at 60 & n.194. Rather, additional data were more likely to continue the trend of decreasing the fraction of imports from the Dominican Republic relative to total imports because "the adjustments made in this preliminary phase decreased the volume of subject imports from the Dominican Republic and increased the volume of total imports of aluminum extrusions."  Views at 60 n.194

The evidence available also did not indicate that [ ████████ ] or the other companies that reported [ ████████████████████████████████████ ████████████████ ] would be able to submit different data in a final phase.  In fact, [ ████ ████ ] indicated it had provided the best estimates possible.  It said that it had [ ███ █████████████████████████████████████████████████████ ].

[ ██████████ ] Follow-up to U.S. Importers' Questionnaire (Parts II & IV) at II-3b (CR330)

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

(emphasis added).  Further, as explained *infra*, the record showed that imports from the Dominican Republic were negligible even with these imports excluded from the calculation. Given that [ ▓▓▓▓▓▓ ] reported that it had already made its best efforts to isolate in-scope merchandise, the record did not indicate that [ ▓▓▓▓▓▓ ] would be able to submit better data in a final investigation.

Plaintiffs also contend that "it is impossible to reasonably say that no evidence of non-negligibility could later arise."  PlBr at 18.  The Commission is not required to determine that it is "impossible" that evidence of non-negligibility may arise; *American Lamb* establishes that the standard is whether there is a reasonable indication for finding that "no likelihood exists that contrary evidence will arise in a final investigation."  *Am. Lamb Co.,* 785 F.2d at 1001.

Conversely, the mere assertion that it is possible that the Commission may obtain better questionnaire responses in the final investigation does not meet the standard of a reasonable likelihood that contrary information would arise in a final investigation.  "A showing of likelihood requires more than speculation, or the indication that something might possibly happen."  *Comm. for Fair Coke Trade v. United States*, 28 CIT 1140, 1163 (2004).  In *Committee for Fair Coke*, this Court determined that the "assertion that 'more complete importers' questionnaire data in a final investigation would likely confirm that imports were increasing' . . . is not enough to compel continuation of the investigation."  *Id.*

> ### 8.    Plaintiffs' Additional Arguments Concerning the Commission's Calculation of Import Volumes Are Without Merit

Plaintiffs argue that because the Commission used questionnaire responses as the "sole data source" rendering Dominican subject imports negligible, that it is "impossible to say that no evidence of non-negligibility could later arise."  PlBr at 18.  Notwithstanding Plaintiffs' claims, the questionnaire responses were not the "sole" data the Commission relied on in determining

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

negligibility.  As discussed above, the Commission used official import statistics and supplemented those data with data from questionnaire responses, using the proprietary Census-edited Customs records for corroboration.  *See* Negligibility Calculations Worksheet (CR355).

Plaintiffs also misconstrue the Commission's use of "the best information available on the record for purposes of negligibility calculations," Views at 56.  Contrary to Plaintiffs' characterization, (PlBr at 9, 17-18), the Commission did not say it was going to disregard questionnaire responses altogether.  Rather, the Commission found that, given the low coverage afforded by importer questionnaire responses, the best information available consisted of "official U.S. import statistics under the primary HTS numbers, adjusted by Commission staff to exclude out-of-scope merchandise and to include certain in-scope merchandise reported under other HTS numbers."  Views at 56-57.  In a footnote, the Commission further explained that the

> {A}djustments include removing aluminum extrusions subject to the existing orders on China; adding additional in-scope imports reported under other HTS numbers *submitted in response to Commission questionnaires*; removing out-of-scope merchandise *based on responses to importer questionnaires*; and removing data compiled from proprietary Census-edited Customs records using the primary HTS numbers to remove imports reported by firms that certified that they do not import aluminum extrusions.

Views at 57 n.183 (citing Staff Report at Table IV-6) (emphasis added).  Thus, opposite to Plaintiffs' understanding, the Commission explained that it did in part use the questionnaire responses, detailing how it applied the questionnaire data in its adjustments to official import statistics to calculate import volumes and import shares.  The Commission thus used parallel adjustments for the denominator (import volumes) and numerators (individual countries' import shares) of its negligibility calculations.  *See* Staff Report at IV-1 n.2 & IV-24 n.8.

Plaintiffs additionally claim that the [ ▮ ] questionnaire coverage for subject imports makes the Commission's negligibility determination suspect.  PlBr at 7-10, 17-18.  Plaintiffs'

arguments overlook that the Commission used official import statistics for the primary HTS categories in calculating import volumes.  The Commission did not rely on questionnaire data to calculate import volumes entering under the primary HTS categories, so the Commission did not lack coverage of these imports regardless of questionnaire coverage.  *See* Negligibility Calculations Worksheet (CR355).  Also, Plaintiffs' argument concerning questionnaire coverage for primary HTS imports is inconsistent with its contention that questionnaire coverage of imports entering under the non-primary HTS categories was too low and that the Commission did not need to consider imports entering under the non-primary HTS numbers at all.  PlBr at 17. Further, as explained, the Commission's determination that the negligibility calculation for imports from the Dominican Republic was unlikely to change in the final phase was rationally connected to its finding that additional adjustments were likely to increase the total volume of imports.  *See* Views at 60 & n.194.

Plaintiffs also appear to argue that because the Commission decided not to rely entirely on questionnaire data for calculating import volumes, then it could not use questionnaire data for any other purpose, including for supplementing the official import statistics.  *See* PlBr at 17-18. Not so.  Just because questionnaires account for approximately half of the data compared to official import statistics does not mean the Commission was precluded from adjusting import statistics with the questionnaire data that was available, especially given the broad and complicated scope of the investigations.

Plaintiffs' reliance on *Nucor Fastener Division v. United States*, 35 CIT 1074, 791 F. Supp. 2d 1269 (2011), for their argument that it was improper for the Commission to use the importer questionnaire data at all due to its "low coverage" is misplaced.  *See* PlBr at 18.  In the *Nucor* investigations, the Commission relied entirely on questionnaire response data to calculate

import volumes and, in the court's view, mischaracterized those data as "comprehensive." *See Nucor*, 35 CIT at 1084, 1088-89, 791 F. Supp. 2d at 1280, 1283-84; *Certain Standard Steel Fasteners from China & Taiwan*, Inv. Nos. 701-TA-472, 731-TA-1171-1172 (Prelim.), USITC Pub. 4109 (Nov. 2009), at 3. In contrast, here the Commission acknowledged the limitations of the questionnaire data and used those data to supplement and adjust the official import statistics, rather than rely on them entirely to calculate import volumes. Views at 56-57. This is consistent with the *Nucor* Court's recognition of the "compromise which the ITC must make between a perfectly accurate and an extremely rapid determination under this complex statute." *Nucor*, 35 CIT at 1089, 791 F. Supp. 2d at 1284 (quoting *Atl. Sugar, Ltd. v. United States,* 744 F.2d 1556, 1563 (Fed. Cir. 1984)). In another case, the Court held that the Commission did not abuse its discretion by relying exclusively on incomplete questionnaire data from domestic producers instead of official import statistics in making a negative preliminary determination. *Torrington.,* 16 CIT at 223, 790 F. Supp. at 1166-67. In *Torrington,* the Court upheld the Commission's determination that producer questionnaire data (representing 74 percent of U.S. production by quantity and 68 percent by value) were the "best information available" because official data only covered part of the period of investigation and did not provide complete data regarding domestic production or capacity utilization. *Id*. at 222-23, 790 F. Supp. at 1166-67. The Court also held that it was "reasonable for the Commission to conclude that additional information obtained in a final investigation would not provide a materially different view." *Id*. at 223, 790 F. Supp. at 1167; *see also Conn. Steel Corp. v United States*, 18 CIT 313, 317, 852 F. Supp. 1061, 1066 (1994) ("{T}he mere presence of conflicting data does not establish the likelihood that contrary evidence will arise in the final investigation.").

Finally, Plaintiffs attempt to turn the other parties' concerns about relying solely on the overly broad import statistics into a concession that certain "record data" showed that Dominican imports levels exceeded 3 percent.  PlBr at 11.  What the unadjusted overinclusive data might have shown, however, does not mean that "no party disagreed . . . that subject imports from the Dominican Republic exceeded the negligibility threshold," as Plaintiffs imply in the background section of their brief.  PlBr at 11.  Negligibility was a central issue in the investigations from the outset.  Plaintiffs in their petition conceded that imports from the Dominican Republic were "*just under the 3 percent threshold*" based on official import statistics, and they noted that "if the Commission receives adequate responses from U.S. importers the Commission may choose to base its negligibility analysis for the Dominican Republic on import quantities collected from questionnaire responses."  Petition at 39 (PR1) (emphasis added).  Petitioners' postconference brief over several pages urged the Commission to find that imports from the Dominican Republic were likely to imminently exceed the 3 percent threshold or that the Commission should simply aggregate imports from the Dominican Republic notwithstanding the prohibition in the CAFTA-DR.  Petitioners' Postconference Brief at 5 n.12, Exhibit 1 at 57-61 (CR274); Views at 54-55.

In its postconference brief, Kingtom asserted that imports from the Dominican Republic were negligible and that the Commission should not rely on official import statistics alone to calculate negligibility because they were overinclusive.  Views at 56; *see also* Kingtom Aluminio Postconference Brief at 6 (CR270).  Furthermore, at the staff conference the parties disagreed about whether the Commission could rely solely on official import statistics to calculate import volumes.  As Plaintiffs acknowledge, a respondent's witness asserted that the unadjusted official import statistics were not the most accurate data for calculating import volumes from subject countries.  *See* PlBr at 10.  A witness from Mexican exporter Frontera

**BUSINESS PROPRIETARY INFORMATION**
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Aluminios testified that "I think we all recognize that the census data could paint a misleading picture *because we don't know how much of the Chinese volume is out of scope or how much of the Mexican volume from companies like Frontera is also out of scope.*" Staff Conference Transcript at 156:2-5 (PR112) (emphasis added). Thus, contrary to Plaintiffs' claims, the calculation of import volumes and negligibility were fully briefed and contested by the interested parties in these investigations, and certainly in the investigation concerning the Dominican Republic.

### C. The Commission's Determination that Subject Imports from Dominican Republic Were Not Likely to Imminently Exceed the Negligibility Threshold Was Rationally Connected to the Facts

Contrary to Plaintiffs' contention (PlBr at 22-23), the Commission thoroughly explained why it found that imports from the Dominican Republic were not likely to imminently exceed the negligibility threshold. And its determination evinced a rational connection between the facts and the determination. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Conn. Steel*, 18 CIT at 314-16, 852 F. Supp. at 1064.

As the Commission found, the Dominican Republic was a small source of subject imports, it already exported a substantial volume of its aluminum extrusion production to the United States, the Dominican industry had limited available capacity, and the observed percentage increases in subject imports from the Dominican Republic during the POI were due largely to the Dominican industry [ ███████████████████████████████ ], rather than a surge in imports. *See generally* Views at 60-64. Without doubt, the Commission's findings show no "clear error" of judgment and there is a "rational nexus between the facts found and the choices made." *Conn. Steel*, 18 CIT at 314-16, 852 F. Supp. at 1064 (quotations omitted).

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

To assess the potential for imports to imminently surpass the negligibility for purposes of a threat analysis, the Commission examines several factors, including the share of total imports, especially toward the latter period of the POI, production capacity, capacity utilization, arranged imports, and the subject country's export orientation. *See Nucor Corp. v. United States*, 296 F. Supp. 3d 1276, 1292 (Ct. Int'l Trade 2018); *see also Certain Collated Steel Staples from China, Korea, and Taiwan*, Inv. Nos. 701-TA-626, 731-TA-1452-1454 (Prelim.), USITC Pub. 4939 (July 2019), at 17-18; *See Certain Steel Concrete Reinforcing Bars from Belarus, China, Korea, Latvia, and Moldova*, Inv. Nos. 731-873-874 and 877-879 (Final), USITC Pub. 3440 (July 2001), at 5.

Plaintiffs argue that it was unreasonable for the Commission to conclude that subject imports from the Dominican Republic were not likely to imminently exceed the negligibility threshold because the unadjusted official import statistics which Petitioners wanted the Commission to rely on would have showed that subject imports from the Dominican Republic increased [ ███ ] percent between 2020 and 2022. PlBr at 20.[14]  Plaintiffs, however, disregard that the unadjusted data did not account for volumes of subject imports under non-primary HTS codes and that the Commission was required to consider the 12-month period dictated by the statute to calculate negligibility. *See* Views at 59 n.188.  Thus, the Commission reasonably adjusted the import data to include importers' reported subject imports in other HTS numbers in addition to subtracting out-of-scope merchandise. Views at 59 n.188.  The Commission also considered the proper 12-month negligibility period preceding the filing of the

---

[14]  We reiterate that Plaintiffs' reliance on the "reasonableness" standard misses that the standard here is whether the Commission committed a "clear error" or that there is not a rational nexus. *See Conn. Steel*, 18 CIT at 315, 852 F. Supp. at 1064.  Nonetheless, as discussed in this section, the Commission's findings were reasonable as well.

**BUSINESS PROPRIETARY INFORMATION**
*SUBJECT TO PROTECTIVE ORDER REDACTED*

petition, which ran from October 2022 through September 2023. Views at 57. Subject imports at the end of the negligibility period in August and September of 2023 were well below 3 percent at [ ██ ] percent and [ ██ ] percent, respectively. *Compare* Views at 61 (citing Staff Negligibility Worksheet at IV-2 and Fig. IV-1 (CR358)) *with* PlBr at 20 (table of unadjusted data over incorrect 12-month period).

Plaintiffs mistakenly assert that the Commission "disregarded" record evidence showing a [ ██ ] percent increase in subject import volumes from the Dominican Republic from interim 2022 to interim 2023. *See* PlBr at 4, 11. The Commission, however, fully considered this issue and found that "the increase in subject imports from the Dominican Republic in interim 2023 compared to interim 2022 resulted, in part, from [ ████████████████ ████████████████████████████████ ████████████ ]." Views at 61 n.198. The Commission further found that even "after the increase," subject imports from the Dominican Republic accounted for only [ ██ ] percent of total imports in interim 2023. Views at 61 n.198 (citing Staff Report at Table IV-2.) Thus, the Commission found that "the trend in subject imports [ ████████████████████████████ ████████████ ] are not indicative of any potential for such imports to exceed 3 percent of total imports in the imminent future." Views at 62-63 n.204. In other words, the Commission determined that the "surge" was largely just the Dominican industry returning to normal operations after a disruption.

Plaintiffs' argument also overlooks that the Commission found that the Dominican Republic was a small source of supply to the U.S. market for aluminum extrusions throughout the POI, and that it ranked last among the subject exporters by total exports of aluminum extrusions. *See* Views at 61-62 & n.199 (citing Staff Report at Table VII-9). In this respect,

**BUSINESS PROPRIETARY INFORMATION**
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Plaintiffs' argument is similar to one the Court rejected in another case where a plaintiff's selective interpretation of the data ignored that, although the percentage increase appeared large, the actual increase in volume was small.  *See Nucor Corp.*, 296 F. Supp. 3d at 1292.  In *Nucor*, this Court upheld the Commission's determination that subject imports of subsidized imports from Turkey did not have the potential to imminently exceed three percent of total imports.  The Court determined that

> {The} increases Nucor mentions, however, are from very small bases.  Increases from such insubstantial bases are minimally probative when viewed in the context of all the data . . . . which amply support the ITC's finding that the record supports a conclusion that there is not a potential that subsidized imports from Turkey will imminently exceed three percent of total imports.

*Id*. (quotation omitted).

Other record evidence supports the Commission's determination that subject imports from the Dominican Republic were not likely to imminently exceed the negligibility threshold. The Commission found that, based on adjusted official import statistics, subject imports from the Dominican Republic never accounted for more than 3 percent of total imports during any of the 21 rolling 12-month periods preceding the filing of the petition.  Views at 61.  The Commission also found that during the negligibility period, subject imports exceeded 3 percent of total imports on a monthly basis only in July 2023, when they accounted for [ █ ] percent, before falling to smaller shares in August 2023 ([ █ ] percent) and September 2023 ([ █ ] percent. Views at 61 & n.197; *see also* Staff Negligibility Worksheet at IV-2 and Fig. IV-1 (CR358).

The Commission also considered the Dominican industry's capacity in making its determination that subject imports from the Dominican Republic were not likely to imminently exceed the negligibility threshold.  The Commission found that the production capacity of the only responding Dominican producer, Kingtom, remained constant throughout the POI at

**BUSINESS PROPRIETARY INFORMATION**
*SUBJECT TO PROTECTIVE ORDER REDACTED*

[ ▓ ] short tons, while its production fluctuated, increasing by [ ▓ ] percent from 2020 to 2021, and decreasing by [ ▓ ] percent from 2021 to 2022.  CR360, Views at 62.  Kingtom's production increased [ ▓ ] percent from interim 2022 to interim 2023 and its [ ▓ ] [ ▓ ] percent in interim 2023 compared to [ ▓ ] percent in 2022.  Views at 62 n.203.  The Commission found that Kingtom had only [ ▓ ] short tons of excess capacity in interim 2023.  Views at 62.  This is consistent with the Commission's finding that [ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ].  *See* Views at 62-63 n.204.

The Commission also noted that Kingtom reported that its exports to the United States increased from 2020 to 2021, declined in 2022, when they accounted for [ ▓ ] percent of its total shipments, and were higher in interim 2023, at [ ▓ ] percent of total shipments, than in interim 2022.  Views at 63.  In addition to finding that Kingtom had almost [ ▓ ] [ ▓ ] ], the Commission found that Kingtom's ability to shift sales from its home market or third-country markets was limited, as exports to the United States already accounted for a large majority of Kingtom's total shipments.  Views at 63; *see also* Staff Report at Appx. H, Tables H-1 and H-2 (showing [ ▓▓▓▓▓▓▓ ] exported to United States and [ ▓▓▓▓▓ ▓ ]).  In regard to the Dominican industry overall, the Commission found that adjusted import statistics showed that subject imports from the Dominican Republic accounted for [ ▓ ] percent of total imports in 2021.  Views at 63.  Furthermore, they accounted for [ ▓ ] percent of total imports in interim 2023, which was less than their [ ▓ ] percent share during the negligibility period.  Views at 63.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Moreover, evidence regarding arranged imports further supports the Commission's determination. The Commission found that reported arranged imports from the Dominican Republic accounted for [ ██ ] percent of all reported arranged imports for October 2023 to March 2024, but *decreased in each quarter*. Views at 63. Arranged imports from the Dominican Republic were lower in the fourth quarter of 2023 than in the third quarter and were zero in the first and second quarters of 2024. Views at 63. Conversely, reported arranged imports from other subject sources increased in the fourth quarter of 2023, and were positive for the majority of subject sources in both the first and second quarters of 2024. Views at 63. Thus, the arranged import evidence suggested that imports from the Dominican Republic would decrease in the imminent future, while subject imports from other sources would increase. *See* Views at 63-64.

Plaintiffs argue that it was improper for the Commission to rely on the questionnaire responses "from a single Dominican respondent" in considering the Dominican industry's capacity (PlBr at 20-21), but overlook that the single respondent, Kingtom, is [ ████████ ████████████████████████ ] and the only one that submitted a questionnaire response.[15] Petitioners identified only one other subject producer in the Dominican Republic, International Dominican Aluminum, which did not respond to the Commission's foreign producer

---

[15] In its postconference brief, Kingtom stated that it had the "[ ██████████████████ ██████████████████ ] of aluminum extrusion producers in the Dominican Republic{.}" Kingtom Aluminio Postconference Brief at 13 (CR270). The Commission noted that Kingtom's exports to the United States accounted for [ ████ ] percent of adjusted official U.S. imports of aluminum extrusions in 2022, and that Kingtom estimated that it accounted for [ ████ ] percent of total production of aluminum extrusions in the Dominican Republic in 2022. Views at 62 n.200. The Commission also noted that Kingtom's exports to the United States were equivalent to [ ████ ] percent of exports from the Dominican Republic to the United States in interim (January-June) 2023. Views at 62 n.200.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

questionnaire.  Views at 62 n.200.  There was no indication that the other Dominican producer would respond to a questionnaire in a final investigation.

In any event, as discussed in Section V.B., the Commission primarily used adjusted official import statistics —supplemented by the questionnaire data — in the negligibility calculations, including the volume from the Dominican Republic.  *See* Negligibility Calculations Worksheet (CR355).  Consistent with the statute, the Commission used the best data available to calculate import volumes and to consider the Dominican industry's production capacity, production, and exports.  *See* 19 U.S.C. § 1677(24)(C).  Finally, the Commission found that subject imports from the Dominican Republic would have needed to be [ ▮ ] percent higher to have accounted for 3 percent of the [ ▮ ] short tons of total imports of aluminum extrusions during the twelve-month negligibility period.  Views at 64 & n.211, (citing Staff Report at IV-25 (Table IV-6)).  The Commission made that finding based on adjusted official import statistics and did not extrapolate it from the questionnaire data of a single producer.

Thus, there is a rational nexus between the Commission's determination that subject imports from the Dominican Republic did not have the potential to exceed the 3 percent negligibility threshold in the imminent future and the record evidence.  The trend in subject imports from the Dominican Republic as a share of total imports, the small size of the industry, and its limited available capacity and ability to shift exports to the United States all supported the Commission's determination.

While Plaintiffs point to different facts in the record that support their preferred outcome, they have not demonstrated that anything about the Commission's determination was arbitrary and capricious or an abuse of discretion.

## VI.    CONCLUSION

For the foregoing reasons, we respectfully request that the Court affirm the

Commission's determination to terminate the investigation of subject imports from the

Dominican Republic because such imports were negligible and were not likely to imminently

exceed the negligibility threshold.

Respectfully submitted,

Dominic L. Bianchi
General Counsel

Andrea C. Casson
Assistant General Counsel for Litigation

*/s/Anthony C. Famiglietti*
Michael K. Haldenstein
Anthony C. Famiglietti
Attorney-Advisors
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2520
Facsimile: (202) 205-3111
Anthony.famiglietti@usitc.gov

*Attorneys for Defendant United States International Trade Commission*

Dated: August 29, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to this Court's Scheduling Order 1(f) and Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached **DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD** contains 13,901 words, according to the word-count function of the word processing system used to prepare this brief (Microsoft Office 365 ProPlus).

Dated: August 29, 2024

*/s/ Anthony C. Famiglietti*
Anthony C. Famiglietti
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 708-2520
Facsimile: (202) 205-3111
anthony.famiglietti@usitc.gov