NON-CONFIDENTIAL VERSION

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **U.S. ALUMINUM EXTRUDERS COALITION,**<br><br>and<br><br>**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**KINGTOM ALUMINO S.R.L.,**<br><br>Defendant-Intervenor. | **Before:  Hon. Lisa W. Wang, Judge**<br><br>**Court No. 23-00270**<br><br>**NON-CONFIDENTIAL VERSION**<br><br>**Business Proprietary Information Removed from Pages 5, 7-12, 15-20, and 22** |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF RULE 56.2
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Robert E. DeFrancesco, III, Esq.
Alan H. Price, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union*

Dated: October 15, 2024

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................... 1

II.  STANDARD OF REVIEW .................................................................................... 3

III.  ARGUMENT .......................................................................................................... 5

    A.  Plaintiffs Have Not Appealed from the Commission's Methodology
        .................................................................................................................... 5

    B.  The Commission's Termination Decision Had No Rational Basis in
        Fact ............................................................................................................. 6

        1.  Unadjusted import data demonstrated non-negligibility .......................... 7

        2.  The Commission over-counted total imports ............................................ 7

        3.  Commerce specifically forecasted potential changes to the
            scope. .................................................................................................... 12

        4.  Preliminary questionnaire response coverage was low. .......................... 15

        5.  At minimum, the record demonstrated the potential for
            imminent non-negligibility. .................................................................. 16

    C.  The Commission's Termination Decision Was Not in Accordance
        with Law .................................................................................................. 18

        1.  The Commission's brief, circular discussion is not a
            "reasoned basis" for its determination. ................................................. 20

        2.  The Views failed to address material limitations. .................................. 20

        3.  The Commission's *post hoc* rationalizations confirm the
            Views' inadequacy. ............................................................................. 21

IV.  CONCLUSION ..................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Lamb Co. v. United States,*
   785 F.2d 994 (Fed. Cir. 1986)......................................................................... *passim*

*Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed.*
   *Rsrv. Sys.*, 745 F.2d 677 (D.C. Cir. 1984) .................................................................3

*Bando Chem. Indus., Ltd. v. United States,*
   787 F.Supp. 224 (Ct. Int'l Trade 1992) ...................................................................18

*Borlem S.A.-Empreedimentos Industriais v. United States,*
   13 CIT 535, 718 F.Supp. 41 (Ct. Int'l Trade 1989) .................................................15

*Bowman Transp., Inc. v. Ark.-Best Freight Sys.*,
   419 U.S. 281 (1974).............................................................................................4, 20

*Burlington Truck Lines, Inc. v. United States,*
   371 U.S. 156 (1962)...............................................................................................4, 6

*Co-Steel Raritan, Inc. v. Int'l Trade Comm'n,*
   357 F.3d 1294 (Fed. Cir. 2004).........................................................................13, 14

*Comm. for Fair Coke Trade v. United States,*
   28 CIT 1140 (2004) .................................................................................................16

*Connecticut Steel Corp. v. United States,*
   30 CIT 1658, 462 F.Supp.2d 1322 (2006) .........................................................11, 12

*Dell Fed. Sys. v. United States,*
   906 F.3d 982 (Fed. Cir. 2018)....................................................................................4

*Fischer S.A. Comercio, Industria & Agricultura v. United States,*
   471 F. App'x 892 (Fed. Cir. 2012) .............................................................................9

*Jacobi Carbons AB v. United States,*
   313 F.Supp.3d 1308 (Ct. Int'l Trade 2018) .............................................................12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)...................................................................................2, 4, 18, 19

*Nucor Fastener Div. v. United States,*
   35 CIT 1074, 791 F.Supp.2d 1269 (2011) ............................................3, 18, 20, 21

*Nucor Fastener Div. v. United States*,
    37 CIT 749 (2013) ........................................................................................18

*Ranchers-Cattlemen Action Legal Found. v. United States*,
    23 CIT 861, 74 F.Supp.2d 1353 (1999)............................................2, 3, 16

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1995)........................................................................................4

*Torrington Co. v. United States*,
    16 CIT 220, 790 F. Supp. 1161 (1992) ..........................................................16

**Statutes**

19 U.S.C. § 1673b(a) ...............................................................................................4

19 U.S.C. § 1677(24)(A)(iv) ..................................................................................16

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .................10, 11

**Administrative Materials**

*Aluminum Extrusions From the People's Republic of China, Colombia, the
    Dominican Republic, Ecuador, India, Indonesia, Italy, the Republic of Korea,
    Malaysia, Mexico, Taiwan, Thailand, the Republic of Turkey, the United Arab
    Emirates, and the Socialist Republic of Vietnam*,
    88 Fed. Reg. 74,421 (Dep't Commerce Oct. 31, 2023) ..................................12

*Aluminum Extrusions from the People's Republic of China*,
    89 Fed. Reg. 38,031 (Dep't Commerce May 7, 2024) ....................................15

*Aluminum Extrusions from the People's Republic of China*,
    89 Fed. Reg. 80,506 (Dep't Commerce Oct. 3, 2024) ....................................15

Plaintiffs submit this reply to the response briefs filed by Defendant the U.S. International Trade Commission ("Commission") and Defendant-Intervenor Kingtom Aluminio S.R.L. ("Kingtom"). *See* ECF 34 ("ITC Opp."); ECF 32 ("Kingtom Opp.").

## I.    <u>INTRODUCTION</u>

The parties agree the starting point for the Commission's negligibility calculation was official import statistics, compiled for the primary Harmonized Tariff Schedule ("HTS") codes, demonstrating an import share for aluminum extrusions from the Dominican Republic above 3 percent.    The parties further agree the Dominican import share fell below that negligibility threshold only through adjustments.  And the parties also agree the Commission's adjustments were based predominantly on importer questionnaire responses that the Commission found too incomplete (*i.e.*, "low coverage") to rely on to measure overall import volumes; that were subject to change in response to specifically-forecasted scope modifications by the U.S. Department of Commerce ("Commerce"); and that over-reported non-Dominican imports on their face.  And yet, the Commission stands by its determination that "*no likelihood* exist{ed} for contrary evidence concerning the level of subject imports from the Dominican Republic to arise in any final phase of these investigations that would make them non-negligible{.}"[1]  *See* Confidential Views of the Commission, *Aluminum Extrusions from China, Colombia, the Dominican Republic, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, the United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1657 (Prelim.) ("*AEC2*") (Nov. 29, 2023), C.R. 360, at 60–61 ("Views").

---

[1]    Unless otherwise noted, all emphasis in this Brief has been added, and all internal quotations, alterations, and citations have been omitted.

The Commission's arguments in support of that determination are unpersuasive and, to a large extent, beside the point. Kingtom and the Commission argue primarily that the Commission has discretion to select a reasonable methodology for calculating the volume of subject imports. But, as Plaintiffs explained in our opening brief, the Commission's methodology is not the issue in this appeal. Instead, the issue is the Commission's determination that no likelihood existed for Dominican imports to exceed the negligibility threshold, when the Commission only reached a finding of negligibility through extensive adjustments *and* its adjustment methodology had indisputable limitations. The obvious potential for contrary evidence to arise in the final phase of the investigations—*e.g.*, as a result of specifically forecasted scope changes or clarifications, higher questionnaire coverage, and/or corrected reporting—deprives the Commission's determination of a "rational nexus between the facts found and the choices made." *See Ranchers-Cattlemen Action Legal Found. v. United States*, 23 CIT 861, 878, 74 F.Supp.2d 1353, 1369 (1999). The Commission's failure to acknowledge or address the inherent limitations in its preliminary data render its determination arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And the Commission's determination as a whole was not otherwise in accordance with law: terminating an investigation at the preliminary phase requires "*clear and convincing evidence* that there is no material injury or threat of such injury" and "*no* likelihood exists that contrary evidence will arise in a final investigation." *Am. Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986).

The Commission's further determination that there was no likelihood that Dominican imports would imminently exceed the negligibility threshold was unlawful and unsupported for similar reasons. *See, e.g.*, *Epoxy Resins from China, India, South Korea, Taiwan, & Thailand*, Inv. Nos. 701-TA-716-719 and 731-TA-1683-1687, USITC Pub. 5510 (May 2024) (Prelim.) at 23

("USITC Pub. 5510") (*American Lamb* requires "clear and convincing evidence that there is not a *potential* for subject imports ... to imminently exceed the negligibility threshold"). The same over-reporting that inflated the Commission's total-imports denominator necessarily impacted its threat analysis as well. And with regard to the numerator, the Commission disregarded clear and convincing evidence that Dominican imports had the potential for continued growth.

Because the Commission's decision to terminate the investigation into Dominican subject imports was both divorced from record facts and contrary to law, it should be remanded.

## II.    <u>STANDARD OF REVIEW</u>

We begin by clarifying the standard of review, which has both a factual and legal lens. On the factual side, Plaintiffs and Kingtom cited the familiar substantial evidence standard under 19 U.S.C. § 1516a(b)(1)(B). *See* Pls.' Br., ECF 24 at 13–14; Kingtom Opp. at 3. However, the Commission correctly notes preliminary determinations are governed by Section 1516a(b)(1)(A). *See* ITC Opp. at 13. Accordingly, the Commission's determination need not have been supported by substantial evidence, but rather must have had a "rational basis in fact." *Id.* The distinction does not substantially impact the Court's review: however stated, a preliminary determination must be grounded in the record. *See Ranchers-Cattlemen*, 23 CIT at 878, 74 F.Supp.2d at 1369 (noting remand is required where a determination rests on a "clear error of judgment" or lacks a "rational nexus between the facts found and the choices made").[2] Such grounding "must include at least a candid recognition of and response to inherent limitations" in the Commission's data and methodology. *See Nucor Fastener Div. v. United States*, 35 CIT 1074, 1090, 791 F.Supp.2d 1269,

---

[2]      *See also Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984) ("When the arbitrary or capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test{.}").

1285 (2011) (reversing negative preliminary injury determination where Commission failed to acknowledge "inherent limitations" in underlying data).

On the legal side, the standard for reversal remains the same: reversal is required if the Court finds the Commission's preliminary determination "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Am. Lamb,* 785 F.2d at 1000 (quoting 19 U.S.C. § 1516a(b)(1)(A)). This standard requires the Commission to have "examine{d} the relevant data and articulate{d} a satisfactory explanation for its action," including by taking "important aspect{s} of the problem" into account. *See State Farm*, 463 U.S. at 43. Thus, on appeal, the Court "may not accept appellate counsel's *post hoc* rationalizations for agency action; *Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1995). The Commission must also adhere to governing statutes, binding court decisions, and its own regulations. *See* Pls.' Br. at 14 (collecting authorities). Here, all three are memorialized in *American Lamb*, in which the Federal Circuit upheld the Commission's interpretation of the statutory "reasonable indication" standard as permitting the termination of an investigation "*only* when (1) the record as a whole contains *clear and convincing evidence* that there is no material injury or threat of such injury; *and* (2) *no likelihood* exists that contrary evidence will arise in a final investigation." *Am. Lamb,* 785 F.2d at 1001 (Fed. Cir. 1986).[3]

---

[3] The Commission argues that, under these legal standards, "reasonableness" is not at issue. *See* ITC Opp. at 40 n.14. But the statutory standard is a "reasonable" indication. 19 U.S.C. § 1673b(a). The arbitrary and capricious standard requires a "reasoned basis" for agency action. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 285–86 (1974). And the "rational basis test asks whether the {administrative} agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018). The contention that the Commission need not have acted reasonably is incorrect.

## III.  ARGUMENT

### A.  Plaintiffs Have Not Appealed from the Commission's Methodology

The Commission's lead argument on appeal, and the bulk of its Opposition, is in defense of the agency's methodology for calculating the volumes of subject imports. *See* ITC Opp. at 17–28. To recap, the Commission started with "unadjusted official import statistics for primary HTS numbers {that} would have shown that subject imports from the Dominican Republic were [    ] percent of total imports during the negligibility period{.}" *Id.* at 21. Based on a finding that those statistics were both over- and under-inclusive, the Commission made "adjustments to the data." *Id.* From the numerator of Dominican imports, the Commission "used questionnaire data to remove [    ] short tons of out-of-scope merchandise{.}" *Id.* at 9. And to the denominator of total imports, the Commission used questionnaire data to add "[    ] short tons of subject imports reported under non-primary HTS numbers{.}" *Id.* The Commission also used "proprietary Census-edited Customs records to remove [    ] short tons of aluminum extrusion{s} for importers who certified in their questionnaire responses that they did not import in-scope merchandise," including "deducting [    ] short tons from the numerator for subject imports from the Dominican Republic." *Id.* at 10. "Using this methodology, the Commission calculated that subject imports from the Dominican Republic were [    ] percent of total imports and thus negligible for purposes of material injury." *Id.*

On appeal, the Commission argues that, "in computing import volumes for purposes of its negligibility calculations, the Commission may make reasonable estimates on the basis of available statistics," *id.* at 2, and in so doing may use any "reasonable" methodology, *id.* at 15. Accordingly, the Commission contends its methodology, *i.e.*, its manner of making adjustments, should be affirmed. *See id.* at 18–28; Kingtom Opp. at 5. The Commission misapprehends the basis for this

appeal.  Plaintiffs have not appealed from the Commission's calculation methodology—*i.e.*, have not asked this Court to reject the Commission's adjustments, or to remand with instructions to recalculate the Dominican import share based on unadjusted import statistics alone.  Rather, as Plaintiffs explained in our opening brief, Plaintiffs appeal from the Commission's decision to terminate the investigation into Dominican imports where the agency only reached a finding of negligibility through adjustments that were facially flawed and subject to change.

In other words, Plaintiffs' opening brief highlighted the inaccuracies and limitations in the Commission's adjustments not to unwind them, but to illustrate the clear potential for different evidence to arise in the final phase.  *See, e.g.*, Pls.' Br. at 17 ("Given the magnitude of the adjustment at issue …, <u>any</u> efforts to correct the over-reporting in total imports at the final phase would have increased the Dominican import share proportionally."); *id.* at 18 ("{G}iven the low coverage afforded by preliminary questionnaire responses, and their role as the <u>sole</u> data source rendering Dominican subject imports negligible at the preliminary phase, it is impossible to reasonably say that <u>no</u> evidence of non-negligibility could later arise.").  The Commission's and Kingtom's arguments in defense of the agency's adjustments are thus misplaced.

### B.    The Commission's Termination Decision Had No Rational Basis in Fact

Plaintiffs' opening brief identified five independent reasons that the record could not support the Commission's finding that there was "<u>no</u> likelihood" for evidence of non-negligibility or imminent non-negligibility to arise in a final investigation.  *See id.* at 15–21.  The Commission's Opposition does not persuade otherwise, including by failing to marshal support in the record, relevant authorities, or the underlying determination itself.  Most of the Commission's arguments speak only to its methodology, which is not at issue.  Other arguments are *post hoc* rationalizations that may not be considered on appeal.  *See Burlington*, 371 U.S. at 168–69.  And <u>*none*</u> of the

Commission's arguments demonstrate that there was no likelihood for contrary evidence to arise in the final phase. *See Am. Lamb,* 785 F.2d at 1001.

### 1.    Unadjusted import data demonstrated non-negligibility.

There is no dispute that, before the Commission's adjustments, "unadjusted official import statistics for primary HTS numbers would have shown that subject imports from the Dominican Republic were [    ] percent of total imports during the negligibility period{.}" ITC Opp. at 21. The Commission counters that it is authorized to use "either importer questionnaire data or official import statistics, or some combination thereof, particularly in making its negligibility determinations in preliminary phase investigations." *Id.* at 18; *see also* Kingtom Opp. at 10–11. But the Commission's authority to consult questionnaires (*i.e.*, to make adjustments) is not the point. The point is that official import statistics are a trusted data source, *see* Pls.' Br. at 15–16, and were the starting point for the Commission's calculations here. Thus, evidence of non-negligibility was not just a theoretical possibility; rather, credible data supported a finding of non-negligibility from the start. Stated differently, in determining whether there is "no likelihood" that evidence of non-negligibility could arise, there is a meaningful difference between a record containing <u>no</u> evidence of non-negligibility and a record that demonstrates either negligibility or non-negligibility depending on how you slice it.

### 2.    The Commission over-counted total imports.

There is no dispute that the Commission's adjustments overstated total imports without any corresponding inflation of Dominican imports. The Commission's largest adjustment was to raise the total-imports denominator from [        ] to [        ] short tons based on questionnaire data corresponding to imports under non-primary HTS codes. *See* ITC Opp. at 8–9; Pls.' Br. at 8.

[                    ] of the additional imports were reported by [                ], which specifically stated

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

that [

].  *See* ITC Opp. at 9; Pls.' Br. at

17.  The Commission's Staff Report noted that several other firms had "reported difficulties with

isolating the weight and value of just aluminum extrusions" at the preliminary phase.[4]  *See*

Preliminary and Final Staff Report to the Commission, *AEC2* (Nov. 13, 2023), C.R. 336, P.R. 170

at IV-1 n.3 ("Staff Report").  None of the added imports were Dominican.  *Cf.* Kingtom Opp. at 12

(arguing, incorrectly, that the "imperfections" in questionnaire responses "would have impacted

both the numerator and the denominator").

The Commission acknowledges that preliminary questionnaire responses overstated total

imports and had a material impact on its negligibility calculations.  *See* ITC Opp. at 9.  It counters

with four arguments that (i) are *post hoc* rationalizations not expressed in the Views and (ii) lack

merit in any event.

*First*, the Commission argues that Plaintiffs "recognized"—in their Petition, before any

questionnaire responses had been received—"that the Commission might need to supplement

official import statistics with questionnaire data because subject merchandise enters under non-

primary HTS numbers."  *Id.* at 22–23.  Again, the Commission's use of questionnaire data is not

the issue.  The issue is the Commission's use of <u>*overinclusive*</u> questionnaire data, coupled with a

determination that <u>*no*</u> contrary data might arise in the final phase.  Notably, however, even in that

early context, Plaintiffs stated only that questionnaire data "<u>*may*</u> ... serve as a more accurate

measure of import volumes"—"{d}epending on the coverage and quality of the responses

---

[4]    The potential magnitude of the over-reporting was considerable.  The record showed that
aluminum extrusion components are incorporated into complex, heavy assemblies like "solar panel
mounting systems," "curtain wall and window wall units," and "systems for refrigerators," in
which the extruded aluminum component could be as slight as an exterior frame.  *AEC2*, USITC
Pub. 5477 (Nov. 2023), P.R. 174, at 11–12.

received." *Id.* As Plaintiffs have explained, and as the Commission has now confirmed, both the coverage and quality of those preliminary responses in fact were lacking. *See* Pls.' Br. at 17–18; ITC Opp. at 9 (conceding questionnaire responses were over-inclusive); Views at 56 (noting "low coverage" of preliminary questionnaire responses).

*Second*, the Commission argues (for the first time) that there is no indication questionnaire responses would have been more accurate at the final phase. Specifically, it argues [                          ]

[                                                              ] and reportedly had

[                                              ] ITC Opp. at 23; *see*

*also* Kingtom Opp. at 12. This *post hoc* rationalization was not expressed in the Views. But, in any event, one importer's reported inability to provide broken-out data in the [                          ] it had to comply with the condensed preliminary timeline does not support the conclusion that there was "no likelihood of later contrary"—*i.e.*, more accurate—"evidence" in the final phase.

"Revisions to reported data between the preliminary phase and final phase are common as parties become more familiar with the definition of products under investigation and the Commission's reporting methodology, and they have more time to review their data and respond to the questionnaire in the final phase." *Certain Amorphous Silica Fabric from China*, USITC Inv. Nos. 701-TA-555 and 731-TA-1310, USITC Pub. 4672 (Mar. 2017) (Final) at 14 n.57. Moreover, Commerce and the Commission have an independent duty to collect (or, at minimum, <u>*try*</u> to collect) accurate information. *See, e.g.*, *Fischer S.A. Comercio, Industria & Agricultura v. United States*, 471 F. App'x 892, 895 (Fed. Cir. 2012). Thus, the Commission's *post hoc* suggestion that it was

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

stuck with the facially inaccurate import data submitted at the preliminary phase is neither legally nor factually credible.[5]

*Third*, the Commission contends that, even if the over-inclusive questionnaire data were omitted from its calculations, the Dominican import share would not reach 3 percent—only [    ] percent.  *See* ITC Opp. at 25–26.  That argument misses the mark.  The issue is not whether a single modification, in isolation, would result in a present finding of non-negligibility.  The issue is whether the record at the preliminary phase left "no likelihood" for evidence of non-negligibility to later arise.  The over-reporting of total imports was one of many issues that forecasted a likelihood that more and better evidence would arise at the final phase—and whose correction would necessarily increase the Dominican import share.  In confirming that this lone adjustment accounted for a negligibility shortfall of just [         ] of a percent, *see id.*, the Opposition confirms inaccurate data played a material role in the Commission's determination.

*Fourth*, in a further *post hoc* rationalization, the Commission argues it was authorized to accept [         ] facially overbroad data as a "reasonable estimate" of total imports under 19 U.S.C. § 1677(24)(C) and the Statement of Administrative Action of the Uruguay Round Agreements Act ("SAA").  *See* ITC Opp. at 24.  Specifically, it argues (1) that Section 1677(24)(C) permits the Commission to "make reasonable estimates on the basis of available statistics" in calculating import volumes, (2) that the SAA (H.R. Doc. No. 103-316, vol. 1, at 856 (1994),

---

[5]    The Commission's argument begs the question how the Commission planned to (and did) conduct the final phase with inaccurate data.  Belying the suggestion that the Commission may just throw up its hands, other preliminary determinations demonstrate the agency can and will generally attempt to correct inaccuracies at the final phase.  *See, e.g.*, *Glass Wine Bottles from Chile, China, & Mexico*, Inv. Nos. 701-TA-703 and 731-TA-1661-1663, USITC Pub. 5493 (Feb. 2024) (Prelim.) at 26 n.136 (where questionnaire and official import data resulted in calculations that "may ... be overstated," Commission "invite{d} the parties' comments on how to achieve better importer questionnaire coverage and how to calculate market share more accurately").

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

*reprinted in* 1994 U.S.C.C.A.N. 4040, 4188) specifically contemplates "a scenario in which the Commission uses overbroad statistics ... in a preliminary phase of its investigations in calculating negligibility because questionnaire data are incomplete or the HTS numbers do not correspond to the scope of the investigation," and (3) that in *Connecticut Steel Corp. v. United States*, 30 CIT 1658, 462 F.Supp.2d 1322 (2006), the Court affirmed the Commission's reliance on estimated data in a preliminary investigation, ITC Opp. at 20, 24–25.  In addition to being waived, the problem with the Commission's argument is that [          ] questionnaire data was not an estimate of subject imports at all—much less a *reasonable* estimate.  It was the sum of [

                                            ].  *See* Staff Report at IV-1 n.3.  The Commission's argument and proffered authorities are thus off-base.

      To begin with, the SAA does not authorize the Commission to substitute the total value of downstream products for a reasonable estimate of subject imports—much less without explaining that the Commission has done so and why.  Instead, the SAA provides that "if available U.S. government import statistics concern a basket tariff provision that is broader than the like product designated by the Commission, the Commission may reasonably *estimate a figure from the data* available for the total imports *corresponding to the like product*."  SAA at 856, 1994 U.S.C.C.A.N. at 4189.  Because neither [          ] nor the Commission made any effort to "estimate a figure *from*" the overbroad data submitted, the SAA lends no support.  *Connecticut Steel* is even further afield.  There, a plaintiff appealed from the Commission's reliance on a questionnaire response for multiple reasons, one of which was that the response reported estimated values.  30 CIT at 1666–67, 462 F.Supp.2d at 1329–30.  The court rejected the challenge as "disingenuous" because the plaintiff itself had relied on estimates, and upheld the Commission's determination overall because the questionnaire was a "single piece of evidence" that added only a "small quantity of out-of-

scope merchandise." *Id.* at 1664, 1667 n.4, 462 F.Supp.2d at 1327, 1330 n.4.  Here, by contrast,

[          ] did not estimate or even purport to estimate subject imports, but rather transparently

[                                              ].  And far from being "insignificant," the

Commission concedes [          ] was "the largest importer" accounting for the largest

adjustment the Commission made.  ITC Opp. at 25.

Because the Commission concedes questionnaire data had a material impact on its

calculations, concedes questionnaire data was inaccurate on its face, and fails to persuade there

was no likelihood that different data would arise in a final investigation, its arguments fail.

**3.    Commerce specifically forecasted potential changes to the scope.**

There is no dispute that Commerce forecasted potential changes to the scope in response

to specific administrability "concerns."  *See AEC2*, 88 Fed. Reg. 74,421, 74,423 (Dep't Commerce

Oct. 31, 2023) (initiation of less-than-fair-value inv.), P.R. 164 ("We have some concerns related

to the administrability of certain provisions in the proposed scope. ... Accordingly, Commerce

intends to continue evaluating the scope of these investigations, with the possibility of making

additional modifications to clarify further what products are covered and not covered by the scope

of these investigations.").  Nor is there any dispute that the Commission specifically noted that

possibility.[6]  *See* Staff Report at I-8 n.18.  Needless to say, scope modifications "clarify{ing}

---

[6]    Overlooking its own recognition that the scope might change, the Commission argues
Plaintiffs failed to exhaust administrative remedies as to this aspect of our appeal.  *See* ITC Opp.
at 5, 30.  That is incorrect on two levels.  *First*, the Commission was plainly "on notice of the
issue."  *Jacobi Carbons AB v. United States*, 313 F.Supp.3d 1308, 1330 (Ct. Int'l Trade 2018)
("The determinative question regarding administrative exhaustion is whether {the agency} was
put on notice of the issue.").  As Plaintiffs explained in our opening brief, scope issues
predominated at the Preliminary Conference.  *See* Pls.' Br. at 10.  And the Commission itself
flagged the potential for scope modifications.  Staff Report at I-8 n.18.  *Second*, even setting aside
formal changes to the scope, Plaintiffs clearly argued that respondents had misinterpreted the scope
as then-written, requiring prospective clarification and correction.  *See* Post-Conf. Br. of
Petitioners, *AEC2* (Oct. 31, 2023), C.R. 274, P.R. 132, at 2–3.

further what products are covered and not covered by the scope of these investigations" would have a material impact on the data collected in the final phase.

The Commission counters that preliminary determinations must be "based on the information available to it at the time of the determination," and that the agency appropriately declined to "speculate" whether the scope might later change. ITC Opp. at 28; *see also* Kingtom Opp. at 14. But the "reasonable indication" standard inherently requires *some* speculation. And here, the potential for scope modifications was not just possible in the abstract but specifically forecasted by Commerce itself—well in advance of the Commission's preliminary determination. As such, neither *Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294 (Fed. Cir. 2004), nor *Certain Crystalline Silicon Photovoltaic Cells from China and Taiwan*, Inv. Nos. 701-TA-511 and 731-TA-1246-1247, USITC Pub. 4454 (Feb. 2014) (Prelim.) ("*CSPV*") ("USITC Pub. 4454"), supports the Commission as it contends. *See* ITC Opp. at 28–31.

In *Co-Steel Raritan*, the Commission issued a staff report "three days prior to the vote of the Commission on the preliminary injury determination," finding subject imports from certain countries negligible. 357 F.3d at 1299. The same day, the plaintiff "sent the Commission a letter advising that {it} had *that day* asked Commerce to modify the scope" and thus asking the Commission not to terminate its investigations. *Id.* The Commission declined, reasoning that while the plaintiff had unilaterally sought to modify the scope, "Commerce had not acted on the request," Commerce had previously expressed "reluctance" to adopt the kind of scope parameter the plaintiff was advocating, and the "only record evidence" that a scope modification might result in evidence of non-negligibility was the plaintiff's own estimate—all of which rendered the requested changes overly "speculative." *Id.* at 1300. For all of those reasons, the Federal Circuit

found "no reason to fault the Commission for concluding that Co-Steel's *eleventh-hour* request to Commerce" had been insufficient. *Id.* at 1314.

The Commission argues *Co-Steel Raritan* is on all fours with this case and confirms the Commission "cannot speculate about future changes in the scope." ITC Opp. at 29 (arguing a focus on the plaintiff's "eleventh-hour" request "miss{es} the larger point" of *Co-Steel Raritan*); *see also* Kingtom Opp. at 14–15. That is not correct. *Co-Steel Raritan* makes clear the Federal Circuit was focused on the belated timing of the plaintiff's scope modification request, which may have indicated a specific intention to impact the Commission's negligibility determination:

> *When Co–Steel made its scope modification request, the Commission had completed its preliminary investigation, the Staff Report had been issued, and the members of the Commission were scheduled to vote on the preliminary determination in just three days*. … We find much force in the Commission's argument that if the Court of International Trade's decision in this case is upheld, future petitioners will be encouraged to make similar *late-in-the-day scope modification requests* to Commerce, and then argue before the Court of International Trade for remands and redeterminations based on new developments in the event a scope modification is made by Commerce.

357 F.3d at 1317. Because it was *Commerce* that signaled the potential for scope modifications here, at the outset of the investigations and not at the "eleventh hour," and because respondents themselves argued extensively at the hearing regarding the need for scope modifications, *Co-Steel Raritan* has no bearing on this case, and the Commission is left once again without relevant support.

By contrast, the Commission's attempt to distinguish *CSPV* (in which the Commission cited scope uncertainty as a reason *not* to terminate an investigation) rests on a mistaken description of the underlying facts. The Commission contends that in *CSPV*, Commerce modified the scope of an investigation after the Commission had mailed its questionnaires, "so there was no data at all to calculate negligibility for imports from China." ITC Opp. at 31. Based on that misreading, the Commission contends that *CSPV* is inapt. In reality, Commerce did not modify

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

the scope of the *CSPV* investigation during the preliminary phase; rather, the petitioner filed a scope revision after the Commission had issued its questionnaires, as to which no decision from Commerce had yet issued. USITC Pub. 4454 at 17. "Because it is not clear whether or how Commerce will apply petitioner's *proposed* rules concerning which products are subject imports from China or Taiwan, Commerce's decision *may* impact import levels with respect to subject imports from both subject countries." *Id.* at 18–19. Accordingly, the Commission declined to find that subject imports were negligible "on the basis of the *American Lamb* standard." *Id.* at 19.

In short, Commerce's own prediction that the scope could change—at the outset of the investigations—was further credible indication that contrary evidence could arise in a final investigation. Because the Commission's arguments overlook that record evidence and find no support in the agency's proffered authorities, they fail.[7]

### 4.  Preliminary questionnaire response coverage was low.

*Fourth*, there is no dispute that preliminary questionnaire responses accounted for only "[   ] percent for all import sources and [    ] percent for subject imports," including [    ] percent of subject imports from the Dominican Republic. Views at 8, 56. That "low coverage" is the reason the Commission elected not to rely on questionnaire data itself for its negligibility calculations. *Id.* at 56. Contrary, again, to the Commission's and Kingtom's arguments on appeal, Plaintiffs do not highlight the "low coverage afforded by importer questionnaire responses" to

---

[7]      Judicially noticeable documents confirm Commerce did, in fact, significantly modify the scope of the investigations as projected. *See Aluminum Extrusions from the People's Republic of China*, 89 Fed. Reg. 38,031 (Dep't Commerce May 7, 2024) (prelim. affirm. deter. of sales at less-than-fair-value, postponement of final deter., and ext. of provisional measures); *Aluminum Extrusions from the People's Republic of China*, 89 Fed. Reg. 80,506 (Dep't Commerce Oct. 3, 2024) (final affirm. deter. of sales at less than fair value); *see also Borlem S.A.-Empreedimentos Industriais v. United States*, 13 CIT 535, 541, 718 F.Supp. 41, 46 (Ct. Int'l Trade 1989) (taking judicial notice of Commerce determination).

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

eliminate those responses from consideration. *See* ITC Opp. at 36; Kingtom Opp. at 14. Rather, Plaintiffs' point is that the Commission itself recognized limitations in preliminary questionnaire data for one purpose but not for another. And with roughly [    ] of such data outstanding, the Commission's preliminary data set was far from "comprehensive and complete." *Cf. Ranchers-Cattlemen*, 23 CIT at 893, 74 F.Supp.2d at 1365 (ITC Opp. at 13) (affirming determination based on "complete, comprehensive and reliable information"); *Comm. for Fair Coke Trade v. United States*, 28 CIT 1140, 1163 (2004) (ITC Opp. at 34) (affirming determination based on "approximately 80% of U.S. imports ... and *virtually all* U.S. imports from Japan"—whose "accuracy is *undisputed*"); *Torrington Co. v. United States*, 16 CIT 220, 223, 790 F. Supp. 1161, 1167 (1992) (ITC Opp. at 37) (affirming determination based on "an estimated 74%" of imports, including "usable responses from *nearly all* of the major producers").

Because *American Lamb* "weight{s} the scales in favor of affirmative and against negative determinations," a [          ] on outstanding data weighs against a negative determination. 785 F.2d at 999; *accord Dry Film Photoresist from Japan*, Inv. No. 731-TA-622, USITC Pub. 5222 (Aug. 1992) (Prelim.) ("Where there is a question as to what the evidence would show in a final investigation, I give all benefit of doubt to the Petitioner, as instructed by the statute.").

### 5.    At minimum, the record demonstrated the potential for imminent non-negligibility.

Finally, there is no dispute that Dominican imports grew at a faster rate than in any other subject country in the three years preceding the investigation, Staff Report at IV-12 (Table IV-2), demonstrating at minimum "*a potential*" that Dominican imports would continue to grow and "imminently account for more than 3 percent" of total subject imports, 19 U.S.C. § 1677(24)(A)(iv). The Commission's arguments in opposition pull at individual threads, without adequately addressing the larger picture that a [        ] percent growth trajectory is further

evidence that non-negligibility, or imminent non-negligibility, was distinctly possible, particularly on a final-phase record that was likely to provide additional and potentially different information.

For example, the Commission counters that the [      ] percent increase in Dominican imports between 2020 and 2022 was among primary HTS imports, not the non-primary HTS codes that the Commission incorporated via questionnaires.  *See* ITC Opp. at 40.  But, those primary HTS codes capture imports of merchandise that is largely, if not completely, subject.   In determining whether subject imports are likely to grow, such a rapid and steep increase in imports classified under the primary codes is highly instructive.

The Commission further counters that a growth trajectory over three years is immaterial because "the Commission was required to consider the 12-month period dictated by the statute to calculate negligibility."  *Id.*  But this is not a simple negligibility calculation.  This is an inquiry into whether imports may imminently exceed the negligibility threshold, which necessarily looks at longer trends and broader data.  *See id.* at 43 (comparing Dominican imports in 2020, 2021, 2022, and interim 2023); *accord* USITC Pub. 5510 (finding, while Chinese imports accounted for 1.2 percent of total imports during the 2023-2024 negligibility period, capacity increases in 2021, 2022, and 2023 suggested potential for further growth).   Within the negligibility period, the Commission argues the observed "surge {in Dominican imports} was largely just the Dominican industry returning to normal operations after a disruption" in interim 2022.  ITC Opp. at 41.  But a _growth_ in imports year over year cannot be fairly characterized as a "return to normal."

More fundamentally, the same limitations that inflated the Commission's negligibility denominator impacted the Commission's "threat of injury" analysis as well.  The argument that "subject imports exceeded 3 percent of total imports on a monthly basis only in July 2023" is only true using adjusted data.  *Id.* at 42; Views at 61.  Likewise, the argument that Dominican imports

BUSINESS PROPRIETARY INFORMATION
                  HAS BEEN DELETED                              NON-CONFIDENTIAL VERSION

"would have needed to be [       ] percent higher to have accounted for 3 percent of the [       ]

short tons of total imports" overlooks that the Commission's denominator was indisputably

inflated.  ITC Opp. at 45.  Put differently, the Commission's entire framework for determining

what it would take for Dominican imports to exceed the negligibility threshold was skewed by the

same limited-coverage, inflated data that underlay its negligibility determination.  Because those

limitations created an obvious potential for contrary data to arise in a later investigation, on top of

which Dominican imports were demonstrably on a meteoric rise, the Commission's threat analysis

independently lacks a rational basis in fact.

### C.    The Commission's Termination Decision Was Not in Accordance with Law

Nor was the Commission's decision to terminate the investigation in accordance with law.

The Commission must provide a "reviewable, reasoned basis" for its determinations.  *Bando Chem.*

*Indus., Ltd. v. United States*, 787 F.Supp. 224, 227 (Ct. Int'l Trade 1992).  Put differently, to "pass

muster under the arbitrary and capricious standard," the Commission must "articulate a satisfactory

explanation for its action including a rational connection between the facts found and the choice

made."  *State Farm*, 463 U.S. at 43, 56.  The Commission fails to meet its burden when it "entirely

fail{s} to consider an important aspect of the problem."  *Id.* at 43.  In the context of a negligibility

determination, such consideration requires at least "a candid recognition of and response to

inherent limitations in {the Commission's} data and methodology."  *Nucor Fastener Div. v. United*

*States*, 37 CIT 749, 755 (2013) (summarizing *Nucor*, 35 CIT at 1090, 791 F.Supp.2d at 1285).

For the reasons discussed above, the Commission did not have a rational basis for its

negligibility determination.  But even if it had, that rationale was not adequately explained.  The

sum total of the Commission's consideration under *American Lamb* was this:

> Further adjustments to data for subject imports from the Dominican Republic or
> total imports are possible.  Nonetheless, any such changes are unlikely to increase

BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

subject imports from the Dominican Republic as a share of total imports from [    ] percent based on the record of the preliminary phase of the investigations to the 3 percent required for them to be found not negligible.

FN194: We note that the adjustments made in this preliminary phase decreased the volume of subject imports from the Dominican Republic and increased the volume of total imports of aluminum extrusions.

Views at 60 & n.194. "Accordingly," the Commission concluded, "no likelihood exists for contrary evidence concerning the level of subject imports from the Dominican Republic to arise in any final phase of these investigations that would make them non-negligible for purposes of present material injury." *Id.* at 60–61.

That is not a reasoned determination. *First*, past is not prologue, *i.e.*, the fact that the Commission preliminarily adjusted the Dominican import share downward does not explain why *future* evidence would have "no likelihood" of increasing the Dominican import share. To the contrary, it recognizes that the Commission's own adjustments resulted in a lower percentage of Dominican imports; if those adjustments were performed differently in the final phase (*e.g.*, on the basis of different data received), the percentage of Dominican imports was likely to increase. *Second*, in basing its determination solely on its own adjustments, without *any* acknowledgement of those adjustments' inaccuracies and limitations, the Commission failed to consider an important aspect of the problem. *Third*, apparently recognizing as much, the Commission's brief is replete with rationalizations not expressed in the agency's Views. As noted above, however, "*post hoc* rationalizations" must be rejected. *State Farm*, 463 U.S. at 50. Because the Commission's "no likelihood" determination was inadequate and circular, did not address *any* of the obvious issues with preliminary data that created a likelihood of contrary evidence in a final phase, and cannot be supplemented with new arguments on appeal, it should be remanded.

BUSINESS PROPRIETARY INFORMATION
                        HAS BEEN DELETED

### 1. The Commission's brief, circular discussion is not a "reasoned basis" for its determination.

The Commission's three-sentence analysis is not a "reasoned basis" for its determination—nor even one from which the agency's "path may reasonably be discerned." *See Bowman*, 419 U.S. at 285–86. Sentence One recognizes that further adjustments to both the numerator and denominator are possible. Views at 60. Sentence Two posits that such adjustments "are unlikely" to increase the Dominican import share "based on the record of the preliminary phase of the investigations." *Id.* And Sentence Three (in footnote) presumably explains what the Commission meant by the "record of the preliminary phase": namely, that the Commission's preliminary adjustments had "decreased the volume of subject imports from the Dominican Republic and increased the volume of total imports of aluminum extrusions." *Id.* In other words, because the Commission adjusted the Dominican import share downward—using facially inaccurate data, that represented only [      ] of subject imports, and that could change dramatically in response to corrective instructions or formal modifications of the scope—the Commission assumed the other [      ] of outstanding data would result in more of the same.

That is not a rational determination in the abstract. And it certainly is not in accordance with *American Lamb*. *See* 785 F.2d at 999; *see also Nucor*, 35 CIT at 1088, 791 F.Supp.2d at 1283 (reversing negative preliminary injury determination: "To the extent that the agency's path may nonetheless reasonably be discerned, that path appears to involve casual conflation of a limited sample with the larger population from which that sample is drawn.").

### 2. The Views failed to address material limitations.

Even taking the Commission's circular explanation at face value—*i.e.*, that prior adjustments resulting in negligibility are predictive of future data trends—the Views fail entirely to acknowledge those adjustments' limitations. This is not a situation where Plaintiffs alone take

issue with the Commission's data.  Rather, the inaccuracies and limitations underlying the Commission's adjustments were indisputable on their face.  *See* Views at 56 (noting "low coverage afforded by importer questionnaire responses"); Staff Report at IV-1 n.3 (noting likelihood that questionnaire data was "over-inclusive"); *id.* at I-8 n.18 (noting Commerce's "concerns related to the administrability of certain provisions in the proposed scope" and "possibility of making additional modifications").  Nor is there any doubt that those inaccuracies directly reduced the Dominican import share.  Indeed, that is the entire basis for the Commission's determination.  *See* Views at 60 n.194.

Obviously, the Commission adjusted the Dominican import share downward.  But without any acknowledgment that those adjustments were based, *e.g.*, on facially inaccurate data, the Commission's stated basis for its determination is necessarily arbitrary.  *See Nucor*, 35 CIT at 1090, 791 F.Supp.2d at 1285 ("{A} negative preliminary injury determination must still possess 'a rational basis in fact.' … In the necessarily imperfect world of antidumping and countervailing duty determinations, that basis must include at least a candid recognition of and response to inherent limitations.").[8]

### 3.    The Commission's *post hoc* rationalizations confirm the Views' inadequacy.

Implicitly conceding that the Views left too much to the imagination, the Commission has prepared entirely new explanations for its determination on appeal.  Indeed, all of Section V.B.7 is *post hoc* explanation of what the Commission *could* have offered in support of its determination.

---

[8]    The Commission contends *Nucor* is distinguishable because, there, the Commission treated "incomplete data as comprehensive."  ITC Opp. at 36–37.  But that is precisely what it has done here.  While the Commission "acknowledged {some} limitations of the questionnaire data" in explaining why it would not rely on such data to calculate negligibility, *see id.* at 37, it did not acknowledge *any* such limitations in basing its "no likelihood" determination on the effects of questionnaire data alone.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

*See* ITC Opp. at 31–34.  The Commission argues preliminary questionnaire data did not report Dominican imports under non-primary HTS numbers, lessening the likelihood that further questionnaire data would grow the negligibility numerator, *id.* at 32—a rationale that is nowhere to be found in the Views.  The Commission discusses questionnaire responses from Kingtom and certain importers of Dominican subject imports, *id.*—none of which were discussed in the Views.  As discussed above, the Commission also newly speculates that [          ] and other importers may not have been able to provide more accurate data in the final phase, *see id.* at 33–34—another rationale that is nowhere in the Views.  Which is to say nothing of the Commission's new determination that [          ]'s data was a "reasonable estimate" of subject imports under 19 U.S.C. § 1677(24)(C).  Despite pervading the Commission's argument on appeal, *see* ITC Opp. at 2, 4, 15–17, 20, 24, neither the phrase "reasonable estimate" nor Section 1677(24)(C) appears even once in the Views.

Because the Commission's new defenses of its determination were not expressed below, they cannot salvage the agency's original inadequate explanation.

## IV.    CONCLUSION

For all of the reasons above, and those in our opening brief, Plaintiffs respectfully request that this Court remand the Commission's preliminary determination.

Ct. No. 23-00270                                    NON-CONFIDENTIAL VERSION

Respectfully submitted,

/s/ Robert E. DeFrancesco, III
Robert E. DeFrancesco, III, Esq.
Alan H. Price, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the U.S. Aluminum Extruders
Coalition and the United Steel, Paper and
Forestry, Rubber, Manufacturing, Energy,
Allied Industrial and Service Workers
International Union*

Dated: October 15, 2024

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 6,984 words.

_/s/ Robert E. DeFrancesco, III_
(Signature of Attorney)

Robert E. DeFrancesco, III
(Name of Attorney)

U.S. Aluminum Extruders Coalition and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union
(Representative Of)

October 15, 2024
(Date)